2022-1559

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

TEJA RAVI,
Plaintiff-Appellant,

v.

THE UNITED STATES,
Defendant-Appellee.

# BRIEF FOR DEFENDANT-APPELLEE

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

ERIC P. BRUSKIN
Assistant Director

MEEN GEU OH
Senior Trial Counsel
Commercial Litigation Branch
Civil Division, Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-0184
Fax: (202) 305-7644
Meen-Geu.Oh@usdoj.gov

Attorneys for Defendant-Appellee

Of Counsels:

BRETT J. HERTEL
LAUREN ALLEN
Office of the General Counsel
U.S. Customs & Border Protection

September 2, 2022

**TABLE OF CONTENTS**


INTRODUCTION ....................................................................................................1

STATEMENT OF THE ISSUES...............................................................................3

STATEMENT OF THE CASE SETTING OUT RELEVANT ..............................3

I. Nature Of The Case ..........................................................................................3

II. Legal Background ...........................................................................................3

III. Visa-Mill Universities And Their Defiance Of Immigration Law...........6

IV. Government Officials Certify Operation Paper Chase, Authorizing The Creation Of An Undercover Visa-Mill University Called The University Of Farmington To Investigate And Expose Visa Fraud.........8

V. Farmington's Early Investigative Phase And Mr. Ravi's Involvement...12

VI. After The Conclusion Of The Investigation, Mr. Ravi Leaves The Country And Demands That The Government Return His Money Under A Breach Of Contract Theory, But The Trial Court Dismisses His Complaint ...........................................................................................16

SUMMARY OF ARGUMENT ...............................................................................18

ARGUMENT ..........................................................................................................20

I. Standards Of Review ........................................................................................20

II. The Sovereign Capacity Doctrine Bars Mr. Ravi's Contract Action.......21

A. The Tucker Act And The Sovereign-Capacity Doctrine ....................21

B. The Trial Court Correctly Applied The Sovereign-Capacity Doctrine To The Contract Alleged In Mr. Ravi's Complaint ............................25

III. The Court Can Affirm The Trial Court's Dismissal On Alternative Grounds ..............................................................................................30

A. The Complaint Sounds In Tort, Which Is Outside The Trial Court's Jurisdiction ........ 30

B. Mr. Ravi Has Not Plausibly Pleaded All Necessary Elements To Establish A Tucker Act Contract Claim For Educational Services, Nor Can He ........ 33

CONCLUSION ........ 39

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Aetna Cas. & Sur. Co. v. United States*,
655 F.2d 1047 (Ct. Cl. 1981)....................31

*Aluminum Shapes, LLC v. United States*,
139 Fed. Cl. 709 (2018)....................2,23

*Awad v. United States*,
61 Fed. Cl. 281 (2004).................... 2, 22, 23

*Baha v. United States*,
144 Fed. Cl. 500 (2019)....................34

*Bailey v. United States*,
54 Fed. Cl. 459 (2002)....................28

*Bank of Guam v. United States*,
578 F.3d 1318 (Fed. Cir. 2009)....................21

*Banks v. United States*,
741 F.3d 1268 (Fed. Cir. 2014)....................21

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .................... 21, 36

*Biltmore Forest Broad. FM, Inc. v. United States*,
555 F.3d 1375 (Fed. Cir. 2009)....................20

*City of Cincinnati v. United States*,
153 F.3d 1375 (Fed. Cir. 1998)....................33

*City of El Centro v. United States*,
922 F.2d 816 (Fed. Cir. 1990)....................33

*Collins v. United States*,
532 F.2d 1344 (Ct. Cl. 1976)....................34

*Dakota Tribal Indus. v. United States,*
34 Fed. Cl. 295 (1995)....................31

*Degenaars Co. v. United States*,
2 Cl. Ct. 482 (1983)....................30

*Folden v. United States,*
379 F.3d 1344 (Fed. Cir. 2004)....................20

*Frigard v. United States*,
862 F.2d 201 (9th Cir. 1988)....................32

*Ga. Cas. & Surety Co. v. United States*,
823 F.2d 260 (8th Cir. 1987)....................32

*Glaxo Grp. Ltd. v. TorPharm, Inc.*,
153 F.3d 1366 (Fed. Cir. 1998)....................30

*Gould, Inc. v. United States*,
935 F.2d 1271 (Fed. Cir. 1991)....................21

*H.F. Allen Orchards v. United States*,
749 F.2d 1571 (Fed. Cir. 1984)....................33

*Hercules Inc. v. United States*,
516 U.S. 417 (1996)....................34

*Jumah v. United States,*
90 Fed. Cl. 603 (2009)....................36

*Kania v. United States*,
650 F.2d 264 (Ct. Cl. 1981).................... 2, 22, 24

*Kellogg Brown & Root Servs., Inc. v. United States*,
99 Fed. Cl. 488 (2011), *aff'd*, 728 F.3d 1348 (Fed. Cir. 2013), *opinion corrected on denial of reh'g*, 563 F. App'x 769 (Fed. Cir. 2014)....................35

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994)....................21

*Lumbermens Mut. Cas. Co. v. United States*,
654 F.3d 1305 (Fed. Cir. 2011) ....................34

*Morris v. United States*,
33 Fed. Cl. 733 (1995) ....................31

*Moyer v. United States*,
190 F.3d 1314 (Fed. Cir. 1999) ....................21

*Mt. Homes, Inc. v. United States*,
912 F.2d 352 (9th Cir. 1990) ....................31

*Outlaw v. United States*,
116 Fed. Cl. 656 (2014) ....................32

*Perez v. United States*,
156 F.3d 1366 (Fed. Cir. 1998) ....................35

*Phang v. United States*,
87 Fed. Cl. 321 (2009), *aff'd sub nom. Phu Mang Phang v. United States*,
388 F. App'x 961 (Fed. Cir. 2010) ....................32

*Piotrowski v. United States*,
No. 13-760C, 2014 WL 7476033 (Fed. Cl. Dec. 30, 2014),
*aff'd*, 722 F. App'x 982 (Fed. Cir. 2018) ....................32

*Ravi v. United States*,
158 Fed. Cl. 775 (2022) ....................3

*Redmond v. U.S. S.E.C.*,
518 F.2d 811 (7th Cir. 1975) ....................32

*Reforestacion de Sarapiqui v. United States*,
26 Cl. Ct. 177 (1992), *aff'd*, 985 F.2d 583 (Fed. Cir. 1992) ....................31

*Rexnod Indus., LLC v. Kappos*,
705 F.3d 1347 (Fed. Cir. 2013) ....................30

*Sadeghi v. United States*,
46 Fed. Cl. 660 (2000) ....................23

*Seuss v. United States*,
535 F.3d 1348 (Fed. Cir. 2008) ........................................................................33

*Shearin v. United States*,
992 F.2d 1195 (Fed. Cir. 1993) ........................................................................21

*Silva v. United States*,
51 Fed. Cl. 372, 377 (2002), *aff'd*, 51 F. App'x 12 (Fed. Cir. 2002)........... *passim*

*Sorrells v. United States*,
287 U.S. 435 (1932) ........................................................................................27

*Trudeau v. United States*,
68 Fed. Cl. 121 (2005), *aff'd*, 186 F. App'x 998 (Fed. Cir. 2006).................. 2, 23

*United States v. Bharath Kakireddy*,
No. 19-cr-29926, Indictment, ECF No. 1 (E.D. Mich. Jan. 15, 2019)...................6

*United States v. Neustadt*,
366 U.S. 696 (1961) ........................................................................................30

*United States v. Salman*,
378 F.3d 1266 (11th Cir. 2004) ..........................................................................5

*Utley v. Donaldson*,
94 U.S. 29 (1876) ............................................................................................34

*Villars v. United States*,
126 Fed. Cl. 626 (2016)....................................................................................36

*Yifrach v. United States,*
145 Fed. Cl. 691 (2019), *aff'd*, 825 F. App'x 899 (Fed. Cir. 2020)......................28

*Young Dong Kim v. Holder*,
737 F.3d 1181 (7th Cir. 2013) ............................................................................5

