2022-1559

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

**TEJA RAVI, Individually and on Behalf of All Others Similarly Situated,**

*Plaintiff-Appellant*

v.

**UNITED STATES,**

*Defendant-Appellee*

Appeal from the United States Court of Federal Claims
Case Number 20-1237C, Judge Nancy B. Firestone

**APPELLANT'S CORRECTED BRIEF**

Amy E. Norris
Anna L. Nathanson
Norris Law Group, PLLC
616 E Street, N.W.
Washington DC 20004-2264
Telephone 202-830-1225

*Attorneys for Appellant*

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2022-1559 |
| **Short Case Caption** | Ravi v. United States |
| **Filing Party/Entity** | Teja Ravi |

> **Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: September 21, 2022

Signature: /s/ Amy Norris

Name: Amy E. Norris

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.  ☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Teja Ravi | Teja Ravi | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable            ☐    Additional pages attached

| | | |
|---|---|---|
| Amy Norris | Meen-Geu Oh | Nataliya Dominguez |
| Anna Nathanson | Lauren Allen | Jason Ritter |
| Diane Foose | N/A | N/A |

**5. Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5).  See also Fed. Cir. R. 47.5(b).

☑    None/Not Applicable            ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable            ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS
DECISION IN 20-1237C

TABLE OF AUTHORITIES…………………..…………………………...ii

STATEMENT OF RELATED CASES………………………………………1

JURISDICTIONAL STATEMENT…………………………………….…...1

STATEMENT OF THE ISSUES…………………………………...………....2

STATEMENT OF THE CASE
I.      Statement of the Case…………………………………………….…..3
II.     Statement of the Facts……………….…………………….…..……...4

SUMMARY OF THE ARGUMENT………………..……………………..…7

ARGUMENT
I.      Standard of Review…………...………………………………....…11
II.    This Court has jurisdiction under the Tucker Act, as the contract presented to Ravi was a contract for educational services on its face; contracts for educational services are not exclusive to Sovereigns. Thus, the Trial Court erred in determining that it lacked jurisdiction over Mr. Ravi's agreement for educational services……………………………………………………………………..12
III.    Mr. Ravi did not have the mens rea to commit any crime; the contract was purely for educational services; thus the Court should rule that the Court has jurisdiction over his contract…………………………………………….…18

CONCLUSION……………………………………………………….......22

ADDENDUM
      Judgment…………………………………………………Appx1
      Opinion…………………………………………...…….......Appx2

## TABLE OF AUTHORITIES

Page(s)

Cases

*Awad v. United States*, 61 Fed. Cl. 281 (2004) ………………….…..………….....19

*Bailey vs. United States*,
   54 Fed. Cl. 459 (2002) …………………………......……………8, 10, 16, 19

*Bloemker v. United States*,
   229 Ct. Cl. 690 (1981) ……………….……………………………....……...14

*Chang v. United States*,
   859 F.2d 893 (Fed. Cir. 1988) …………………………....……………….11

*Doe v. United States*,
   2021 WL 1726814 (Fed. Cl. Apr. 30, 2021) …………………………8, 10, 20

*Engage Learning, Inc. v. Salazar*,
   660 F.3d 1346 (Fed.Cir.2011) ……………………………………….12

*Fisher v. United States*,
   128 Fed. Cl. 780 (2016) ……………………….....……………....12

*Henke v. United States*,
   60 F.3d 795 (Fed. Cir. 1995) ……………………….....……………11, 13

*Houston v. United States*,
   60 Fed. Cl. 507………………………………….....………………17, 19

*James M. Ellett Constr. Co. v. United States*,
   93 F.3d 1537 (Fed. Cir. 1996) ……………………….....…………….11

*Kania v. United States*,
   650 F.2d 264 (Ct. Cl. 1981) …………………….…………....……………14, 16, 19

*Mendez v. United States*,
   121 Fed. Cl. 370 (2015) …………………………….....………...8, 10, 12, 20

*Owen v. United States*,
   851 F.2d 1404 (Fed. Cir. 1988) ……………………….....……………..11

*Sanders v. United States*,
   252 F.3d 1329 (Fed.Cir. 2001) ……………………………....…………16, 17

*Silva v. United States*,
   51 Fed. Cl. 374 (Fed. Cl. 2002) ……………………………....…………9, 10, 21

*Sommers Oil Co. v. United States*,
   241 F.3d 1375 (Fed. Cir. 2001) …………………….....………...8, 9, 10

*Stovall v. United States*,
   71 Fed. Cl. 696 (2006) ……………………………....……………8, 13, 16, 17

*Trauma Serv. Grp. v. United States*,
   104 F.3d 1321 (Fed. Cir. 1997) …………………….....……………..12

*Trudeau v. United States*,
68 Fed. Cl. 121 (2005) …………………………...………………....14, 16
*United States v. Winstar Corp.*,
518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) ………………………..17

Statutes

28 U.S.C. § 1295(a)(3) (2000) ……………………………....………………..1
28 U.S.C. § 1491 (2000) …………………………...……………………...4
28 U.S.C. § 1491(a)(1) (2000) ……………………………...…………1, 12

Other Authorities

*Restatement (Second) of Contracts* § 346……………………………....………17

## STATEMENT OF RELATED CASES

No other appeal in or concerning the same civil action in the Court of Federal Claims previously has been before this or any other appellate court. This case is not related to any other action filed in any other court.

## JURISDICTIONAL STATEMENT

The Court of Federal Claims has jurisdiction of this action under the Tucker Act. 28 U.S.C. § 1491(a)(1) (2000). The order, Appx1, and opinion, Appx2, of the Court of Federal Claims appealed from are final. This Court accordingly has jurisdiction over this appeal. 28 U.S.C. § 1295(a)(3) (2000).

# STATEMENT OF THE ISSUES

Whether the trial court erred when it determined that a contract for educational services is not proprietary of nature, when a contract for educational services is a contract for which "the sovereign stepp[ed] off the throne and engag[ed] in purchase and sale of goods, lands, and services, transactions such as private parties, individuals or corporations also engage in among themselves"?

Is the government allowed to abdicate its responsibilities regarding contracts made when there is no criminal intent by the contractee, if the contract was made for an undercover operation?

Is the government sovereignly immune from fulfilling contracts made for educational services, when a contract for educational services appears to be completely legitimate?

If innocent students, who lacked mens rea to commit any kind of crime, were indeed the proprietary target of the U.S. government's undercover operation, whether the government can renounce their duties to fulfill contracts for commercial educational services?

# STATEMENT OF THE CASE

## I.     Statement of the Case

This action arises from the Government's breach of contracts with private individuals—a breach by which ICE wrongfully targeted innocent students and completely ruined their lives. ICE created a University—the University of Farmington—which had a legitimate presence and was accredited by the Department of Education. As a part of that operation, the University offered commercial educational services to students who signed-up to attend the University. Once the students enrolled and the students provided tuition money, ICE did not provide classes as promised. ICE did not allow the innocent students to transfer, as required by law. The breach of contract completely ruined their lives, causing at least one student to be in detention for 40 days. All the students were required to leave the United States, although they had no mens rea to commit any crime. If the government targeted these students, it was not because they were predisposed for any crime, it was because of their race or national origins. The students' only fault, if it can even be considered a fault, was signing up for a university which appeared completely legitimate. These students, at the very least, deserve their tuition money back.

Accordingly, Teja Ravi, brought this class-action case on behalf of, upon information and belief, six-hundred plus students who were denied educational

services after paying tuition money. The students, upon information and belief, were all people of color-- all of Indian national descent, besides one student who was from Palestine.  Mr. Ravi brought the action for the students in the United States Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491 (2000), seeking damages for the government's breach of contract. The government moved to dismiss the action for lack of subject matter jurisdiction and failure to state a claim.

On March 16, 2022, the Court of Federal Claims ordered dismissal of the action for lack of subject matter jurisdiction—specifically because the Agreement for commercial educational services had been made by the United States in its "sovereign capacity." Appx22. A judgment of dismissal was entered on March 16, 2022. Appx1. On behalf of the students, Mr. Ravi filed a timely notice of appeal to this Court on March 18, 2022.

## II.    Statement of the Facts

In early 2018, Teja Ravi was an engineering student at Northwestern Polytechnic University in Fremont, California. Appx29. However, Mr. Ravi was ready for a change. Mr. Ravi wanted to be as marketable as possible to future employers. Mr. Ravi was interested in the University of Farmington ("the University") as it offered graduate programs in Information Technology (IT),

which he hoped would make him a more attractive candidate to prospective

employers. *Id.*

Teja Ravi learned of the University from a friend who advised him that he

could attend all classes online, which would allow him to maintain the Curricular

Practical Training that allowed him to attend school and continue with employment

in the United States. *Id.* Plaintiff was also enticed by the University's three-month

semester schedule as he traveled frequently for his contracted work, which was on

a six-month basis. *Id.*

When Mr. Ravi researched the University on the University's website, he

discovered that the University had a red and blue coat of arms as its emblem, a

Latin slogan meaning "knowledge and work" and a physical location at a

commercial building in Farmington Hills, Michigan. Appx57. Further, the website

offered specific details related to its courses and provided tuition pricing. *Id.* Mr.