*Zhu v. Dep't of Homeland Sec.*,
No. 2:18-489, 2019 WL 4261167 (W.D. Wash. Sept. 9, 2019)..........................37

**Statutes**

8 U.S.C. § 1101(a) ....................4, 7

8 U.S.C. § 1363a ....................10

8 U.S.C. § 1363a(a) ....................11

19 U.S.C. § 2081 ....................10

19 U.S.C. § 2081(a)(3) ....................11

26 U.S.C. § 7608(c) ....................10

28 U.S.C. § 533 ....................10

Public Law 102-395 § 102(b) ....................10

Public Law 108-447, div. B, title I, § 116 ....................10

Tucker Act,
28 U.S.C. § 1491(a) .................... *passim*

**Regulations**

8 C.F.R. § 214.2(f) .................... *passim*

**Other Authorities**

*Restatement (Second) of Torts* § 525 (1977) ....................32

U.S. Dep't of State, Foreign Affairs Manual, § 9 FAM 102.1-2 ....................4

## INTRODUCTION

This is a breach of contract case arising from an undercover law enforcement operation. The plaintiff-appellant, Teja Ravi,[1] is an Indian national who came to the United States on a student visa in 2015. In 2018, Mr. Ravi became an administrative target in a Department of Homeland Security (DHS) undercover investigation designed to expose visa fraud. That investigation involved the use of a fake, law-enforcement-created visa-mill university called the University of Farmington (Farmington), which provided enrollees with fake immigration documents in exchange for "tuition" payments—mimicking a scheme commonly known as an illegal pay-to-stay scheme. Over the course of a year in which he received no classes or coursework, Mr. Ravi remitted a dozen distinct payments to the fake university in exchange for immigration documents that permitted him to work in the United States. Mr. Ravi was not aware during this time that the individuals who accepted his "tuition" payments were undercover law enforcement agents. When the Government finally closed its investigation and began making arrests, Mr. Ravi left the country. Now back in India, Mr. Ravi

[1] Teja Ravi's legal name is "Ravi Teja Tiyagurra." *E.g.*, Appx426 n.1. Before the trial court, Mr. Ravi used the name "Teja Ravi." Accordingly, throughout the case below, the parties and the trial court referred to him by that name. For consistency, we will continue to refer to Mr. Tiyagurra as Mr. Ravi throughout this brief.

presents himself as an "unwitting victim" of the operation, and demands the return of his payments under a breach of contract theory.

The United States Court of Federal Claims dismissed Mr. Ravi's complaint for lack of subject-matter jurisdiction based on the sovereign capacity doctrine. That doctrine bars contract claims that arise out of lawful "criminal" or "civil enforcement actions . . . that could only be undertaken by the sovereign" unless there has been a "clear[]" and "unmistakable waiver of sovereign immunity." *Aluminum Shapes, LLC v. United States*, 139 Fed. Cl. 709, 714 (2018); *Trudeau v. United States*, 68 Fed. Cl. 121, 127 (2005) (citing *Kania v. United States*, 650 F.2d 264, 268 (Ct. Cl. 1981); *Silva v. United States*, 51 Fed. Cl. 372, 377 (2002), *aff'd*, 51 F. App'x 12 (Fed. Cir. 2002)), *aff'd*, 186 F. App'x 998 (Fed. Cir. 2006); *see also Awad v. United States*, 61 Fed. Cl. 281, 284 (2004). Farmington was indisputably part of a law enforcement operation that could only be undertaken by the Government and there was no express waiver of sovereign immunity, so the trial court's decision is correct. The government also sought dismissal of the complaint because it sounds in fraud and falls outside the scope of the court's Tucker Act jurisdiction, and because the complaint fails to plead a plausible breach of contract. The trial court dismissed the case, however, without reaching these alternative grounds for affirmance.

## STATEMENT OF THE ISSUES

1. Whether the sovereign-capacity doctrine bars the trial court from adjudicating Mr. Ravi's breach of contract claim.

2. Whether the trial court has jurisdiction under the Tucker Act to consider Mr. Ravi's complaint, which alleges manipulation, deception, and fraudulent conduct, and therefore sounds in fraud, not contract.

3. Whether Mr. Ravi has plausibly alleged two necessary elements of his contract claim: (1) that there was mutuality of intent to enter into an educational services contract; and (2) that undercover agents—acting solely in their law-enforcement capacity—had authority to enter into a contract for the Government to provide him with educational services.

## STATEMENT OF THE CASE SETTING OUT RELEVANT FACTS

### I. Nature Of The Case

Mr. Ravi appeals the trial court's judgment in *Ravi v. United States*, 158 Fed. Cl. 775 (2022), Appx425-451, dismissing his complaint for lack of subject-matter jurisdiction under the sovereign-capacity doctrine.

### II. Legal Background

"The laws of the United States generally require foreign citizens to obtain a visa before entering the country." Appx427. A visa is an endorsement (within a passport) that grants the holder official permission to enter, leave, or stay in the

United States for a specified time period. *See* U.S. Dep't of State, Foreign Affairs Manual, § 9 FAM 102.1-2 (hereafter FAM), available at https://fam.state.gov/FAM/09FAM/09FAM010201.html (last accessed Jun. 8, 2022). One type of visa the United States offers to foreign citizens is the F-1 non-immigrant academic visa (F-1 visa), which is sometimes called a student visa. Appx427 (citing 8 U.S.C. § 1101(a)(15)(F)(i)). In basic terms, the "F-1 visa allows nonimmigrant foreign citizens to come to the United States for a specified time period to pursue a 'full course of study' at an approved educational institution." *Id*. (citing 8 U.S.C. § 1101(a)(15)(F)(i)).

The F-1 visa comes with certain requirements. First, to establish eligibility for the visa, the individual "must apply and be accepted to a school certified by the Student and Exchange Visitor Program (SEVP), which is overseen and administered by the Department of Homeland Security (DHS)." Appx428; *see* U.S. Dep't of State, Bureau of Consular Affairs, Student Visa Page, available at https://travel.state.gov/content/travel/en/us-visas/study/student-visa.html (last accessed Jun. 8, 2022). "SEVP schools are authorized to issue students a 'Certificate of Eligibility for Nonimmigrant Student Status,' otherwise known as a Form I-20, which demonstrates that the holder meets all standards of admission for the school and has been accepted for a full course of study." Appx428 (citing 8 C.F.R. § 214.2(f)(1)(i)(A)). Second, upon receiving a Form I-20, the individual

must complete an F-1 visa application and typically must attend an interview at the United States Embassy or Consulate in the country where the applicant resides. 1 Austin T. Fragomen & Careen Shannon, Immigr. Proc. Handbook, Ch. 2, § 2:19 (Jun. 2021). Third, "if granted an F-1 visa," the individual "must pursue a full course of study for the entire time period specified in the visa (subject to certain exceptions not relevant here)." Appx428 (citing 8 C.F.R. § 214.2(f)(5)(i)).

This last requirement—the "full course of study" requirement—has important legal implications. F-1 visas are time-limited and circumstance-specific permissions of entry. By law, if the F-1 visa holder is no longer making normal progress toward completing a course of study, stops attending school, or takes less than a full course load without authorization, that individual is deemed out of status and *must* leave the country within 15 days.[2] *See id*. (citing 8 C.F.R. § 214.2(f)(5)(iv); *United States v. Salman*, 378 F.3d 1266, 1267 n.1 (11th Cir. 2004) (explaining that F-1 visas are only valid for the "'duration of status'—that is, as long as the visa holder pursues a full course of study at an educational

---

[2] DHS manages foreign citizen students through an internet-based data system called the Student and Exchange Visitor Information System (SEVIS). SEVIS provides school and Government officials, including immigration officials, with access to current information on nonimmigrant foreign citizen students, including the school where the individual is enrolled. *See, e.g.*, *Young Dong Kim v. Holder*, 737 F.3d 1181, 1182 n.2 (7th Cir. 2013) (describing the SEVIS database); U.S. Immigration and Customs Enforcement, *SEVIS Overview* https://www.ice.gov/sevis/overview (last visited Jun. 11, 2022).

institution").[3] Likewise, student visa holders who complete their approved course of study are required to return to their home countries within 60 days of completing their approved study program. *See* Appx428 (citing 8 C.F.R. § 214.2(f)(5)(iv)).