Ravi was convinced of the University's legitimacy as the website stated the school

was accredited by the Accrediting Commission of Career Schools and Colleges

(www.accsc.org) and licensed by the Michigan Department of Licensing and

Regulatory Affairs as a private postsecondary college. Appx37-38; *see* also

Appx50-51. The website also stated, "UF is authorized by the Student and

Exchange Visitor Program to admit foreign students." Appx37.

E-mails from University officials continue to foster Mr. Ravi's trust. One e-mail stated, "Thank you for your recent interest in The University of Farmington, a nationally accredited business and STEM (science, technology, engineering, and mathematics) institution. Here at the University of Farmington we have created an innovative learning environment that combines traditional instruction with fulltime professional experiences. We offer flexible class schedules and a focus on students who do not want to interrupt their careers." Appx37-38.

Upon enrollment to the University, Plaintiff paid $12,500 in tuition. Appx39. He was advised by the University that he would be scheduled for regular classes every month. *Id.* After commencement of the first semester, Plaintiff did not receive any classes to attend or assignments, as he had been promised by the University. *Id.* Plaintiff contacted University administration to find out why and was told by University officials that the lack of classes and assignments for that semester would not be an issue. Appx39-40. Plaintiff also re-checked the University's accreditation on its website, which indicated that his Curricular Practical Training ("CPT") was valid. Appx40.

Defendant offered admission to the University, including access to classes and advanced degrees, as clearly stated on the University of Farmington website and the offer of admission given to Plaintiff. Appx60. Plaintiff and other students indicated their acceptance of the offer of admission and provided consideration for

the contract by paying tuition and other fees in the amounts of $10,000 to more than $15,000. Appx60; Appx63. The Defendant breached the contract when it failed to provide the offered classes and degrees. *Id.* Defendant had authority to create a commercial University and bind the contract with Mr. Ravi. *Id.*

In January 2019, Defendant revealed that the University was a sham, but never provided Mr. Ravi with any tuition reimbursement. Appx55; Appx60. Further, Defendant reneged on its guarantees that Plaintiff had properly adhered to immigration regulations. Appx55. It was revealed that Defendant created the University; the least that Defendant can do is give Mr. Ravi his tuition money back.

## SUMMARY OF THE ARGUMENT

The trial court is correct that "The central question in this case is whether the government was acting in its sovereign or proprietary capacity when it entered into the alleged contract with Mr. Ravi for educational services." Appx17. The trial court answers this question incorrectly.

The Government engaged in the sale of educational services at the University of Farmington to Mr. Ravi, and thus the Government stepped off its throne to engage in the sale of educational services, such as private parties and educational institutions do every day. Thus, the Court of Federal Claims has subject matter jurisdiction. This Court should remand back to the trial court to

proceed this case on the merits to provide justice to Mr. Ravi and other students with whom the government breached the contracts for educational services.

Although waivers of the Government's sovereign immunity are to be read narrowly, they must be respected where they are clear. The plain language of the Tucker Act covers a breach of the Agreement. The Tucker Act waives sovereign immunity and grants subject matter jurisdiction to the Court of Federal Claims (COFC) for matters relating to contracts with the United States.

The Court of Federal Claims has explained that there are two main categories of contracts that the government makes: proprietary and sovereign. *See Stovall v. United States*, 71 Fed. Cl. 696, 698 (2006). The United States generally has waived sovereign immunity with regard to proprietary contracts, which are contracts in which "the sovereign steps off the throne and *engages in purchase and sale of goods, lands, and services*, transactions such as private parties, individuals or corporations also engage in among themselves" (emphasis added). *Id*. at 697. As Mr. Ravi's contract involved a legal contract for educational services, his contract was a proprietary contract.

In this case, the trial court erred when it blanketly stated that a contract is sovereign if it is a part of undercover law enforcement operation; rather, this Court and the Court of Federal Claims have found jurisdiction in many cases involving undercover operations for legal contracts. *See Sommers Oil Co. v. United States*,

241 F.3d 1375 (Fed. Cir. 2001); *Bailey vs. United States,* 54 Fed. Cl. 459, 483 (2002); *Mendez v. United States*, 121 Fed. Cl. 370, 381 (2015); *Doe v. United States*, No. 19-CV-720 C, 2021 WL 1726814 (Fed. Cl. Apr. 30, 2021).  The lower court in this case stated,  "The sovereign capacity doctrine bars contract actions that arise out of such lawful 'criminal . . . enforcement actions . . . that could only be undertaken by the sovereign. . . . [U]ndercover law enforcement operations' . . .have been held by this court 'without question, lie at the heart of sovereign action.' *Silva v. United States*, 51 Fed. Cl. 374, 377 (Fed. Cl. 2002) (quotation omitted)."  Appx17.

*Silva* was describing a much more circumspect type of undercover law operation. In *Silva*, the court decided not to enforce an illegal contract where the government entered an agreement with a single claimant for the purpose of investigating and prosecuting his criminal conduct. *Silva v. United States*, 51 Fed. Cl. 374 (Fed. Cl. 2002).  The contract at issue there was itself illegal, because it involved the illegal breeding of exotic birds.

*Silva* did not contradict with *Sommers Oil Co. v. United States*, 241 F.3d 1375 (Fed. Cir. 2001), because a key tenant of *Sommers Oils* was that the government did not have to enforce contracts that would allow someone to profit from illegal activity. Here, the students' contracts were for legal activity, so the Court must consider how *Sommers Oils* interacts with *Silva* to apply to

a _legal_ contract made as part of an undercover law operation. Furthermore,

because *Silva* concerned an illegal contract, it was obviously not a proprietary

contract, so it did not contradict with *Bailey v. United States*, 54 Fed. Cl. 459, 483

(2002). In *Silva,* the Court was not considering whether a legal, proprietary

contract was unenforceable if it was part of an undercover law enforcement action.

The trial court improperly extends the limited logic of *Silva* to allow law

enforcement to disregard any legal, proprietary contract they make if they cursorily

label it as part of an undercover law enforcement action. Undercover law

enforcement operations often require proprietary actions that are essential for their

goals but are nonetheless proprietary. For example, renting property, hiring a

design firm to make a logo, and paying DHS employees are all

additional proprietary actions taken as part of this undercover law enforcement

operation. This Court and the Court of Federal Claims has found subject matter

jurisdiction for many cases involving undercover operations. *See Sommers Oil Co.*

*v. United States*, 241 F.3d 1375 (Fed. Cir. 2001); *Bailey vs. United States,* 54 Fed.

Cl. 459, 483 (2002); *Mendez v. United States*, 121 Fed. Cl. 370, 381 (2015); *Doe v.*

*United States*, No. 19-CV-720 C, 2021 WL 1726814 (Fed. Cl. Apr. 30, 2021).  As

Mr. Ravi's contract involved a legal contract for educational services, and thus the

Court of Federal Claims has subject matter jurisdiction, this honorable Court

should remand back to the trial court to proceed on the merits of the case.

# ARGUMENT

## I.    Standard of Review

This Court reviews, *de novo* and without deference, a decision that the court of Federal Claims lacks subject matter jurisdiction. *James M. Ellett Constr. Co. v. United States,* 93 F.3d 1537, 1541 (Fed. Cir. 1996). In considering the Government's motion to dismiss Mr. Ravi's complaint, the Court of Federal Claims was required to treat the factual allegations of the complaint as true. *Henke v. United States,* 60 F.3d 795, 796-97 (Fed. Cir. 1995).

To the extent that the issue of standing presents factual questions, all facts alleged by Mr. Ravi in the complaint are deemed admitted as true, and all reasonable inferences are drawn in favor of Mr. Ravi. *See Owen v. United States,* 851 F.2d 1404, 1407 (Fed. Cir. 1988).  Moreover, "a motion for judgment on the pleadings should be granted only where it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be provided in support of [its] claim." *Chang v. United States,* 859 F.2d 893, 894 (Fed. Cir. 1988).

**II.     This Court has jurisdiction under the Tucker Act, as the contract presented to Ravi was a contract for educational services on its face; contracts for educational services are not exclusive to Sovereigns. Thus, the Trial Court erred in determining that it lacked jurisdiction over Mr. Ravi's agreement for educational services.**

The Court of Federal Claims has jurisdiction to hear Mr. Ravi's claims under the Tucker Act. The plain language of the Tucker Act covers this Agreement. Under the Tucker Act, 28 U.S.C. § 1491(a)(1), this Court has subject matter jurisdiction to hear claims against the Government "founded ... upon any express or implied contract with the United States." Where a plaintiff alleges that he entered into a contract with the Government, the plaintiff need only allege a "non-frivolous *allegation* of a contract with the government." *Mendez v. United States*, 121 Fed. Cl. 370, 378 (2015) (quoting *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1353 (Fed.Cir.2011)) (emphasis in original). Therefore, a plaintiff merely must allege that "either an express or implied-in-fact contract underlies [his] claim." *Id*. (quoting *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997)). Accordingly, to show jurisdiction, a plaintiff must plead the elements of a contract: "(1) mutuality of intent to contract; (2) consideration; (3) an unambiguous offer and acceptance; and (4) actual authority on the part of the government's representative to bind the government." *Fisher v. United States*, 128 Fed. Cl. 780, 785 (2016). The issue before [the Court], when determining subject matter jurisdiction, is not whether such a contract should have been, or even was,

made, and whether it was or was not performed, but whether its alleged existence and the terms entitle him to his day in court on his claim of breach. *Henke v. United States,* 60 F.3d 795, 796-97 (Fed. Cir. 1995).