## III. Visa-Mill Universities And Their Defiance Of Immigration Law

Visa-mill universities undermine the integrity of the F-1 visa program by creating illegal "pay to stay" schemes, whereby academic recruiters collaborate with for-profit educational institutions to help obtain F-1 visas (or maintain F-1 visa status) for foreign "students" who have no intention of pursuing legitimate educational goals. *See, e.g.*, *United States v. Bharath Kakireddy*, No. 19-cr-29926, Indictment, ECF No. 1 (E.D. Mich. Jan. 15, 2019), located at Appx310-334. Under these arrangements, the foreign national typically pays a recruiter to make it appear as if the foreign national is paying tuition, attending classes, or pursuing a legitimate educational internship when that is not actually the case. *See* Appx317-318. The collaborating educational institution then creates false records for foreign nationals meant to deceive Federal immigration authorities in exchange for these "tuition" payments. *See* Appx318.

---

[3] "A 'full course of study' is defined in detail in 8 C.F.R. § 214.2(f)(6), which generally requires a certain number of credit or clock hours depending on the type of educational program attended under a student visa." Appx428 n.2.

The F-1 visa program is an oft-used vehicle to effectuate such "pay to stay" schemes. That is because, under specified circumstances, it permits its visa holders to work for pay in addition to participating in their course of study, sometimes in the form of an arrangement called curricular practical training or CPT. *See* Appx428 (citing 8 C.F.R. § 214.2(f)(10)(i)). But CPT does not displace the requirement for the individual to be a full-time student. CPT regulations require that these work opportunities be "an integral part of an established curriculum" "offered by sponsoring employers through cooperative agreements with the school." 8 C.F.R. § 214.2(f)(1)(i). Accordingly, those deemed eligible for such an arrangement must obtain a special Form I-20 from their institution that specifies that the holder is approved for CPT while pursuing a full course of study, *id.*, and the relevant I-20 will identify a specific end-date for that privilege, *e.g.*, Appx253.

Pay-to-stay arrangements exploit programs meant to aid foreign students seeking an education in the United States. They also undermine the U.S. immigration system by allowing foreign nationals who are no longer in the United States legally to avoid removal proceedings and overstay their visas. *See* 8 U.S.C. § 1101(a)(15)(F)(i) (explaining that the F-1 visa program offers admission to the United States to only "*bona fide* student[s]" who intend to return to their home countries once their "full course of study" is complete). At their worst, pay-to-stay schemes pose a potential national security risk by enabling certain foreign

nationals to enter and stay in the country despite having no legitimate interest in studying here. *See* Appx161.

## IV. Government Officials Certify Operation Paper Chase, Authorizing The Creation Of An Undercover Visa-Mill University Called The University Of Farmington To Investigate And Expose Visa Fraud

"In December 2014, in consultation with the United States Attorney's Office in the Eastern District of Michigan, government officials devised a three-year law enforcement strategy called Operation Paper Chase." Appx429 (trial court opinion (referring to Appx456, ¶ 8)). "Operation Paper Chase was a certified undercover law enforcement operation designed to target individuals fraudulently maintaining their student visa status while working in the United States, without having attended classes or maintain[ing] a full course of study, by paying tuition to a collaborating educational institution in exchange for a Form I-20 authorizing CPT." Appx429 (referring to Appx456, ¶ 8, Appx102, and Appx28, ¶ 1). "The day-to-day aspects of the operation were carried out by special agents of Homeland Security Investigations (HSI) in U.S. Customs and Immigration Enforcement (ICE)," Appx429 (referring to Appx456-457, ¶¶ 8-9 and Appx28, ¶ 1), which is part of DHS.[4]

[4] Operation Paper Chase was a discrete subpart of a larger and more expansive undercover operation. *See* ECF No. 19 at 6-7; *see also* Appx71 (referring to Operation Paper Chase as an "enhancement" and "expansion"). This larger operation is a multi-programmatic undercover effort, also led by HSI, aimed at exposing a number of other related Federal crimes. *See id*.

The setting for the operation was a fictitious HSI-created university called the University of Farmington (Farmington), which agents presented "as a State of Michigan licensed and nationally accredited private university." *See* Appx429 (quoting, Appx164, and citing Appx456-457, ¶¶ 8-9 and Appx28, ¶ 1). "To set up the operation, HSI agents secured an undercover [] storefront" to serve as Farmington's physical location. Appx164. "The storefront [wa]s in a commercial office building in the greater metropolitan Detroit area and [wa]s staffed fulltime by HSI Detroit U[nder] C[over] A[gents]." *Id*. Farmington was never an actual school, nor did it provide any educational services. Appx456-457, ¶ 9. Nevertheless, to ensure proper appearances, "[t]he school" assigned undercover agents to "maintain[] a website and a significant and active social media presence." Appx164.

Because the central purpose of the operation was to identify foreign citizens seeking to violate immigration laws, and expose a surrounding network of illicit recruiters, undercover agents "took efforts to ensure that individuals who enrolled at the University were aware that [Farmington] was a 'pay to stay' scheme solely to [enable them] to maintain their [] F-1 [] status and to receive employment authorization through CPT." Appx457, ¶ 10. These efforts included, in part, telling enrollees that the "school is not a legitimate school and only for those seeking a student visa without requiring them to attend any classes," Appx69; *see*

Appx457, ¶ 11; *e.g.*, Appx259 (informing Mr. Ravi that his "special arrangement" was "illegal" and should be kept secret or else those involved could "get in trouble"); Appx336 ("[T]his arrangement is not legal, you know?"). The operation also limited enrollment to those seeking a second master's degree or inter-school transfers—not new foreign nationals—to ensure that Farmington enrolled only those experienced with F-1 visa requirements. Appx458, ¶ 13. Prospective enrollees conveying an actual interest in meeting the terms of their F-1 visa requirements were denied admission and "referred to a[nother] local school which ha[d] been vetted by HSI and SEVP." Appx69; *see* Appx457, ¶ 10.

To ensure that the operation met legal requirements, HSI followed the certification procedures laid out in two statutes: 8 U.S.C. § 1363a and 19 U.S.C. § 2081. These statutes authorize ICE agents, in furtherance of their undercover investigative work, to lease (and sometimes purchase) commercial spaces, "establish or acquire" commercial entities, and otherwise "operate" these "entities on a commercial basis" to achieve their undercover objectives.[5] Both 8 U.S.C. §

[5] Various law enforcement agencies have their own statutory authority for undercover operations, which are similar to the ones at issue here. *E.g.*, 26 U.S.C. § 7608(c) (Internal Revenue Service); 28 U.S.C. § 533 note (explaining that the Federal Bureau of Investigation and the Drug Enforcement Agency were conferred such authority in Public Law 102-395 § 102(b), and that Public Law 108-447, div. B, title I, § 116 later extended the same authority to the Bureau of Alcohol, Tobacco, Firearms and Explosives).

1363a(a)(4) and 19 U.S.C. § 2081(a)(3) provide that "the proceeds from the undercover operation may be used to offset necessary and reasonable expenses incurred in such operation without regard to the provisions of section 3302(b) of Title 31," which normally requires law enforcement to itemize and account for retained proceeds.

Beginning in 2015, and through and including 2019, HSI received the necessary certifications to execute Operation Paper Chase. The Executive Associate Director for HSI, exercising delegated authority from the Secretary of DHS (Appx285-297), reviewed and approved (and then, where necessary, reapproved) all procedures and operations. Appx59; Appx84; Appx122; Appx156; Appx229. Each authorization request explained the operation in detail, included mission objectives, and outlined what progress agents had made. Appx59-247.[6] In addition to this vetting process, the United States Attorney's Office in the Eastern District of Michigan continued to provide regular oversight of the undercover operation as it unfolded. Appx164; Appx217-219; Appx302-308.