Jurisdiction is established here as Mr. Ravi has alleged a non-frivolous allegation of contract with the government. A contractual relationship was formed between Mr. Ravi and the personnel from ICE, as there was an offer, acceptance, and consideration. Additionally, as Mr. Ravi has alleged, the personnel had the authority to contract with the students as they were given the orders from their agency to make offers to students. *See* Appx119. These students had no idea that the United States government was involved in creating a fake university, and they were assured that this was a real university as ICE obtained real accreditation. When the offers were made to the students, University of Farmington's advertising indicated it to be a real University, which would provide educational services and degrees. The United States breached their agreement when they did not provide the services as offered.

There are two main categories of contract that the government makes: proprietary and sovereign. *See Stovall v. United States*, 71 Fed. Cl. 696, 698 (2006). The United States generally has waived sovereign immunity with regard to proprietary contracts. These are contracts in which "the sovereign steps off the throne and engages in purchase and sale of goods, lands, and services, transactions

such as private parties, individuals or corporations also engage in among themselves." *Kania v. United States,* 650 F.2d 264, 268 (Ct. Cl. 1981); *see also Bloemker v. United States,* 229 Ct. Cl. 690, 692–93 (1981); *Trudeau v. United States*, 68 Fed. Cl. 121, 127 (2005), aff'd¨186 F. App'x 998 (Fed. Cir. 2006).

In the matter at hand, the government stepped off its throne to engage in the sale of educational services. Even if they did not provide the services promised, the government should not be rewarded for the misrepresentations that it made in the act of offering and selling the educational services.

Through the lower Court's inquiry, it has been discovered that the agents had actual authority to operate the University of Farmington and offer educational services. Homeland Security Investigations (HSI) were granted authority to establish the University of Farmington and other business entities in support of Operation Paper Chase and "*operate them on a commercial basis* [emphasis added]." Appx119. Phase 1 of Operation Paper Chase was the "enrollment of students to create a critical mass." Appx245. Phase 2 included "using the operation to support other UC activities." Appx245. Operation Paper Chase included the establishment of a physical campus, the operation of a website that laid out the University of Farmington's accreditation and class offerings, the acceptance and enrollment of hundreds of students for master's degree programs, the collection of tuition, and the creation and dissemination of a class portal where some of the

14

students were allowed to register for classes. The "mass" of students the University of Farmington accepted allowed them to collect millions of dollars in tuition, and Homeland Security Investigations was authorized to use these proceeds for Operation Paper Chase expenses generally.

The Court of Federal Claims has subject matter jurisdiction, as the student contracts at issue were only tangentially related to carrying out a law enforcement purpose and the contract is not sovereign in nature. HSI agents have previously said the law enforcement purpose was to "identify recruiters and entities engaged in immigration fraud". Appx78. The student contracts at issue are tangentially related to that purpose. The students, who bring the current action, were not suspected of criminal activity.  Recruiters were told that it was a fake university, while students were not. Enrolling legitimate students allowed Defendants to identify recruiters engaging in immigration fraud and to collect tuition money that could fund the operation. The student contracts were made for a proprietary and not a sovereign purpose, just like how a contract for ICE to buy firearms would be a proprietary contract even though it is connected to a law enforcement purpose. The lower court erred in ruling that the Court of Federal Claims did not have jurisdiction, as the government stepped off its throne to engage in the sale of educational services. The government was not acting in a sovereign capacity when

forming these contracts as the student contracts were for educational services; those contracts were proprietary and commercial in nature.

When the government created a website and marketed educational services, it was undeniably acting in the private sphere. There was undeniably an express contract, or in the alternative – implied contract, for educational services. This contract was ratified by the tuition money that the government took from the students.

Furthermore, the relevant question is not only whether there is a private counterpart to the specific good or service purchased by the Government, but specifically if the Government has "stepped off the throne and engaged in the purchase and sale of goods, lands and services . . ." *Kania,* 227 Ct.Cl. at 464. As explained in *Bailey:* Prisons are related to the sovereign action of incarcerating persons convicted in the criminal justice system. The act of building the prison, however, is not a sovereign act but an act in which the sovereign has stepped off the throne and has engaged in the purchase of goods, lands and services. 54 Fed.Cl. at 483. *Trudeau v. United States*, 68 Fed. Cl. 121, 129 (2005), aff'd, 186 F. App'x 998 (Fed. Cir. 2006). Similarly, the act of building a school, including the contracts entered into by the students, are proprietary in nature.

Subsequent cases after *Kania*, particularly *Sanders v. United States,* 252 F.3d 1329, 1334–35 (Fed.Cir. 2001), "have clarified that an agreement falls within

the excluded sovereign realm only where it is the sort that can ***only*** be executed by the sovereign." *Stovall v. United States*, 71 Fed. Cl. 696, 698–99 (2006). Correspondingly, the concept of what falls within the "proprietary" realm—and thus within this Court's Tucker Act jurisdiction—is relatively broad and includes not only the "principal class of contract" involving the procurement of goods, lands, and services, but any other agreement undertaken by the Federal government that has a private analogue, that is, categorically of the sort that can be executed among private entities and individuals. *See Houston v. United States*, 60 Fed. Cl. 507, 511 (referring to contracts made in the government's sovereign capacity as a "narrow exception" to the "broad category of proprietary contracts"). *Stovall*, 71 Fed. Cl. at 698–99.

Mr. Ravi's contract undeniably had a private analogue, as students receive offers and make agreements to receive educational services on a daily basis. It is no doubt also true that in the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement. Indeed, as a plurality of the Supreme Court noted in *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), "damages are always the default remedy for breach of contract." *Id.* at 885, 116 S.Ct. 2432 (citing, *e.g., Restatement (Second) of*

*Contracts* § 346, cmt. a (1981)). *Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001).

The government stepped off its throne to engage in the sale of educational services, when it created the University's website, made offers of admission, and took students' money. Thus, the Court erred when determining that the agreement with Mr. Ravi for educational services was sovereign in nature. This Court should remand to the trial court to proceed on the merits.

### III.    Mr. Ravi did not have the mens rea to commit any crime; the contract was purely for educational services; thus the Court should rule that the Court has jurisdiction over his contract.

This Court should rule that the government is not sovereignly immune from fulfilling contracts made for educational services, when a contract for educational services appears to be completely legitimate and the student has pure intentions. The innocent students, who lacked mens rea to commit any kind of crime, were indeed the proprietary target of the U.S. government's undercover operation, and the government should not be able to renounce its duties to fulfill contracts for commercial educational services.

Ravi was an innocent person who had no idea when he entered the facially legal contract that the operation was attempting to get him to do something illegal. Instead, he wished to work and study IT in this country. There is nothing illegal

about working and studying—in fact, normally, it is considered in a positive light. His intent was nothing but pure.

Many cases on which the Court of Federal Claims relied arose in the *criminal* context. *See Kania v. United States,* 650 F.2d 264 (Ct. Cl. 1981); *Awad v. United States,* 61 Fed. Cl. 281 (2004); *Houston v. United States,* 60 Fed. C1. 507 (2004); *Bailey v. United States,* 54 Fed. CI. 459  (2002); 3 *Silva v. United States,* 51 Fed. CI. 374, *aff'd* 51 Fed. Appx. 12 (Fed. Cir. 2002). By contrast, Ravi's contract was purely for educational services. The government should not be allowed to abdicate its responsibilities regarding contracts made when there is no criminal intent by the contractee, even if the contract was made for an undercover operation.

The government sold educational services to Mr. Ravi. The lower court states that "undercover agents did not sell educational services to Mr. Ravi; they were instead authorized to pose as if they did to further a law enforcement operation." However, Mr. Ravi had no idea that the University of Farmington administrators were undercover agents. And, those administrators did sell to Ravi through their offer of educational services. Mr. Ravi was expecting educational services, and the Defendant's lack of provision of those educational services should not preclude Mr. Ravi from receiving the benefits under the contract. The

Court erred when it determined that undercover agents did not sell educational

services to Ravi.

Specifically, in the context of informants for undercover operations, the

Court of Federal Claims has exercised jurisdiction. In *Mendez v. U.S.*, the Court of

Federal Claims exercised Tucker Act jurisdiction over former confidential

informant's contract claims against the government, even though the contract was

made with the backdrop of an undercover operation.

*Mendez v. United States*, 121 Fed. Cl. 370, 381 (2015). *See also Doe v. United*

*States*, No. 19-CV-720 C, 2021 WL 1726814 (Fed. Cl. Apr. 30, 2021). This

demonstrates that the government does not abdicate responsibility for all contracts

just because they happened to be related to an undercover operation. Mendez's

contract and Ravi's contract were both *legal* contracts made in the course of an

undercover operation. Mendez's contract as an informant was much more tied into

an undercover operation than Mr. Ravi's contract for educational services. Mr.