[6] HSI case agents also consulted with Department of Justice headquarters to ensure its investigation complied with legal requirements, and to supplement HSI's own internal Undercover Review Committee process. Appx298-301; Appx309.

## V. Farmington's Early Investigative Phase And Mr. Ravi's Involvement

Soon after Farmington was established, undercover agents were approached by an individual named Avinash Thakkallapally, an Indian citizen who came to the United States under an F-1 visa in 2015. Appx334. At the time, Mr. Thakkallapally attended Harrisburg University, which identifies itself as an SEVP participating school. *Id*. In that encounter, and going by the alias "Vinith Errabelli," Mr. Thakkallapally asked an undercover agent whether he could enroll at Farmington without attending classes to fraudulently maintain his immigration status. Appx335; Appx339. The following conversation ensued:

> Undercover Agent: Let me ask you another question. Are you….. looking to actually go to classes or are you just looking to just maintain your status?
>
> Thakkallapally: I am just looking to maintain my status.
>
> Undercover Agent: So you don't want to go to a class or anything like that?
>
> Thakkallapally: Exactly.
>
> Undercover Agent: Ok. Listen I can help you out but obviously, you know… this arrangement is not legal, you know?
>
> Thakkallapally: Yeah.
>
> Undercover Agent: You understand that? I mean I could bring you in with no classes…and give you Day 1 CPT but obviously it's not legal so it has to stay between us. You know?
>
> Thakkallapally: Yeah. I not tell to anybody.
>
> Undercover Agent: Are you comfortable with that arrangement?

Thakkallapally: Yeah.

Appx336-37. Having received assurances that the arrangement was possible, Mr. Thakkallapally approached Farmington again the next day, this time to ask whether it would be willing to accept referrals in exchange for money, mentioning that he had "lot[s] of friends coming up." Appx337. When asked how much he wanted, Mr. Thakkallapally identified other schools that paid $500 per student for referrals, and Mr. Thakkallapally and the undercover agent agreed to a referral fee of $500 per student. Appx338-39 ("Thakallapally: I tell you. In Harrisburg [U]niversity . . . in NPU [Northwest Polytechnic Institute]…. for one student its $500. Undercover Agent: Ok, I can do $500").

After negotiating that arrangement, Mr. Thakkallapally became a recruiter, referring prospective enrollees to Farmington. Appx338-39. According to public court records, Mr. Thakkallapally "informed his recruits" "[a]t the outset" "there would be no classes and no education." Appx346. He would then call Farmington to refer his clients, "request various actions be taken on behalf of his recruits," and otherwise "update [agents] on his recruiting efforts." Appx460, ¶ 19.

Mr. Ravi, the plaintiff-appellant in this case, was among Mr. Thakallapally's referrals. Appx460, ¶ 18. Like Mr. Thakallapally, Mr. Ravi is an Indian citizen who came to the United States on a F-1 visa in 2015. *Id.* ¶ 17. Prior to enrolling at Farmington, Mr. Ravi was enrolled at NPU. App. Br. 4. Starting in February

2018, however, Mr. Thakallapally submitted an enrollment request to Farmington on Mr. Ravi's behalf. Appx461, ¶ 21; Appx257. He asked Farmington to provide Mr. Ravi with certain documents, including a school identification card and a new Form I-20 *with a CPT endorsement*. Appx461, ¶¶ 21-22; Appx257. As part of the exchange, Mr. Thakallapally indicated that Mr. Ravi had already remitted his first "tuition" payment of $2,500. *Id*. Initially, agents at Farmington sent Mr. Ravi a Form I-20 without a CPT endorsement, but at Mr. Thakallapally's insistence, sent a new one with a CPT endorsement denoting an expiration date of March 31, 2020. Appx461, ¶ 22; Appx253-54. In the seven months that followed receipt of his new Form I-20, Mr. Ravi remitted eight additional payments to Farmington, Appx271-79, despite not attending a single class or being offered any courses.

There is no record of Mr. Ravi ever complaining about or questioning the lack of educational services.[7] In November 2018, however, Mr. Ravi requested directly from undercover agents at Farmington documents pertaining to his visa

[7] Mr. Ravi claims in his brief that he "contacted University Administration to find out why" he had not received classes or assignments and "was told by University officials that the lack of classes or assignments for that semester would not be an issue." App. Br. 6. But he did not allege this in his complaint and does not provide any record citation in his brief in support of this statement. In fact, there is no verifiable evidence of any such communication; incoming and outgoing communications were memorialized by law enforcement agents (either electronically or via audio recording), as one would expect in an undercover operation. And the communications cited in our brief, which are also in the appendix, establish that Mr. Ravi understood that his arrangement with Farmington was illegal.

status. During these communications, the agents told Mr. Ravi repeatedly (via email and through recorded audio) that his "special arrangement" was "illegal," and to keep the arrangement a secret so no one "gets in trouble." Appx259 ("Please remember to keep this 'special arrangement' to yourself so neither you or the school gets into trouble because it is illegal."); Appx269 (audio recording slip sheet) 1:47-2:31; *see also* Appx69 (explaining that as an operational procedure agents would attempt to tell enrollees the "school is not a legitimate school and only for those seeking a student visa without requiring them to attend any classes"). Mr. Ravi, in turn, orally affirmed his understanding of the arrangement, and voiced no complaint. Appx461, ¶ 23; Appx269 (Undercover agent: "And remember to keep this special arrangement to yourself because we could get in trouble, and so could you, because this . . . is not authorized by the Department of Homeland Security. But as long as you don't say anything and we don't say anything we'll be fine." Ravi: "Okay." (audio recording)).

Thereafter, Mr. Ravi continued to participate in his Farmington arrangement, submitting his last recorded payment of $2,500—through four different credit card payments—on January 6, 2019. Appx271 (showing that Mr. Ravi paid his December 2018 "tuition" invoice on January 6, 2019 in four different credit card transactions). That same month, HSI shuttered Farmington and officially closed its investigation.

## VI. After The Conclusion Of The Investigation, Mr. Ravi Leaves The Country And Demands That The Government Return His Money Under A Breach Of Contract Theory, But The Trial Court Dismisses His Complaint

On January 30, 2019, HSI commenced the next phase of Operation Paper Chase by "initiat[ing] a large-scale nationwide enforcement action operation involving the arrest of" hundreds of criminal and administrative targets across 38 states. Appx463, ¶ 27; Appx236. Criminal targets, like Mr. Ravi's recruiter, Mr. Thakkallapally, were arrested and faced criminal charges. Appx310-353 (Indictment and Sentencing Memorandum). Mr. Thakkallapally pled guilty and was convicted and sentenced to prison. Appx326-332 (Judgment). Mr. Ravi, on the other hand, was among the identified administrative targets, and faced administrative arrest and removal proceedings. Appx463, ¶ 27; *see* Appx236. But two days after arrests began, Mr. Ravi left the country. Appx463, ¶ 28 ("February 1, 2019"); Appx281-82.

Upon returning to India, Mr. Ravi filed this action, demanding that the Government return his money. Alleging that he was unaware that Farmington was not an actual educational institution, Mr. Ravi's complaint refers to Farmington as a "fake," a "façade," and a "sham," Appx28-33, ¶¶ 4, 8, 10, 27, and insists that the Government should be held "liable for fraud." *Id*. ¶¶ 15, 27. He nonetheless characterizes his cause of action as a breach of contract, claiming that the

Government should return his money because it never provided him with the educational services he allegedly contracted to receive from Farmington. *See id.*

In response to our initial motion to dismiss, *see* Appx1 (ECF No. 7), Mr. Ravi amended his complaint and then opposed our motion. *Id*. (ECF No. 8). The trial court ordered supplemental briefing on various topics, including the parties' positions on the merits of Mr. Ravi's case. Appx2 (ECF No. 13). After the parties had fully briefed these issues, the trial court held oral argument. *Id*. (ECF Nos. 40 & 51).