Ravi had no idea that an undercover operation was even occurring. Mr. Mendez

knew that an undercover operation was occurring, and still the Court of Federal

Claims exercised jurisdiction over Mendez's breach of contract claims. The Court

of Federal Claims has jurisdiction over Mr. Ravi's contract for educational

services, and Mr. Ravi should receive his tuition money back. There was

absolutely no way for Mr. Ravi to know that an undercover operation was underway; and the Court should find that the Court of Federal Claims has jurisdiction over Mr. Ravi's contract for educational services.

Similarly to the private act of building a prison to serve the sovereign action of incarcerating people, the government engaged in the private act of enrolling students, leasing a building, and forming other commercial contracts to serve the sovereign objective of "Operation Paper Chase." The objective of "Operation Paper Chase" was to target "entities who fraudulently utilize the [student visa program] to endanger national security, commit visa fraud, smuggle and harbor illegal aliens for profit, launder money, and commit other violations of federal law." Appx263. To achieve this objective, the government's first aim was to enroll "students to a critical mass." *See e.g.*, Appx263. ("At the start of the operation and in conjunction with the U.S. Attorney's Office for the Eastern District of Michigan, a series of operational phases were developed during the anticipated three years of operations including: Phase 1, enrollment of students to create a critical mass . . .") *As the evidence shows, the mass was not achieved strictly by enrolling individuals trying to violate their visa status, but instead by enrolling students seeking a legitimate education.* Appx387-390, Appx400-402, Appx411-413, Appx415-417, Appx419-421, Appx432-434, Affidavits of Bachu, Sama, Pasam, Ramgiri, Reddy, Gundabathula, and Ravi. These facts are clearly distinguishable from *Silva v.*

*United States*, 51 Fed. Cl. 374 (Fed. Cl. 2002), *aff'd*, 51 Fed. Appx. 12 (Fed. Cir. 2002), where the government entered an agreement with the claimant for the purpose of investigating and prosecuting his criminal conduct. *Silva v. United States*, 51 Fed. Cl. 374 (Fed. Cl. 2002). Here, the government did not enter an agreement with the purpose of investigating and prosecuting Mr. Ravi, but rather to build a "critical mass" of students. Although this "critical mass" might have been important to achieve the objective of "Operation Paper Chase," just as the lease of an office building might have been important, it does not make the agreement sovereign.

Mr. Ravi did things legally. This is not an illegal contract because it was a contract for educational services. Mr. Ravi should not be punished for the government's acts. The students did not have fraudulent intent or wish to do anything illegally. They wished to attend the University of Farmington for the specific degrees that it offered or because it was less expensive than their current university. They wished to comply with student visa laws and diligently requested their I-20s to ensure that they were compliant.

## CONCLUSION

The trial judge's ruling dangerously extended the power of federal law enforcement, stating that law enforcement can breach any contract if they say it is part of an undercover law enforcement action. Unlike other contracts that have

been held subject to the sovereign capacity exception, the Agreement is not a contract that only the Government can make. The contracts for educational services were proprietary. Jurisdiction is established here as Mr. Ravi has alleged a non-frivolous allegation of contract with the government.

WHEREFORE, Plaintiff respectfully requests that this Court determine that it has jurisdiction over the contracts for educational services and remand to the trial court to proceed with the case on the merits.

Respectfully submitted,

*/s/ Amy E. Norris, Esq.*, (#1017140)
Amy@norrislawgroup.org
*/s/ Anna L. Nathanson, Esq.*, (#1737999)
Anna@norrislawgroup.org

202 830-1225
NORRIS LAW, PLLC

616 E Street N.W, Suite 1156
Washington, DC 20004

Attorneys for Teja Ravi

# ADDENDUM

# In the United States Court of Federal Claims
### No. 20-1237 C
### Filed: March 16, 2022

**TEJA RAVI**

**v.**                                           **JUDGMENT**

**THE UNITED STATES**

Pursuant to the court's Opinion, filed March 16, 2022, granting defendant's motion to dismiss,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff's complaint is dismissed for lack of subject matter jurisdiction.

Lisa L. Reyes
Clerk of Court

By:     s/ Debra L. Samler

Deputy Clerk

<u>NOTE</u>: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of <u>all plaintiffs</u>. Filing fee is $505.00.

# In the United States Court of Federal Claims

No. 20-1237C
(Filed: March 25, 2022)*
**\*Opinion originally filed under seal on March 16, 2022**

|  |  |  |
|---|---|---|
| TEJA RAVI, | ) | |
|  | ) | |
|  | ) | Motion to Dismiss; RCFC 12(b)(1); |
| Plaintiff, | ) | Sovereign Capacity Doctrine; RCFC |
|  | ) | 56(d); RCFC 15; Futility |
| v. | ) | |
|  | ) | |
| THE UNITED STATES, | ) | |
|  | ) | |
| Defendant. | ) | |
|  | ) | |

*Amy E. Norris*, Washington, DC, for plaintiff.

*Meen Geu Oh*, Civil Division, United States Department of Justice, Washington, DC, with whom were *Brian M. Boynton*, Acting Assistant Attorney General, *Martin F. Hockey, Jr.*, Acting Director, and *Eric P. Bruskin*, Assistant Director, for defendant.

## OPINION

**FIRESTONE**, *Senior Judge.*

Between 2018 and 2019, plaintiff Teja Ravi,[1] a citizen of India, enrolled at and made tuition payments to the University of Farmington. At the time of his enrollment, Mr. Ravi did not know that the University of Farmington was a fictitious school staffed and operated by agents from United States Immigration and Customs and Enforcement

---

[1] Mr. Ravi's legal name is Ravi Teja Tiyagurra. Def.'s Supp. Br. at 1 n.1, ECF No. 24. However, the parties continue to refer to the plaintiff as Teja Ravi and, for consistency, so will the court.

(ICE) as part of an undercover law enforcement operation whose purpose was to expose student visa fraud. In 2019, after ICE ceased operating Farmington and began pursuing enforcement actions, Mr. Ravi left the United States and returned to India. In this action, Mr. Ravi seeks the return of his tuition payments, alleging that the government breached a contract with him when it did not provide him legitimate educational services.

Now pending before the court are the government's motion to dismiss Mr. Ravi's amended complaint, or, in the alternative, motion for summary judgment, as well as Mr. Ravi's requests for additional discovery and his motion to further amend his complaint. As discussed in more detail below, the court **GRANTS** the government's motion to dismiss Mr. Ravi's amended complaint for lack of subject matter jurisdiction because the sovereign capacity doctrine bars this court from hearing Mr. Ravi's contract claims. The government's alternative motion for summary judgment is **DISMISSED AS MOOT.** Mr. Ravi's requests for further discovery are **DENIED** as futile, and Mr. Ravi's motion to amend the complaint is also **DENIED** as futile.

## I.   STATUTORY AND REGULATORY BACKGROUND

The laws of the United States generally require foreign citizens to obtain a visa before entering the country. One type of visa the United States offers to foreign citizens is the F-1 nonimmigrant academic visa, sometimes called a student visa. *See* 8 U.S.C. § 1101(a)(15)(F)(i). The F-1 visa allows "nonimmigrant students" to come to the United

States for a specified time period to pursue a "full course of study"[2] at an approved educational institution. *See id.*

Students seeking an F-1 visa are subject to certain requirements. The students must apply and be accepted to a school certified by the Student and Exchange Visitor Program (SEVP), which is overseen by the Department of Homeland Security (DHS). Def.'s Supp. Br. at 3 (citing U.S. Dep't of State, Bureau of Consular Affairs, Student Visa Page, available at https://travel.state.gov/content/travel/en/us-visas/study/student-visa.html (last accessed March 16, 2022)); *see* 8 C.F.R. § 214.3. SEVP schools are authorized to issue students a "Certificate of Eligibility for Nonimmigrant Student Status," otherwise known as a Form I-20, which demonstrates that the holder meets all standards of admission for the school and has been accepted for a full course of study. *See* 8 C.F.R. § 214.2(f)(1)(i)(A). Upon receiving the Form I-20, the student must complete an F-1 visa application, and, if granted an F-1 visa, must pursue a full course of study for the entire time period specified in the visa (subject to certain exceptions not relevant here). *See* 8 C.F.R. § 214.2(f)(5)(i). Visa holders may work for pay in addition to participating in their full course of study by obtaining a Form I-20 authorizing "curricular practical training" or CPT. *See* 8 C.F.R. § 214.2(f)(10)(i). A student is required to return to his or her home country within 60 days of when the approved course

---

[2] A "full course of study" is defined in detail in 8 C.F.R. § 214.2(f)(6), which generally requires a certain number of credit or clock hours depending on the type of educational program attended under a student visa.

of study is complete, or within 15 days of when the individual ceases to maintain a full course of study.  8 C.F.R. § 214.2(f)(5)(iv).

## II.    FACTUAL BACKGROUND

The following undisputed facts relevant to this opinion are taken from Mr. Ravi's amended complaint and certain unchallenged parts of the exhibits to the parties' briefs.