On March 16, 2022, the trial court dismissed Mr. Ravi's case for lack of subject-matter jurisdiction, holding that "the sovereign capacity doctrine bar[red it] from hearing Mr. Ravi's contract claims." Appx425-451. The trial court reasoned that its Tucker Act jurisdiction does not extend to purported "contracts entered into by the government 'in its sovereign capacity that do not unmistakably subject the United States to damages in the event of a breach.'" Appx439 (citations omitted). This bar, the trial court explained, extended to "agreements made in the course of criminal proceedings, or over agreements made by the government in administering the criminal justice system," including alleged contracts "arising out of an undercover law enforcement operation," "unless they clearly and unmistakably subject the government to liability for any breach." Appx439-440 (internal citations and quotations omitted). Because Mr. Ravi's complaint and the

"undisputed evidence" confirmed "that the government was acting in its sovereign capacity when undercover agents enrolled Mr. Ravi at Farmington and accepted his tuition payments," Appx452-453, the trial court concluded that "Mr. Ravi cannot assert breach of contract and related claims against the Government in connection" with that purported agreement, Appx454. The trial court entered judgment the same day.

This appeal followed.

## SUMMARY OF ARGUMENT

The trial court correctly concluded that Mr. Ravi's claim is barred by the sovereign-capacity doctrine. That doctrine bars Tucker Act jurisdiction for contract actions that arise out of lawful "criminal" or "civil enforcement actions . . . that could only be undertaken by the sovereign" unless there has been a "clear[]" and "unmistakable waiver of sovereign immunity." Appx439. Here, there is no dispute that undercover agents—who were using vetted and approved law enforcement methods—were acting in a sovereign capacity when they enrolled Mr. Ravi at Farmington and accepted his money. Law enforcement operations, like Operation Paper Chase, are quintessential examples of sovereign action, and breach-of-contract claims challenging the specific undercover methods used in such operations require a clear and unmistakable waiver of sovereign immunity to

be justiciable under the Tucker Act. Because there was no such waiver here, Mr. Ravi's suit is barred by the sovereign capacity doctrine.

Although the court did not reach the other grounds for dismissal advanced by the government, they independently support dismissal of this action. *First*, regardless of how Mr. Ravi characterizes his cause of action, his complaint sounds in fraud, which is a tort, and the Tucker Act does not extend to tort claims. Mr. Ravi's complaint is replete with allegations of fraud. He alleges that Farmington "deceiv[ingly]" presented itself as "a legitimate and authorized school" when it was actually a "sting operation." Appx28-33, ¶¶ 3, 10, 31. He refers to the undercover agents' actions as "false," "misleading," and "manipulat[ive]," *id*., made in "an effort to induce students" into believing "that the University was a legitimate and authorized school." *Id*. ¶¶ 15, 27. Underscoring the nature of his claim, Mr. Ravi asks the trial court to hold the Government "liable" for "intentional and/or negligent misrepresentations," "false promises," and "fraud." Appx34-35, ¶ 36(d)(viii)-(x). These allegations make it abundantly clear that Mr. Ravi seeks to vindicate a claim of fraud, which is not reviewable under the Tucker Act.

*Second*, assuming Mr. Ravi asserted a Tucker Act contract claim, he was required to plausibly allege the necessary elements to establish his claim. He must, for instance, plausibly plead mutuality of intent, and that the purported contract

was entered into by someone in the Government with actual, constructive, or ratified authority to bind the Government to the specified contract. But Mr. Ravi concedes that Farmington was an undercover "sting operation," not a real school operated by the Government that provided educational services. Accordingly, Mr. Ravi cannot plausibly plead that the Government intended to enter into a contract for educational services. Nor has he plausibly alleged that anyone involved in the operation had the requisite authority to bind the Government to the purported agreement he seeks to enforce. Undercover agents merely had the authority to *pose* as educational administrators; they never had the authority to actually become them. Thus, even assuming the sovereign-capacity doctrine did not bar Mr. Ravi's complaint, and even if his complaint did not sound in tort, the trial court's dismissal still should be affirmed because the complaint failed to state a claim on which relief could be granted.

## ARGUMENT

### I. Standards Of Review

The Court reviews "whether the Court of Federal Claims possesses subject matter jurisdiction de novo." *Biltmore Forest Broad. FM, Inc. v. United States*, 555 F.3d 1375, 1380 (Fed. Cir. 2009) (citation omitted). As a general matter, '"the allegations stated in the complaint are taken as true and jurisdiction is decided on the face of the pleadings.'" *Folden v. United States,* 379 F.3d 1344, 1354 (Fed.

Cir. 2004) (quoting *Shearin v. United States*, 992 F.2d 1195, 1195-96 (Fed. Cir. 1993)). But when jurisdiction is challenged as a factual matter, the allegations in the complaint do not control and only uncontroverted factual allegations are accepted as true, *see*, *e.g*., *Banks v. United States*, 741 F.3d 1268, 1277 (Fed. Cir. 2014), permitting the Court to engage in fact-finding "when considering a motion to dismiss where the jurisdictional facts in the complaint … are challenged," *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999).

This Court reviews de novo questions regarding failure to state a claim pursuant to RCFC 12(b)(6). *See Bank of Guam v. United States*, 578 F.3d 1318, 1325-26 (Fed. Cir. 2009). In reviewing such dismissal, this Court accepts as true a complaint's undisputed factual allegations. *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991). But "[f]actual allegations must be enough to raise a right to relief above a speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553-54 (2007) ("a wholly conclusory statement of claim" cannot "survive a motion to dismiss" by simply leaving "open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery").

## II. The Sovereign Capacity Doctrine Bars Mr. Ravi's Contract Action

### A. The Tucker Act And The Sovereign-Capacity Doctrine

"The Court of Federal Claims is a court of limited jurisdiction." Appx438 (citing *Kokkonen v. Guardian Life Ins. Co. of Am*., 511 U.S. 375, 377 (1994). The

court's jurisdiction is primarily circumscribed by the Tucker Act. 28 U.S.C. § 1491(a). The Tucker Act, in relevant part, confers on the Court of Federal Claims jurisdiction over claims against the United States founded upon express or implied contracts against the Government. *See id*. However, that jurisdictional grant does "not extend to every agreement, understanding, or compact' with the government that 'can semantically be stated in terms of offer and acceptance or meeting of the minds.'" *Kania*, 650 F. 2d at 268.

One such limitation is embodied in the sovereign-capacity doctrine. *See id*. The doctrine is rooted in the awareness that there are "two main categories of contracts that the government makes," which are "often referred to as proprietary and sovereign." *Awad*, 61 Fed. Cl. at 284. Proprietary contracts generally resemble private-market-like "transactions" that "private parties, individuals or corporations also engage in among themselves." *Kania*, 650 F.2d at 268. They include agreements for the "purchase and sale of goods, lands, and services." *Id*. When the Government engages in these transactions, courts presume that the Government has figuratively "stepped off the throne" and presumptively made itself susceptible to contract-based lawsuits, because it, like any private party, has entered the market and assumed commercial liability consistent with the nature of the transaction. *See id*. at 264.