### A.    The University of Farmington

In December 2014, in consultation with the United States Attorney's Office in the Eastern District of Michigan, government officials devised a three-year law enforcement strategy called Operation Paper Chase.  Def.'s Supp. Br., Ex. 2 ¶ 8 ("Webber Decl."). Operation Paper Chase was a certified undercover law enforcement operation designed to target individuals fraudulently maintaining their student visa status while working in the United States, without having to attend classes or maintain a full course of study, by paying tuition to a collaborating educational institution in exchange for a Form I-20 authorizing CPT.  Def.'s Supp. Br. at 6; Def.'s Appx49, ECF No. 33; Webber Decl. ¶ 8; *see also* Am. Compl. ¶ 1, ECF No. 8.  This type of student visa fraud is known as a "pay to stay" scheme.  Def.'s Supp. Br. at 5.  Operation Paper Chase was also designed to target recruiters who assisted students in participating in the "pay to stay" scheme.  *Id.* at 7.  The day-to-day aspects of the operation were carried out by agents of Homeland Security Investigations (HSI) in ICE.  Webber Decl. ¶¶ 8-9; *see also* Am. Compl. ¶ 1.

The setting for the undercover operation was the University of Farmington, which was presented as "a State of Michigan licensed and nationally accredited private university."  Def.'s Appx111; *see also* Webber Decl. ¶ 9; Am. Compl. ¶ 1.  To set up the

operation, HSI undercover agents secured and staffed a commercial office building in the

Detroit, Michigan area and, for purposes of the operation, obtained state accreditation for

the school. Webber Decl. ¶ 9; Am. Compl. ¶¶ 8-11. Undercover agents were also

assigned to "maintain[] a website and a significant and active social media presence."

Def.'s Appx111; Am. Compl. ¶¶ 13-15. The HSI agents posing as Farmington

administrators accepted applications and corresponded with potential and enrolled

Farmington students. *See* Webber Decl. ¶ 11; Am. Compl. ¶ 22.

To ensure that Operation Paper Chase complied with the law governing such

undercover operations, HSI followed the certification procedures in two statutes: 8

U.S.C. § 1363a and 19 U.S.C. § 2081.[3] Webber Decl. ¶ 8 (referencing certification

materials); *see, e.g.,* Def.'s Appx6 (certification memorandum). These statutes authorize

DHS through its ICE agents to lease commercial spaces, "establish or acquire"

commercial entities, and "operate" these "entities on a commercial basis." 8 U.S.C. §

1363a; 19 U.S.C. § 2081. These statutes also explain the procedural steps ICE must

undertake and the approvals ICE must obtain to exercise the undercover authority in the

statutes. *Id.* Once approved, the statutes authorize ICE to use "proceeds" retained in the

operation to recoup costs expended in the undercover efforts. *Id.*

---

[3] The Title 8 statute applied to what was formerly the Immigration and Naturalization Service (INS), and the Title 19 statute applied to what was formerly the Customs Service. The investigative and enforcement functions of INS and the Customs Service were later combined and reorganized under ICE, which is part of DHS. Congress has conveyed to DHS the authority granted to government officials under the statutes. Def.'s Supp. Br. at 9 n.6 (citing 6 U.S.C. § 557).

### B.    Mr. Ravi's Enrollment at Farmington

Mr. Ravi is a citizen of India who, at the time he applied to the University of

Farmington in February 2018, was already enrolled at Northwestern Polytechnic

University in California under an F-1 visa.  Am. Compl. ¶ 29; Def.'s Supp. Br. at 11.  In

March 2018, Mr. Ravi enrolled at the University of Farmington in its "Information

Technology" program and received from Farmington a Form I-20.  Am. Compl. ¶¶ 17,

29; Def. Supp. Br. at 11.  From the time of his enrollment through January 2019, Mr.

Ravi paid Farmington $12,500 in tuition.  Am. Compl. ¶ 30; *see* Def.'s Supp. Br. at 11,

13.  During his entire time with Farmington, Mr. Ravi did not attend any classes or

complete any assignments.  Am. Compl. ¶¶ 30-31.

In January 2019, HSI ceased operating Farmington and began enforcement actions

related to Operation Paper Chase.  Webber Decl. ¶ 27; Def.'s Appx183; Am. Compl. ¶

27.  After Mr. Ravi learned that Farmington was part of an undercover operation and

enforcement actions began, Mr. Ravi returned to India.  Webber Decl. ¶ 28; *see* Pl.'s

Supp. Resp., Ex. 7 ¶ 1, ECF No. 40 (Mr. Ravi's declaration, stating that he currently

resides in India).

## III.    PROCEDURAL BACKGROUND

On September 21, 2020, Mr. Ravi filed his initial complaint in this court

individually and on behalf of a class of similarly situated Farmington students.  Compl.

¶¶ 2-4, ECF No. 1.  According to Mr. Ravi, he understood the University to be a

legitimate educational institution and, by paying tuition, he entered into a contractual

relationship with the government for educational services.  *Id.* ¶¶ 9-33, 39-43.  Because

the government never provided those services, Mr. Ravi brings claims for breach of contract and breach of the implied covenant of good faith and fair dealing. *Id.* ¶¶ 39-49. Among other things, he seeks that the action be certified as a class action,[4] "compensatory, statutory and/or punitive damages" for breach of contract, "fraud, negligent misrepresentation and false promises," and "equitable monetary relief, including restitution and disgorgement." *Id.* ¶ 50.

On January 8, 2021, the government filed a motion to dismiss the complaint under Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), arguing that Mr. Ravi failed to sufficiently allege two elements required to establish a valid contract with the government:  that the government intended to enter into an educational services contract with Mr. Ravi and that the HSI agents running Farmington had actual authority to bind the government in a contract for educational services.  Def.'s Mot. to Dismiss at 5-6, ECF No. 7.  The government also argues that Mr. Ravi's claims should be dismissed under the sovereign capacity doctrine, which bars contract claims that arise out of the government's sovereign actions. *Id.* at 6-7.

After the government filed its motion to dismiss, on January 28, 2021, Mr. Ravi filed an amended complaint under RCFC 15(a)(1)(B).  The amended complaint reiterates the allegations of the original complaint and adds allegations that the HSI personnel behind the University "had actual authority to bind the government in contract . . . ." Am. Compl. ¶ 43; *see also id.* ¶ 8.  The amended complaint also alleges that the

---

[4] Mr. Ravi has not filed a motion for class certification and he is the only named plaintiff in this case.

government "ratified" the contracts for educational services with Farmington students when it "accepted the benefit of the contracts by keeping all tuition money paid by Plaintiff and class members under the contracts." *Id.* ¶ 44; *see also id.* ¶ 27.

After the government filed its reply brief in support of its motion to dismiss, the court held a status conference and ordered Mr. Ravi to file a supplemental brief regarding whether Mr. Ravi, as a citizen of India, had standing to sue under the Reciprocity Act, 28 U.S.C. § 2502. *See* Joint Status Report Order, ECF No. 14. The Reciprocity Act grants plaintiffs who are citizens of a foreign government the right to sue the United States in its courts only if a reciprocal right is afforded to an American citizen in the plaintiff's country. 28 U.S.C. § 2502. In his supplemental briefing, Mr. Ravi argues, and the government agrees, that the Reciprocity Act does not bar Mr. Ravi's claims. Pl.'s Supp. Br. at 1-3, ECF No. 17; Def.'s Supp. Resp. at 1-3, ECF No. 23.

The court also ordered the government to file a supplemental brief in support of its motion to dismiss or, in the alternative, a motion for summary judgment. *See* Joint Status Report Order, ECF No. 14. The court directed the government to address in its supplemental briefing a variety of topics, including "the statutory basis for the University of Farmington undercover operation and whether that operation was certified under the relevant statutes," whether the alleged educational services contract with Mr. Ravi was illegal and unenforceable, and whether the HSI agents operating the University of Farmington had the authority to bind the United States to an educational services contract

with Mr. Ravi.[5]  *Id.*  In its supplemental briefing, the government argues that Mr. Ravi's

amended complaint should be dismissed or summary judgment should be granted in the

government's favor for three reasons:  (1) the sovereign capacity doctrine bars Mr. Ravi's

claims because those claims arise out of a certified undercover law enforcement action;

(2) Mr. Ravi cannot plead or prove a mutuality of intent to contract or that HSI agents

had the necessary authority to bind the United States to a contract for educational

services; and (3) Mr. Ravi knew his conduct was illegal, and, therefore the doctrine of *in*

*pari delicto* bars him from obtaining assistance from this court to recover his tuition

money.  Def.'s Supp. Br. at 2.  The government attached to its supplemental brief

evidence in support of these arguments, including affidavits from ICE personnel and the

required certification documents for the Farmington undercover operation.  *See generally*

Def.'s Appx6-255.

Supplemental briefing on the government's motion to dismiss, or, in the

alternative, for summary judgment was completed on October 8, 2021.  Oral argument

was held on January 13, 2022, and the government's motion is now pending.

Two other matters are also before the court.  First, Mr. Ravi makes a request in his

supplemental briefing for further discovery, which the government opposes.  Pl.'s Supp.

Resp. at 8-9, 14, 16, 21; Def.'s Supp. Reply at 3, 9-10, ECF No. 43.  Second, one day

before oral argument, Mr. Ravi moved to amend his complaint to add another named

plaintiff.  Mot. to Amend at 1, ECF No. 47.  Pursuant to the court's January 12, 2022

---

[5] The court also entered a protective order governing the disclosure of the evidence the
government submitted in support of its supplemental brief.  *See* Protective Order, ECF No. 30.

order, ECF No. 49, the government at oral argument opposed the motion to amend, Tr. 20-23, ECF No. 51.