Sovereign agreements, however, are different. In sovereign agreements, the Government is not "step[ping] off the throne" for the purpose of becoming a commercial participant, but rather, executing an agreement in a "sovereign capacity," whereby the Government is carrying out a function that can "only be undertaken by the sovereign." *Aluminum Shapes*, 139 Fed. Cl. at 714 (citing *Trudeau*, 68 Fed. Cl. at 129). These agreements generally lack a "private analogue." *Awad*, 61 Fed. Cl. at 284. They include "agreements made by the [G]overnment in 'administering the criminal justice system,'" Appx440 (quoting *Sadeghi v. United States*, 46 Fed. Cl. 660, 662 (2000)), "contracts arising out of the government's criminal enforcement actions, such as 'plea agreements, immunity agreements, and witness protection agreement,'" *id*. (quoting *Trudeau*, 68 Fed. Cl. at 128 (citing cases)), and other types of agreements arising out of criminal investigations, *Silva*, 51 Fed. Cl. at 377.[8]

The aim of the Government when it enters sovereign agreements is to "protect the public" or "vindicate[ a] public interest," *Trudeau*, 68 Fed. Cl. at 130, rather than to engage in a commercially-motivated transaction. For that reason, courts have recognized that the Government does *not* waive its sovereign immunity

[8] The same rationale has been used to limit review of "contract claims arising out of civil enforcement actions because, like criminal enforcement actions, civil enforcement actions 'could only be undertaken by the sovereign.'" Appx440 (quoting *Aluminum Shapes*, 139 Fed. Cl. at 714) (citing *Trudeau*, 68 Fed. Cl. at 129)).

as it relates to such agreements unless the purported agreement "unmistakably subjects the United States to damages in the event of breach," *id.* at 127 (citing *Kania*, 650 F.2d at 268; *Silva*, 51 Fed. Cl. at 377, *aff'd*, 51 F. App'x 12).

The most instructive application of the sovereign-capacity doctrine as it relates to this case is *Silva v. United States*, in which the court concluded that a purported "contract arising out of a law enforcement operation was barred by the sovereign capacity doctrine." 51 Fed. Cl. at 377. In that case, the U.S. Fish & Wildlife Service conducted an undercover operation to expose a scheme to illegally import wildlife. *Id.* at 375-76. As part of the operation, a third party cooperating with law enforcement executed a "commercial agreement" to care for an illegal importer's birds. *Id*. at 376. The cooperating individual later conveyed those birds to the Government, prompting the Government to confiscate them. Aggrieved by the confiscation, the importer filed a contract-based lawsuit alleging that the Government (assumed to be in privity of contract with the importer) must contractually compensate him for the lost value of his merchandise. *Id*. at 377. The *Silva* court disagreed, explaining that despite what the agreement appeared to be "on its face," the "commercial agreement" was not a proprietary contract, but rather a tool used to further a "law enforcement operation[]," which, "without question, lie[s] at the heart of sovereign action." The court thus held that the sovereign capacity doctrine barred the importer's case. *Id*. at 377-78.

B. The Trial Court Correctly Applied The Sovereign-Capacity Doctrine To The Contract Alleged In Mr. Ravi's Complaint

There is no meaningful dispute "that the [G]overnment was acting in its sovereign capacity when it allegedly entered into an educational services contract with Mr. Ravi." Appx441. Indeed, Mr. Ravi's complaint repeatedly refers to Farmington as a "sting operation." Appx28-33, ¶¶ 3, 10, 31. His complaint acknowledges that the Government "created Farmington in an attempt to expose student visa fraud in the United States." Appx28, ¶ 1. And it concedes that the methods undercover agents used—that is, the process of "enrolling students and accepting tuition payments"—was "made in furtherance of the goals of that undercover law enforcement operation." Appx442 (referring to Appx29, ¶ 8).

The facts elicited by the trial court confirm that the Government's actions alleged in the complaint were undertaken in its sovereign capacity. The record is replete with documents describing precisely how Operation Paper Chase, of which Farmington was a part, was a certified undercover law enforcement operation. Appx443 (referring to Appx59-308). These documents show that the purpose of Farmington "was not to provide students with an education, but 'to address[] visa fraud, . . . [t]o identify the full scope of the criminal [student visa fraud] enterprise, to include not only student visa violators, but also the recruiters and facilitators of the criminal enterprise." *Id*. (referring to Appx68). The purported educational

services contract Mr. Ravi identifies as giving rise to his case was meant for no other purpose than to effectuate a certified undercover law enforcement operation.

Mr. Ravi presents two arguments to the contrary. First, he argues that the sovereign capacity bar should not apply here because "the Government stepped off its throne to engage in the sale of educational services, such as private parties and educational institutions do every day." App. Br. 7, 13-18.

But the only reason why undercover agents represented themselves to Mr. Ravi as Farmington administrators—thereby enrolling him, accepting his payments, and providing him immigration documents—was to effectuate the goals of the undercover operation. *See* Appx445. As the trial court recognized, "[u]ndercover agents did not sell educational services to Mr. Ravi; they were instead authorized to pose as if they did to further a law enforcement operation." *Id*. (referring to Appx164). Even if Mr. Ravi's purported contract could "on its face" appear to be a "commercial agreement," there is no dispute that the true purpose of the Government's actions was to further a "law enforcement operation, which 'without question, lie[s] at the heart of sovereign action.'" *Id*. (quoting *Silva*, 51 Fed. Cl. at 377). And the methods that agents used to effectuate the operation do not give rise "to contract-based claims" under the Tucker Act. *Id.*

Accepting Mr. Ravi's view of the law—that the appearance of an undercover transaction governs questions of reviewability—would have sweeping

implications. If Mr. Ravi were correct, then many undercover operations would be subject to such collateral, contract-based attacks. "Artifice and stratagem" are the hallmarks of activity "to catch those engaged in criminal enterprises," *Sorrells v. United States*, 287 U.S. 435, 441 (1932), and undercover operations are often designed to resemble real-world transactions for the purpose of effectuating law enforcement goals. Opening the Government to these kinds of breach of contract claims—with undercover agents serving as key witnesses in civil damages trials based on actions taken while performing their undercover work—would inflict lasting damage on the ability of law enforcement to investigate criminal activity.

Second, Mr. Ravi contends that the trial court took an overly broad view of the sovereign capacity doctrine and "erred when it blanketly stated that a contract is sovereign if it is a part of [an] undercover law enforcement operation." App. Br. 8 (citing cases); *see also id*. at 18-22. Mr. Ravi's argument mischaracterizes the trial court's opinion. The trial court expressly recognized the doctrine's well-established limits, then explained why those limits did not apply here. In particular, the trial court acknowledged that "not all contract claims that are related to a government's sovereign actions [are] barred by the sovereign capacity doctrine[.]"). Appx441. It offered the example of the Government executing a contract to build a prison, which while "related to the sovereign action of incarcerating persons," is *not* barred by the sovereign capacity doctrine because the

act of "building the prison" is an instance where "the sovereign has stepped of the throne and has engaged in the purchase and sale of goods, lands and services." *Id.* (quoting *Bailey v. United States*, 54 Fed. Cl. 459, 483 (2002)).

Here, however, the trial court explained that Mr. Ravi is not contesting a proprietary component of the operation, such as a Government contract with a confidential informant to "secure" "informant services" during the course of an investigation. Appx446, n. 7 (*Yifrach v. United States*, 145 Fed. Cl. 691, 697-98 (2019), *aff'd*, 825 F. App'x 899 (Fed. Cir. 2020)).[9] Rather, Mr. Ravi contends that the specific undercover methods that special agents used to effectuate their mission created the contract-based liability under which he believes he should recover. The trial court explained that this sort of contract action is precisely what the sovereign-capacity doctrine bars. Appx444-46.

Mr. Ravi also contends that the trial court misapplied *Silva*. He argues that *Silva* is distinguishable because it involved "an illegal contract where the government entered into an agreement with a single claimant for the purpose of investigating and prosecuting his criminal conduct," whereas the contract alleged

[9] The trial court also recognized that it was possible for the Government to perform a sovereign act and still be subject to contract-based liability if there is a clear and unmistakable waiver of sovereign immunity as part of that transaction, Appx439-40, but noted that Mr. Ravi did "not present any evidence to demonstrate or even suggest that his alleged contract with HSI agents" afforded him that right, Appx446, n.8. Mr. Ravi does not appear to challenge that determination on appeal.

here was one for self-proclaimed "legal activity." App. Br. 9-10; *see also id*. at 18-22. It is undisputed, however, that Mr. Ravi was advised by HSI agents that his arrangement with Farmington was illegal. Appx259 ("Please remember to keep this 'special arrangement' to yourself so neither you or the school gets into trouble because it is illegal."); Appx269, 1:47-2:31 (Ravi confirming awareness of the illegality of his actions). Moreover, *Silva* assumed that the purported contract—a wildlife care agreement—might otherwise "on its face" be a legitimate type of "commercial agreement" in other contexts, at one point analogizing such contracts to the kind of "agreement that the Smithsonian Institution might conceivably make for the National Zoo." 51 Fed. Cl. at 377. Looking to the substance of the agreement, however, the *Silva* court recognized that the agreement was "entered into by [law enforcement] for the purpose of furthering undercover law enforcement operations," *id*., thereby taking that agreement out of the ambit of the Tucker Act. Likewise here, although foreign students can validly contract to enroll at United States educational institutions, Mr. Ravi's alleged contract arose from an undercover law enforcement operation.