## IV.     DISCUSSION

Although the parties agree on this point, the court first addresses whether the Reciprocity Act bars Mr. Ravi's claims.  The court will then turn to the government's motion to dismiss, or, in the alternative, motion for summary judgment.  Finally, the court will address Mr. Ravi's request for additional discovery and Mr. Ravi's motion to amend his complaint to add another named plaintiff.

### A.     The Reciprocity Act Does Not Bar Mr. Ravi's Contract Claims

Because Mr. Ravi is a citizen of India, he must meet the requirements of the Reciprocity Act, 28 U.S.C. § 2502, in order to pursue his claims before this court.  Under the Reciprocity Act, "[c]itizens or subjects of any foreign government which accords to citizens of the United States the right to prosecute claims against their government in its courts may sue the United States in the United States Court of Federal Claims if the subject matter of the suit is otherwise within such court's jurisdiction." *Id.*  The Act "burdens alien plaintiffs who invoke the process of the Court of Federal Claims with showing that their home courts treat natives and American citizens equally when they adjudicate claims brought against their home countries." *El-Shifa Pharm. Indus. Co. v. United States*, 378 F.3d 1346, 1354 (Fed. Cir. 2004).  The Act should not be interpreted "rigidly" and does not require "the existence of an action in the foreign state of identical nature or scope." *Ferreiro v. United States*, 350 F.3d 1318, 1322 (Fed. Cir. 2003). Rather, "[e]qual treatment is the paramount requirement of the Reciprocity Act." *Id.*  A

plaintiff may satisfy the requirements of the Reciprocity Act with evidence—such as statutes, case law, treaties, or an affidavit from an experienced attorney or government official from the foreign state, *see Yifrach v. United States*, 145 Fed. Cl. 691, 697 (2019); *Humphries v. United States*, 44 Fed. Cl. 81, 82 (1999)—that demonstrates that "American citizens enjoy an equal standing with foreigners in actions against the foreign state," *Nippon Hodo Co. v. United States*, 285 F.2d 766, 767-68 (Ct. Cl. 1961).

In this case, the court agrees with Mr. Ravi and the government that Mr. Ravi has satisfied the requirements of the Reciprocity Act. *See* Pl.'s Supp. Br. at 1-3; Def.'s Supp. Resp. at 1-3. Mr. Ravi provides an affidavit from an experienced Indian attorney who is an Assistant Professor at a leading law school in India explaining that "an American citizen has a right to sue the Indian government in its courts under the existing constitutional as well as statutory scheme in India." Pl.'s Supp. Br., Ex. A at 2. In support, Mr. Ravi's supplemental brief and attached affidavit cite the Indian Constitution, Indian Civil Procedure Code Sections 9, 79, and 83, and case law. *Id.* at 1-3, Ex. A at 2-9; *see also* Def.'s Supp. Resp. at 1-3 (citing Article 300(1) of India's Constitution and Sections 9, 79, and 83 of India's Code of Civil Procedure). Taken together, these sources of law demonstrate that the Act does not bar Mr. Ravi's claims.

Article 300(1) of the Constitution of India authorizes suits against the Indian government:

> The Government of India may sue or be sued by the name of the Union of India and the Government of a State may sue or be sued by the name of the State and may, subject to any provisions which may be made by an Act of Parliament or of the Legislature of such State enacted by virtue of powers conferred by this Constitution, sue or be sued in relation to their respective affairs in the like cases as the Dominion of India and the corresponding Provinces or the corresponding

Indian States might have sued or been sued if this Constitution had not been enacted.

*See also* Pl.'s Supp. Br., Ex. A at 8 n.28, Ex. B; Def.'s Supp. Resp. at 2.  Likewise,

Section 79 of India's Code of Civil Procedure states:

> In a suit by or against the Government, the authority to be named as plaintiff or defendant, as the case may be, shall be – (a) in the case of a suit by or against the Central Government, the Union of India, and (b) in the case of a suit by or against a State Government, the State.

*See also* Pl.'s Supp. Br., Ex. A at 8 & n.27; Def.'s Supp. Resp. at 2.  In addition, Section

9 of India's Code of Civil Procedure confers Indian courts with jurisdiction over "all civil

suits."  Pl.'s Supp. Br., Ex. A at 8 & n.26 (noting a "civil court in India would have

jurisdiction to entertain" civil suits) .  These provisions together provide that the

government of India is subject to civil lawsuits, with no limitations on who may bring

those claims.  *Id.*, Ex. A at 8 (explaining that Section 79 and Article 300 of the Indian

Constitution "provide[] that the Government of India may sue or be sued") .

Section 83 of India's Code of Civil Procedure states that "alien friends[] may sue

in any Court otherwise competent to try the suit, as if they were a citizen of India."  *See*

*also* Pl.'s Supp. Br., Ex. A at 8-9 & n.29.  Alien friends under Section 83 are foreign

citizens whose government is not "at war with India," such as American citizens.  *Id.*

Section 83 demonstrates that American citizens and Indian citizens may sue the Indian

government on equal footing.

Therefore, when read together, the Indian Constitution and Code of Civil

Procedure Sections 9, 79, and 83, and the affidavit submitted by Mr. Ravi, Pl.'s Supp.

Br., Ex. A, demonstrate that American citizens "enjoy an equal standing" with Indian

citizens in actions against the Indian government. *Nippon Hondo Co.*, 285 F.2d at 767-78. The court thus concludes that the Reciprocity Act does not bar Mr. Ravi's contract claims in this court.

### B.    The Sovereign Capacity Doctrine Bars Mr. Ravi's Contract Claims

While the government has moved to dismiss Mr. Ravi's contract claims, or for summary judgment, on three grounds, this opinion will focus only on the government's argument based on the sovereign capacity doctrine that Mr. Ravi's claims should be dismissed for lack of subject matter jurisdiction under RCFC 12(b)(1). As discussed below, under the sovereign capacity doctrine, the court must dismiss Mr. Ravi's contract claims.

### i.    Legal Standard Under RCFC 12(b)(1)

When deciding a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), the court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the plaintiff's favor. *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). The plaintiff bears the burden of establishing subject matter jurisdiction, and must do so by a preponderance of the evidence. *Id.* If the court determines that it lacks subject matter jurisdiction, it must dismiss the plaintiff's action. RCFC 12(h)(3).

### ii.    The Sovereign Capacity Doctrine

The Court of Federal Claims is a court of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). As relevant here, the Tucker Act grants the court jurisdiction over "any claim against the United States founded . . .

upon any express or implied contract with the United States." 28 U.S.C. § 1491. The Tucker Act, however, merely confers jurisdiction on this court, it does not "create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976).

"The contract liability which is enforceable under the Tucker Act consent to suit does not extend to every agreement, understanding, or compact" with the government that "can semantically be stated in terms of offer and acceptance or meeting of minds." *Kania v. United States*, 650 F.2d 264, 268 (Ct. Cl. 1981). As this court has explained, there are "two main categories of contracts that the government makes," which are "often referred to as proprietary and sovereign." *Awad v. United States*, 61 Fed. Cl. 281, 284 (2004). The United States has "generally waived sovereign immunity with regard to proprietary contracts" where "the sovereign steps off the throne and engages in purchase and sale of goods, lands, and services, transactions such as private parties, individuals or corporations also engage in among themselves." *Id.* (quoting *Kania*, 650 F.2d at 268).

However, the government has not waived sovereign immunity for—and jurisdiction of the Court of Federal Claims does not extend to—contracts entered into by the government "in its sovereign capacity that do not unmistakably subject the United States to damages in the event of breach." *Trudeau v. United States*, 68 Fed. Cl. 121, 127 (2005) (citing *Kania*, 650 F.2d at 268; *Silva v. United States*, 51 Fed. Cl. 374, 377 (2002), *aff'd*, 51 F. App'x 12 (Fed. Cir. 2002)), *aff'd*, 186 F. App'x 998 (Fed. Cir. 2006); *see also Awad*, 61 Fed. Cl. at 284. Under the sovereign capacity doctrine, this court "generally . . . does not possess subject matter jurisdiction over agreements made in the course of

criminal proceedings," *Silva*, 51 Fed. Cl. at 377, or over agreements made by the government in "administering the criminal justice system," *Sadeghi v. United States*, 46 Fed. Cl. 660, 662 (2000). So, for example, this court has declined to exercise jurisdiction over contracts arising out of the government's criminal enforcement actions, such as "plea agreements, immunity agreements, and witness protection agreements," *Trudeau*, 68 Fed. Cl. at 128 (citing cases), unless those agreements "clearly and unmistakably subject[] the government to monetary liability for any breach," *Aluminum Shapes, LLC v. United States*, 139 Fed. Cl. 709, 713 (2018) (quoting *Sanders v. United States*, 252 F.3d 1329, 1335 (Fed. Cir. 2001)). This court has applied the same rationale to contract claims arising out of civil enforcement actions because, like criminal enforcement actions, civil enforcement actions "could only be undertaken by the sovereign." *Aluminum Shapes*, 139 Fed. Cl. at 714 (citing *Trudeau*, 68 Fed. Cl. at 129).