Consequently, Mr. Ravi's effort to avoid application of the sovereign-capacity doctrine is unavailing. The trial court's decision accurately described the scope of the doctrine and correctly applied it to Mr. Ravi's complaint. The trial court's judgment should be affirmed.

## III. The Court Can Affirm The Trial Court's Dismissal On Alternative Grounds

Even assuming that Mr. Ravi's complaint were not barred by the sovereign-capacity doctrine, it is nonetheless subject to dismissal for the additional reasons advanced by the Government before the trial court.[10]

### A. The Complaint Sounds In Tort, Which Is Outside The Trial Court's Jurisdiction

Although he styles his suit as one grounded upon a contract to invoke the trial court's jurisdiction under the Tucker Act, Mr. Ravi "pervades [his] pleading with insinuations of scienter, which, if properly presented would mean that the petition would clearly have to be dismissed as a demand[] founded in tort." *Degenaars Co. v. United States*, 2 Cl. Ct. 482, 490 (1983) (citations omitted); *see United States v. Neustadt*, 366 U.S. 696, 703 (1961) (instructing courts to "look beyond the literal meaning of the language to ascertain the real cause of complaint"). Mr. Ravi alleges that Farmington "deceiv[ingly]" presented itself as "a legitimate and authorized school" when it was actually a "sting operation." Appx28-33, ¶¶ 3, 10, 31. He refers to the undercover agents' actions as "false,"

[10] The Court "may affirm a judgment of a district court on any ground the law and the record will support so long as that ground would not expand the relief granted." *Glaxo Grp. Ltd. v. TorPharm, Inc.*, 153 F.3d 1366, 131 (Fed. Cir. 1998) (citations omitted); *see Rexnod Indus., LLC v. Kappos*, 705 F.3d 1347, 1356 (Fed. Cir. 2013) (collecting cases).

"misleading," and "manipulat[ive]," *id.*, made in "an effort to induce students" into believing "that the University was a legitimate and authorized school." *Id.* ¶¶ 15, 27. And he repeatedly calls Farmington a "fake," a "façade," a "sham," and "fraudulent." *Id.* ¶¶ 4, 8, 10, 27. Mr. Ravi expressly asks the trial court to hold the Government "liable" for "intentional and/or negligent misrepresentations," "false promises," and "fraud." Appx34-35, ¶ 36(d)(viii)-(x). Consequently, Mr. Ravi's complaint sets forth a "fraudulent inducement" claim, which is a tort and not cognizable under the Tucker Act. *See Aetna Cas. & Sur. Co. v. United States*, 655 F.2d 1047, 1059 (Ct. Cl. 1981) (dismissing claims of "fraudulent inducement and misrepresentation" because they sound in tort and therefore do not fall under the Tucker Act).[11]

Mr. Ravi's effort to characterize his claim as contractual does not change this conclusion because, regardless of how Mr. Ravi "couche[s his] complaint," the

---

[11] Tortious misrepresentation claims, which are distinct from claims of fraudulent inducement, are sometimes remediable under the Tucker Act. A key difference is that the tortious misrepresentation claim can be traced back to an already-existing contract, for instance, in cases where there is a "tortious breach of contract." *See*, *e.g.*, *Dakota v. United States*, 34 Fed. Cl. 295, 297 (1995), *Morris v. United States*, 33 Fed. Cl. 733, 742 (1995). Perhaps the best example of this distinction is in *Reforestacion de Sarapiqui v. United States*, where the Court of Federal Claims dismissed a claim of "fraud in the inducement," because it "presupposes that certain tortious acts were committed by [the Government] *prior* to the execution of the written contracts, and not *after* the execution and in the performance thereof." 26 Cl. Ct. 177, 191 (1992), *aff'd*, 985 F.2d 583 (Fed. Cir. 1992).

Court must look to the "conduct upon which his claim is based." *Mt. Homes, Inc. v. United States*, 912 F.2d 352, 356 (9th Cir. 1990). Mr. Ravi contends that the Government's conduct was manipulative and misleading and that the alleged contract would not exist *but for* that conduct. Courts have repeatedly held that the Tucker Act does not confer jurisdiction over this type of fraudulent inducement claim. *E.g.*, *See Phang v. United States*, 87 Fed. Cl. 321, 325–26 (2009), *aff'd sub nom. Phu Mang Phang v. United States*, 388 F. App'x 961 (Fed. Cir. 2010) (dismissing claim that the Government knowingly made misrepresentations to induce the complainant to sign a plea agreement because such a claim sounds in tort); *Outlaw v. United States*, 116 Fed. Cl. 656, 662 (2014) (same); *Piotrowski v. United States*, No. 13-760C, 2014 WL 7476033, at *13 (Fed. Cl. Dec. 30, 2014), *aff'd*, 722 F. App'x 982 (Fed. Cir. 2018) (dismissing claim that "the Army 'intentionally misled' [the plaintiff] into entering an enlistment agreement," on the ground that the claim is a "tort" (citing *Restatement (Second) of Torts* § 525 (1977)).[12] The result should be the same here.

[12] Federal courts routinely dismiss tort claims against the Government brought by persons claiming that they were innocent third parties injured by an undercover operation based on the discretionary function exception and the misrepresentation exceptions in the Federal Tort Claims Act. *See, e.g., Frigard v. United States*, 862 F.2d 201, 203 (9th Cir. 1988) (affirming dismissal of suit filed by investors who alleged that that CIA involvement with an investment company in which the investors suffered losses was an actionable misrepresentation); *Ga. Cas. & Surety Co. v. United States*, 823 F.2d 260, 263 (8th Cir. 1987) (denying tort claim arising from the FBI's decision to maintain secrecy about an undercover

### B. Mr. Ravi Has Not Plausibly Pleaded All Necessary Elements To Establish A Tucker Act Contract Claim For Educational Services, Nor Can He

Mr. Ravi's claim fails for an additional reason—he has not plausibly pleaded (and cannot prove) the elements necessary to establish the alleged contract. To properly allege a breach of contract claim, a plaintiff must plausibly plead (1) mutuality of intent to contract, (2) lack of ambiguity in offer and acceptance, and (3) consideration. *Seuss v. United States*, 535 F.3d 1348, 1359 (Fed. Cir. 2008). And "[w]hen the United States is a party, a fourth requirement is added: the government representative whose conduct is relied upon must have actual authority to bind the government in contract." *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998); *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990) (same); *see also H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed. Cir. 1984) (explaining that plaintiff must show "that the officer whose conduct is relied upon had actual authority to bind the government in contract"). Mr. Ravi fails (at minimum) to plausibly plead the first and fourth elements.

---

automobile theft operation); *Redmond v. U.S. S.E.C.*, 518 F.2d 811, 817 (7th Cir. 1975) (affirming the dismissal of a tort claim against the Government for failing to warn a plaintiff allegedly defrauded by a confidence man as barred by the misrepresentation exception to the FTCA). Mr. Ravi has not asserted an FTCA claim here, nor would such a claim be within the trial court's jurisdiction.