Most relevant to this case, this court in *Silva v. United States* held that a contract action arising out of an undercover law enforcement operation was barred by the sovereign capacity doctrine. 51 Fed. Cl. at 377. *Silva* involved a government operation to expose a scheme to illegally import wildlife. *Id.* at 375-76. During the operation, a third party cooperating with the U.S. Fish and Wildlife Service entered into an agreement to care for and feed an illegal importer's birds. *Id.* at 376. At the close of the operation, the government confiscated more than 100 exotic birds belonging to the illegal importer. *Id.* The illegal importer filed a contract-based lawsuit in this court alleging that the government (assumed to be in privity of contract with the importer) should be held liable for the lost value of the birds. *Id.* The importer argued that the government had entered

into a "commercial agreement" to care for and feed the birds. *Id.* at 377. Despite what the agreement appeared to be "on its face," the court held that it lacked jurisdiction over the contract action under the sovereign capacity doctrine. *Id.* at 377-78. The court explained that the purported "commercial agreement" was meant to further "law enforcement operations," which, "without question, lie at the heart of sovereign action." *Id.* at 377 (quotation omitted).

The court recognizes that not all contract claims that are related to a government's sovereign actions will be barred by the sovereign capacity doctrine. As this court has explained:

> Prisons are related to the sovereign action of incarcerating persons convicted in the criminal justice system. The act of building the prison is however, not a sovereign act but an act in which the sovereign has stepped off the throne and has engaged in the purchase and sale of goods, lands and services.

*Bailey v. United States*, 54 Fed. Cl. 459, 483 (2002). The central question in this case is whether the government was acting in its sovereign or proprietary capacity when it entered into the alleged contract with Mr. Ravi for educational services. *See Trudeau*, 68 Fed. Cl. at 129.

### iii.    Mr. Ravi's Claims Must Be Dismissed Under RCFC 12(b)(1)

Applying the above-discussed standards, the court concludes that Mr. Ravi's claims are barred by the sovereign capacity doctrine and must be dismissed for lack of subject matter jurisdiction. The undisputed facts demonstrate that the government was acting in its sovereign capacity when it allegedly entered into an educational services contract with Mr. Ravi. Specifically, the allegations in Mr. Ravi's amended complaint

and the undisputed evidence[6] submitted by the government during supplemental briefing demonstrate that the alleged educational services contract was made in furtherance of an undercover law enforcement operation, a sovereign action.

The allegations in Mr. Ravi's amended complaint state that the purpose of the University of Farmington was to effectuate an undercover law enforcement operation to expose student visa fraud by targeting Farmington enrollees and recruiters. *See, e.g.*, Am. Compl. ¶ 1 (stating that the government "created Farmington in an attempt to expose student visa fraud in the United States") ; ¶¶ 3, 10, 31 (referring to the University as a "sting operation"). Mr. Ravi's allegations also confirm that the activities of the HSI agents operating Farmington that form the basis of Mr. Ravi's contract claims, such as enrolling students and accepting tuition payments, were made in furtherance of the goals of that undercover law enforcement operation. *See, e.g.*, Am. Compl. ¶ 8 ("The University of Farmington was a fake university setup by ICE's Homeland Security Investigations and overseen by DHS and was setup to expose student visa fraud. Defendant authorized HSI and/or DHS agents to setup and run the University of

---

[6] The court requested in its supplemental briefing order that the government submit evidence on a variety of issues. Joint Status Report Order, ECF No. 14. Normally, unless jurisdictional facts are in dispute, the court will not look beyond the pleadings when considering a motion to dismiss under RCFC 12(b)(1). *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583-84 (Fed. Cir. 1993). However, in the context of an RCFC 12(b)(1) motion arising out of summary judgment proceedings, the Federal Circuit has held that the court can "consider . . . evidentiary matters outside the pleadings." *Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985). Mr. Ravi does not dispute the facts taken from the government's evidence that the court relies on in this opinion.

Farmington scheme, including to enroll students, to accept tuition payments, and to use these contracts with students as a basis to revoke their visa status.").

The undisputed evidence provided by the government likewise shows that the government was acting in its sovereign capacity when undercover agents enrolled Mr. Ravi at Farmington and accepted his tuition payments. These documents describe Operation Paper Chase, the undercover law enforcement operation involving Farmington that was lawfully certified and reauthorized under 8 U.S.C. § 1363a and 19 U.S.C. § 2081. Def.'s Appx6-255 (certification and reauthorization documents describing the actions taken by HSI agents in operating the University for Operation Paper Chase). They explain that HSI agents, in furtherance of Operation Paper Chase and using the lawful authority granted to them under 8 U.S.C. § 1363a and 19 U.S.C. § 2081, established the University of Farmington, enrolled students, and accepted tuition payments. *See, e.g.*, Def.'s Appx176 (reauthorizing the Operation Paper Chase "undercover investigative operation"), Appx182-83 (describing agents' activities). The objective of these undercover actions was not to provide students with an education, but "to address[] visa fraud, . . . [t]o identify the full scope of the criminal [student visa fraud] enterprise, to include not only the student visa violators, but also the recruiters and facilitators of the criminal enterprise." *Id.* Appx15. The last phase of Operation Paper Chase involved "the prosecution of criminal targets and administrative immigration charges against those aliens who engaged in fraud," including both student visa violators and recruiters. *Id.* Appx183.

These undisputed facts demonstrate that any alleged educational services contract formed between HSI agents and Mr. Ravi arose out of Operation Paper Chase, an undercover law enforcement operation. The sovereign capacity doctrine bars contract actions that arise out of such lawful "criminal . . . enforcement actions . . . that could only be undertaken by the sovereign." *Aluminum Shapes*, 139 Fed. Cl. at 714. "[U]ndercover law enforcement operations" like Operation Paper Chase have been held by this court to "without question, lie at the heart of sovereign action." *Silva*, 51 Fed. Cl. at 377 (quotation omitted). Under the sovereign capacity doctrine, therefore, Mr. Ravi cannot assert breach of contract and related claims against the government in connection with his alleged educational services contract with Farmington. Based on the undisputed facts before it, the court must dismiss Mr. Ravi's claims for lack of subject matter jurisdiction.

Mr. Ravi argues that the sovereign capacity bar does not apply to this lawsuit for three reasons. First, Mr. Ravi argues that undercover agents were "stepp[ing] off [the government's] throne to engage in the sale of educational services" during Operation Paper Chase. Pl.'s Supp. Resp. at 16-18. Mr. Ravi points out that the operation's certification and reauthorization documents demonstrate that the government engaged in "commercial" activities, such as "creat[ing] a website and market[ing] educational services," "accept[ing] and enroll[ing] . . . international students into a university," and "leasing a building," *id.* at 16-17, which he contends support his argument that the alleged educational services contract was "private" in nature, *id.*

The court disagrees. As the government argues, Def.'s Supp. Reply at 5-6, the only reason the government engaged in the actions that allegedly form the basis of the

purported educational services contract with Mr. Ravi was to effectuate the goals of
Operation Paper Chase.  Undercover agents did not sell educational services to Mr. Ravi;
they were instead authorized to pose as if they did to further a law enforcement operation.
*See, e.g.*, Def.'s Appx111 (describing the purpose of Operation Paper Chase and the
undercover agents' activities).  Even if the alleged educational services contract between
Mr. Ravi and the government could "on its face" appear to be a "commercial agreement,"
the true purpose of the government's conduct was to further "law enforcement
operations" targeting student visa violators, not to provide Mr. Ravi with an education.
*Silva*, 51 Fed. Cl. at 377.  Law enforcement operations "without question, lie at the heart
of sovereign action," *id.* (quotation omitted), and are not susceptible to contract-based
claims in this court.

Second, Mr. Ravi argues that the alleged contract for educational services under
which he attempts to bring this lawsuit was "only tangentially related to carrying out a
law enforcement purpose."  Pl.'s Resp. at 3-4, ECF No. 9.  In support, Mr. Ravi invokes
the prison analogy discussed above to argue that, like the "private" act of building a
prison to serve the sovereign action of incarcerating people, the government engaged in
the "private" act of enrolling students to serve the sovereign objective of Operation Paper
Chase.  Pl.'s Supp. Resp. at 17.  In this case, however, the alleged educational services
contract was not a "private" act "tangentially" connected to the government's undercover
operation.  Rather, the undisputed facts show that enrolling students at Farmington was
fundamental to the goals of Operation Paper Chase, a sovereign action.