As it relates to the first element—whether there was any mutuality of intent to enter into an agreement—a plain reading of Mr. Ravi's pleading defeats any plausible basis for that allegation. Mr. Ravi's pleading alleges that Farmington was a "fake," a "façade," a "sham," and "fraudulent," Appx28-33, ¶¶ 4, 8, 10, 27, and that the Government made "false" and "misleading" promises designed to "manipulate" and "deceive the public," *id.* ¶ 10. In making these allegations, he acknowledges that Farmington, and more specifically the HSI agents who operated it, never intended to offer Mr. Ravi any educational services. Mr. Ravi, therefore, does not allege that there was any mutuality of intent to establish the formation of an enforceable contract.[13] *Utley v. Donaldson*, 94 U.S. 29, 47 (1876) ("Where

[13] The facts also show that Mr. Ravi never intended to enter into an educational services contract. The evidence demonstrates that Mr. Ravi knew that he had not entered into a legitimate contract for educational services, but instead believed that he was entering into a pay to stay scheme.

This highlights precisely why Mr. Ravi's case is not actually a contract case. He seems to argue that he has pleaded a viable contract case even absent mutuality of intent because, according to him, the Government has unjustly retained some benefit. *See* Appx28-33, ¶¶ 8, 27, 36(d)(vii) & (xiii), 44, 50. But an implied-in-law contract claim—such as a "quasi-contract" claim for unjust enrichment or *quantum meruit*—is a fictional contract claim that is not redressable under the Tucker Act. *Baha v. United States*, 144 Fed. Cl. 500, 507 (2019) (dismissing "quasi-contract" claim where "Army occupied the subject property without paying rent" because the Tucker Act does not confer the Court with jurisdiction over "implied in law contract" claims) (citing *Hercules Inc. v. United States*, 516 U.S. 417, 423 (1996) and *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1316 (Fed. Cir. 2011)); *Collins v. United States*, 532 F.2d 1344, 1351 (Ct. Cl. 1976) (citing 1 Corbin on Contracts, s 19 (2d ed. 1963)) (explaining that, unlike genuine contract claims, where "the equivalent of mutual assent is present," "a

there is a misunderstanding as to anything material, the requisite mutuality of assent as to such thing is wanting; consequently the supposed contract does not exist, and neither party is bound."); *Kellogg Brown & Root Servs., Inc. v. United States*, 99 Fed. Cl. 488, 515 (2011), *aff'd*, 728 F.3d 1348 (Fed. Cir. 2013), *opinion corrected on denial of reh'g*, 563 F. App'x 769 (Fed. Cir. 2014) (explaining circumstances where a contract can be deemed void *ab initio* where a "false statement" "induce[s] the contract so that no mutual assent can be said to have existed"); *see Perez v. United States*, 156 F.3d 1366, 1370 (Fed. Cir. 1998) (explaining that courts must assume that all well-pled factual allegations are true for purposes of a motion to dismiss for failure to state a claim).

Apart from the issue of mutual intent, Mr. Ravi also fails to plausibly plead the fourth element of his contract case. He has not plausibly alleged that the undercover agents at Farmington were conferred the legal authority necessary to contractually obligate the Government to provide him with educational services. The only relevant allegation in his amended complaint is the threadbare assertion that "law enforcement personnel" "had actual authority to bind the government in contract" to provide him with educational services, Appx36, ¶ 42, and his equally

---

contract implied in law is one in which a duty to make restitution is implied, *regardless of the lack of mutual assent*, for reasons of justice and equity" (emphasis added)).

thin insistence that someone in the Government with the requisite authority must have later "ratified th[os]e contracts," *id.* ¶ 43. Mr. Ravi added these allegations to his complaint only after we pointed out in our motion to dismiss that Mr. Ravi had not even pleaded all the necessary elements of his contract claim. *Compare* Appx15 (original complaint) *with* Appx36 (amended complaint). These last-minute, conclusory allegations are nothing more than "formulaic recitation[s] of the elements of [the] cause of action," which are legally insufficient. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (explaining that a plaintiff must plead more than labels and conclusions).

Especially in cases that challenge undercover law enforcement functions, a plaintiff should "direct the Court's attention to anything that would vest in [some individual] the specific authority to bind the United States in contract." *Silva*, 51 Fed. Cl. at 378. Mr. Ravi makes no attempt to do that here. He does not, for instance, identify anything in "the Constitution, a statute, or regulation" that independently authorizes the undercover agents here to enter into the alleged educational services contract "in unambiguous terms."[14] *Villars v. United States*,

[14] By contrast, the authorizing documents for Operation Paper Chase show that individuals associated with it were granted clear contractual authority to execute proprietary contracts to effectuate the operation, such as to lease a storefront or set-up a website. *E.g.*, Appx164. But there is no similar indication that anyone associated with the operation was authorized to execute proprietary educational services contracts.

126 Fed. Cl. 626, 635 (2016) (quoting *Jumah v. United States,* 90 Fed. Cl. 603, 612 (2009)). Nor does he try to explain what basis he has to believe that anyone involved in Farmington did or could have later ratified the agreement he alleges. At most, Mr. Ravi suggests that undercover agents must have been authorized to enter into contracts because that authority is integral to effectuate the undercover operation. *See* Appx2 (ECF No. 9 at 6). But that confuses the authority necessary to make *representations* as part of an undercover operation with the authority it takes to actually bind the Government in contract. In order to effectuate Operation Paper Chase, the only authority undercover HSI agents needed was the ability to *appear* to be educational administrators, which is not remotely the same as the authority necessary to obligate the Government via contract in that endeavor. Undercover agents—who were carrying out their law enforcement duties—possessed the former, but not the latter. Appx59-247. At least one other court has dismissed a substantively identical claim on this precise ground. *Zhu v. Dep't of Homeland Sec.*, No. 2:18-489, 2019 WL 4261167, at *4 (W.D. Wash. Sept. 9, 2019) (dismissing complaint because plaintiff did not "allege facts that plausibly show a government's representative had actual authority to bind the government in contract"). The same outcome is warranted here.

That Mr. Ravi has provided only a formulaic recitation of the Government's authority to contract is unsurprising given the other allegations in his complaint.

Again, as Mr. Ravi has made clear, his claims are premised on the central allegation that the "school" created as part of the undercover operation was a "fake," a "façade," a "sham," and "fraudulent." Appx28-33, ¶¶ 4, 8, 10, and 27. Indeed, Mr. Ravi agrees that Farmington itself was created for law enforcement (and not educational) purposes. Appx28-29, ¶¶ 1, 8. As such, Mr. Ravi concedes (and we agree) that Farmington was never an actual school. Appx456-457, ¶ 9. It would make little sense, therefore, for anyone involved with the operation to have authority to contractually obligate the Government to provide educational services to the targets of the operation; such authority was never necessary to effectuate the operation.

In any event, at the request of the trial court we provided, and thus the record includes, all of the documents authorizing and justifying the Farmington operation, including the certification documents. Appx59-247. None of these documents suggest that undercover agents participating in Operation Paper Chase were ever authorized to enter into real educational service contracts. *Id.*; Appx465, ¶ 7. Indeed, to remove all doubt on the question, the record includes a declaration from ICE's acquisitions Unit Chief for Investigation and Support, who declared under the penalty of perjury that no one—not a single "agent or officer, absolutely no one"—associated with the "undercover operation had authority to enter into a contract to provide educational services." Appx465, ¶ 7. Thus, not only do the

allegations in Mr. Ravi's complaint fall well short of plausibly pleading the existence of a binding contract, but the evidence makes clear that he could never do so.

## CONCLUSION

For these reasons, we respectfully request that the Court affirm the judgment of the trial court.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Eric P. Bruskin
ERIC P. BRUSKIN
Assistant Director

/s/ Meen Geu Oh
MEEN GEU OH
Senior Trial Counsel
Commercial Litigation Branch
Civil Division, Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-0184
Fax: (202) 305-7644
Meen-Geu.Oh@usdoj.gov

Of Counsel:

BRETT J. HERTEL
LAUREN ALLEN
Office of the General Counsel
U.S. Customs & Border Protection

September 2, 2022

Attorneys for Defendant-Appellee

CERTIFICATE OF COMPLIANCE

I certify that pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, this brief complies with the Court's type-volume limitation rules. According to the word count calculated by the word processing system with which this brief was prepared, the brief contains a total of 9,294 words.

/s/Meen Geu Oh
MEEN GEU OH
Counsel for Defendant-Appellee