Finally, Mr. Ravi in his original response to the government's motion to dismiss relies on *Sommers Oil Co. v. United States*, 241 F.3d 1375 (Fed. Cir. 2001), to argue that the sovereign capacity doctrine does not apply here. Pl.'s Resp. at 4. Specifically, Mr. Ravi argues that, under *Sommers Oil*, the sovereign capacity doctrine does not apply where enforcing the alleged contract with the government "would not disrupt an active criminal case" and "would not requir[e] paying monetary damages for seized contraband." *Id.* This is incorrect. Mr. Ravi later acknowledges that the sovereign capacity doctrine has been applied outside of active criminal proceedings or the seizure of contraband, *see, e.g., id.* at 4 (noting that the doctrine has been applied to "civil enforcement agreements" among others), and Mr. Ravi does not rely on *Sommers Oil* in his supplemental briefing.[7]

In sum, the purported educational services contract on which Mr. Ravi bases his contract claims arises out of a government law enforcement operation, a sovereign action. Under the sovereign capacity doctrine, this court lacks jurisdiction over Mr. Ravi's contract claims, which must be dismissed under RCFC 12(b)(1).[8] The court does not

---

[7] *Sommers Oil* involved a claim for money damages pursuant to an agreement entered into by an informant with the Internal Revenue Service. 241 F.3d at 1377. This court has held that the government can "step off the throne" to secure informant services. *See Yifrach*, 145 Fed. Cl. at 697-98. This case does not involve an informant services contract.

[8] This court has held that even where the government enters into a contract in its sovereign capacity, a plaintiff may assert a contract action if the alleged contract "unmistakably subject[s] the United States to damages in the event of breach" and if a government agent was authorized to enter into the contract. *Trudeau*, 68 Fed. Cl. at 127-128. In this case, Mr. Ravi alleges only that a contract was formed when he obtained an offer of admission to Farmington and paid tuition. Am. Compl. ¶¶ 17, 22, 29-30, 40. Mr. Ravi does not present any evidence to demonstrate or even suggest that his alleged contract with HSI agents afforded him an "unmistakable" right to

address the government's other grounds for dismissal or summary judgment, and the government's alternative motion for summary judgment is dismissed as moot.

### C.    Mr. Ravi's Request for Additional Discovery is Denied as Futile

Although he has not made a formal motion, Mr. Ravi throughout his supplemental response brief requests that the court order additional discovery before ruling on the government's alternative motion for summary judgment so that Mr. Ravi may explore certain material facts that he argues are disputed. Pl.'s Supp. Resp. at 8-9, 14, 16, 21. The government opposes Mr. Ravi's request because additional discovery would be futile. Def.'s Supp. Reply at 10 ("Mr. Ravi provides no reason to suspect pre-answer discovery will lead to a different result."). The court agrees with the government.

RCFC 56(d) permits this court to order additional discovery during summary judgment proceedings when essential facts are not available to the nonmovant. Rule 56(d)(2) provides that "if a nonmovant [for summary judgment] shows by affidavit or declaration that . . . it cannot present facts essential to justify its opposition, the court may . . . allow time . . . to take discovery." RCFC 56(d)(2). Such a motion must articulate "with particularity, what facts the movant hopes to obtain by discovery and how these facts will raise a genuine issue of fact." *Pfizer Inc. v. United States*, 149 Fed. Cl. 711, 715-16 (2020) (citing *Exigent Tech., Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1310 (Fed. Cir. 2006)). While motions under RCFC 56(d) are to be "liberally granted," *Jade Trading, LLC v. United States*, 60 Fed. Cl. 558, 565 (2004), the court may deny a motion

damages in the event he did not receive educational services. It is therefore not necessary to reach the question of HSI agents' authority to contract for educational services.

for discovery under RCFC 56(d) if the requested discovery would be futile, *see JEM Transport, Inc. v. United States*, 120 Fed. Cl. 189, 196-97 (2015) (citing, among others, *Simmons Oil Corp. v. Tesoro Petroleum Corp.*, 86 F.3d 1138, 1144 (Fed. Cir. 1996)). This is true even in cases like this one where a formal discovery period has not yet occurred. *Id.*

Mr. Ravi fails to satisfy the requirements of RCFC 56(d). To begin, Mr. Ravi has not complied with the Rule's procedural requirements. He has not provided an affidavit in support of the requests. RCFC 56(d); *Clear Creek Cmty. Servs. Dist. v. United States*, 100 Fed. Cl. 78, 82-83 (2011).

In addition, Mr. Ravi's requests for discovery would be futile in light of the court's holding that the sovereign capacity doctrine presents a jurisdictional bar to Mr. Ravi's contract claims. Mr. Ravi seeks additional discovery for the following reasons: to explore whether Farmington offered "actual classes," Pl.'s Supp. Resp. at 8, to "obtain more names of students, conduct more interviews, and view government records of communications between Farmington officials and students" to determine whether these students were aware of the "pay to stay" scheme, *id.* at 9, to determine whether tuition payments "were used to fulfill Operation Paper Chase objectives," *id.* at 14, to "identify the [ICE] personnel involved" in the operation, *id.*, to "see if the Government also had implied actual authority to enter into" the alleged educational services contract, *id.*, and "to discern which agents made representations to Mr. Ravi," *id* at 16. However, the information requested would not alter the court's decision dismissing Mr. Ravi's contract claims. As discussed above, the undisputed facts demonstrate that the University of

Farmington was a government-created educational institution established as part of a lawful, certified undercover operation to identify and prosecute student visa violators and recruiters engaging in a "pay to stay" visa fraud scheme. Based these undisputed facts, the court lacks jurisdiction over Mr. Ravi's contract claims under the sovereign capacity doctrine. The court therefore denies Mr. Ravi's discovery requests as futile.[9]

### D.    Mr. Ravi's Motion to Amend His Complaint is Denied as Futile

Finally, Mr. Ravi has filed a motion to amend his complaint in order to add an additional lead plaintiff, Swetha Batchu. Mot. to Amend. at 1. Mr. Ravi asserts that "Ms. Bachu is one of the many who never received educational services after she accepted an offer to pay tuition money in exchange for an accredited educational program." *Id.* Mr. Ravi argues that allowing him to add an additional lead plaintiff years into this case "would serve justice and promote judicial efficiency." *Id.*

The government opposes this motion. Tr. 20-23. First, the government argues that "the sovereign capacity bar" is decisive, "and if the case is resolved" on that ground, "adding a party is futile." *Id.* at 21. Second, the government contends that "there is unfair prejudice and undue delay" in Mr. Ravi's request. *Id.* The government points out

---

[9] The court does not read Mr. Ravi's supplemental briefing as requesting jurisdictional discovery. *See* Pl.'s Supp. Resp. at 21 (stating that "summary judgment" would not be appropriate without additional discovery). The court may permit discovery to resolve a dispute regarding jurisdictional facts. *Clear Creek*, 100 Fed. Cl. at 81. The court, however, "may deny jurisdictional discovery when it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction[.]" *Nuance Commc'ns, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1235-36 (Fed. Cir. 2010) (quotation omitted). To the extent Mr. Ravi requests jurisdictional discovery, that request is also denied as futile, because none of Mr. Ravi's requests would provide a basis for this court's jurisdiction.

that this case was filed in 2020, and the parties have completed two rounds of briefing including "a full merits analysis as to Mr. Ravi's case." *Id.* To add an additional plaintiff now, the government argues, would make much of this effort and work "for naught." *Id.* at 21-22. Finally, the government asserts that the motion to amend "seem[s] to be an attempt to prolong" proceedings at a time when the court "is clearly ready to make a decision," which is improper. *Id.* at 22.

Mr. Ravi did not file a reply.

The court agrees with the government and will deny Mr. Ravi's motion to amend as futile. A party may amend its complaint under RCFC 15(a)(2) with the court's leave, which should be given "freely . . . when justice so requires." Courts construe this language liberally, and generally grant leave to amend. *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1158 (Fed. Cir. 2014) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). The court, however, should deny leave to amend if there is evidence of delay, bad faith, repeated failure to correct a complaint's deficiencies, undue prejudice to the opposing party, or if the amendment would be futile. *Id.*

"A proposed amendment is futile if it would not survive a motion to dismiss." *Marchena v. United States*, 128 Fed. Cl. 326, 330 (2016), *aff'd*, 702 F. App'x 988 (Fed. Cir. 2017). "When a party faces the possibility of being denied leave to amend on the ground of futility, that party . . . must proffer sufficient facts supporting the amended pleading that the claim could survive a dispositive pretrial motion." *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, 464 F.3d 1339, 1354-55 (Fed. Cir. 2006). Mr. Ravi has failed to do so here.

Mr. Ravi seeks to amend his complaint to add an additional plaintiff who will assert contract claims for educational services with the government based on the government's law enforcement activities during Operation Paper Chase. *See* Mot. to Amend. at 1. However, the court has held that it lacks jurisdiction over such claims under the sovereign capacity doctrine. Because the court would lack jurisdiction over any such claims regardless of the named plaintiff, Mr. Ravi's proposed amendment would be futile, and his motion to amend his complaint is therefore denied.

## V.    CONCLUSION

For the reasons discussed above, the government's motion to dismiss, ECF No. 7, for lack of subject matter jurisdiction under RCFC 12(b)(1) is **GRANTED**. The government's alternative motion for summary judgment is **DISMISSED AS MOOT**. Mr. Ravi's requests for further discovery, *see* ECF No. 40, are **DENIED**. Mr. Ravi's motion to amend the complaint, ECF No. 47, is also **DENIED**. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, this brief complies with the Court's type-volume limitation rules. According to the word count calculated by the word processing system with which this brief was prepared, the brief contains a total of 4,953 words.


/s/ *Amy E. Norris*
AMY E. NORRIS
Counsel for Plaintiff-Appellant