2022-1559

---

## UNITED STATES COURT OF APPEALS
### FOR THE FEDERAL CIRCUIT

---

**TEJA RAVI, Individually and on Behalf of All Others Similarly Situated,**

*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**

*Defendant-Appellee.*

---

Appeal from the United States Court of Federal Claims
Case Number 20-1237C, Judge Nancy B. Firestone

---

### APPELLANT'S CORRECTED REPLY BRIEF

---

Amy E. Norris
Anna L. Nathanson
Norris Law Group, PLLC
616 E Street, N.W., Suite 1156
Washington DC 20004-2264
Telephone 202-830-1225

*Attorneys for Appellant*

# **TABLE OF CONTENTS**

APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS
DECISION IN 20-1237C

TABLE OF AUTHORITIES……………………..………………………………...ii

SUMMARY OF THE ARGUMENT……………..…………………………..1

ARGUMENT
     I.     The Government Was Not Acting In Its Sovereign Capacity When It Entered Into The Contract With Mr. Ravi For The Provision Of Educational Services……………………………..……………………………………….3
     II.    Mr. Ravi's Claim Is Properly Characterized As A Breach Of Contract Claim……………………..……………………………………..…….10
     III.   Mr. Ravi Has Plead The Necessary Elements For Breach Of Contract………………………..……………………………………..…13

CONCLUSION…………………………………………………………………...20

i

# TABLE OF AUTHORITIES

**Cases**

*Aluminum Shapes, LLC v. United States*,
   139 Fed.Cl. 709 (2018).....................................................................7, 8

*Anderson v. United States*,
   344 F.3d 1343 (Fed. Cir. 2003).....................................................13

*Awad v. United States*,
   301 F.3d 1367 (Fed. Cir. 2002) ...............................................11, 12

*Bailey v. United States*,
   54 Fed. Cl. 459, 483 (2002) ...............................................................6

*Bloemker v. United States*,
   229 Ct. Cl. 690 (1981) ........................................................................9

*Doe v. United States*,
   58 Fed. Cl. 479 (2003) ......................................................................19

*Doe v. United States*,
   No. 19-CV-720 C, 2021 WL 1726814 (Fed. Cl. Apr. 30, 2021) .........................7

*First Com. Corp. v. United States*,
   335 F.3d 1373, 1379–80 (Fed. Cir. 2003) .........................................13

*GS-92-X003 v. United States*,
   85 Fed. Cl. 678 (2009) ........................................................................7

*Houston v. United States*,
   60 Fed.Cl. 507 (2006) .........................................................................7

*Kania v. United States*,
   650 F.2d 264 (Ct. Cl.1981).........................................................5, 6, 9

*Mendez v. United States*,
   121 Fed. Cl. 370, 381 (2015) ...............................................................6

*Prestex, Inc. v. United States,*
  320 F.2d 367 (Ct. Cl. 1963) ...................................................17

*Sadeghi v. United States,*
  46 Fed. Cl. 660 (2000) ..........................................................4

*Sanders v. United States,*
  252 F.3d 1329 (Fed.Cir.2001) ...............................................5

*SGS-92-X003 v. United States,*
  85 Fed. Cl. 678 (2009) ............................................4, 5, 6, 11

*Silva v. United States,*
  51 Fed. Cl. 374, aff'd, 51 F. App'x 12 Fed. Cir. 2002) ....................6, 9

*Sommers Oil Co. v. United States,*
  241 F.3d 1375 (Fed. Cir. 2001) ............................................6

*Stovall v. United States,*
  71 Fed. Cl. 696 (2006) ................................................. 1, 7, 9

*Suess v. United States,*
  535 F.3d 1348, 1360 (Fed. Cir. 2008) ..................................13

*Trudeau v. United States,*
  68 Fed. Cl. 121 (2005), aff'd¨186 F. App'x 998 (Fed. Cir. 2006) .........9

*United States v. Amdahl Corp.,*
  786 F.2d 387 (Fed.Cir.1986) ...............................................17

*Veridyne Corp. v. United States,*
  83 Fed. Cl. 575 (2008) .......................................................17

*Wood v. United States,*
  961 F.2d 195 (Fed.Cir.1992) ...............................................11

**Rules**

Federal Circuit Rule 28(b) ....................................................11

iii

**Statutes**

8 CFR § 214.3(l)(iii) ...............................................................................12

Tucker Act
  28 U.S. Code § 1491..................................................1, 4, 5, 6, 7, 11, 20

## SUMMARY OF THE ARGUMENT

We all agree–the trial court, the appellant, and the appellee–regarding the main question in this case: was the agreement sovereign or was it proprietary? In proprietary contracts giving rise to Tucker Act jurisdiction, the "sovereign steps off the throne and engages in purchase and sale of goods, lands, and services, transactions such as private parties, individuals or corporations also engage in among themselves". *Stovall v. United States*, 71 Fed. Cl. 696, 698 (2006). In this case, the Government engaged in the sale[1] of educational services to Mr. Ravi, such as private parties engage in among themselves. Thus, this case falls under Tucker Act jurisdiction. This Court should remand back to the trial court to rule on the merits of the case.

As the Government engaged in the sale of educational services, going as far as obtaining accreditation for the school, the Court of Federal Claims has Tucker Act jurisdiction for this matter. There was an unambiguous offer, acceptance,

---

[1] The University of Farmington had a professional website that indicated the degree programs offered. The University marketed itself as a university that "provide[s] students from throughout the world a unique educational experience". The school was accredited by the Michigan Department of Licensing and Regulatory Affairs and the Accrediting Commission of Career Schools and Colleges. Appx50. The offer letter to Mr. Ravi included an offer for renowned faculty and an education. Appx279. The Government engaged in the sale of educational services in their school that was authorized to enroll students in a university that "offer[ed] BA and MA degrees".  See Appx331. Mr. Ravi paid the tuition, effectuating the sale.

consideration, and the Government had the authority to operate the school and to enroll students. As the agreement for educational services was proprietary, subject matter jurisdiction exists, and this Honorable Court should remand back to the trial court.

The Government was not acting in its sovereign capacity when it contracted with Mr. Ravi to provide him with educational services. Unlike contracts which are plainly a part of the criminal justice system and are therefore sovereign contracts, the contract at issue here was for educational services - a purely proprietary contract. The contract was not integral to the undercover operation, and ultimately functioned only to ensnare Mr. Ravi in the Government's poorly-designed and overly broad trap. Allowing Mr. Ravi to recover the money he spent in earnest for legitimate educational services is not only fair, but would also help ensure that future undercover operations are not so haphazardly-designed as to encompass innocent parties with no criminal intent.

Mr. Ravi's claim is a breach of contract claim. He is not suing the Government for its deception, but for its failure to provide the educational services which he paid them for. The basis of Mr. Ravi's claim is the contract, not the Government's duty not to defraud him. His claim therefore is properly characterized as a contract claim.

Finally, Mr. Ravi has pleaded the necessary elements for his breach of contract claim. Mr. Ravi intended to contract for educational services, not for a pay to stay

scheme. The Government's evidence that he was told about the scheme, dated well after the contract was formed, does not undermine his intent in entering into the contract for legitimate educational services. Even if the Government had a secret intention to never provide the educational services, it opened itself up to liability when it offered the services and accepted payments for such.  Furthermore, the agents were specifically authorized to bind the Government to Mr. Ravi for these services, and, additionally, their conduct was ratified by those with the requisite authority, as indicated by the high degree of supervision and review detailed in the Government's description of the operation.


## ARGUMENT

### I.   The Government Was Not Acting In Its Sovereign Capacity When It Entered Into The Contract With Mr. Ravi For The Provision Of Educational Services

The question on appeal is whether the contract between the Government and Mr. Ravi for educational services was a sovereign or a  proprietary contract. Was the government acting in its sovereign or proprietary capacity when it entered into an alleged contract with Mr. Ravi to provide him educational services? The standard of review is *de novo.*

The contract here was a contract for educational services, and on its face was wholly separate from the criminal justice system. Nothing about the contract made

3

clear that the University was fake or part of an undercover operation. It was Mr. Ravi's intent to sign up for an accredited educational program, and he legitimately and rationally believed this was a valid contract for education services – a proprietary contract.

The contractual agreement itself was not a sovereign action. Mr. Ravi does not dispute that the Government formed the University and enrolled students in order to further Operation Paper Chase, which was itself a sovereign action; however, this contract was not a sovereign action.

The Government takes an overly broad view of what is meant by a contract "of the criminal justice system", when it considers Mr. Ravi's contract to be sovereign. The cases the Government refers to involve "plea agreements, immunity agreements, and witness protection agreements." *Sadeghi v. United States*, 46 Fed. Cl. 660, 662 (2000) (internal quotation marks omitted). Indeed, these sovereign contracts are plainly a part of the criminal justice system - a fact which would be apparent to all contracting parties at the time of formation.

Instructive here is *SGS-92-X003 v. United States*, 85 Fed. Cl. 678 (2009), where the Court determined that Tucker Act jurisdiction did apply. In *SGS*, the plaintiff, known as "the Princess," brought suit against the DEA for breach of a contract which would provide her with a commission based on the value of seized assets in exchange for her work as an undercover informant. *Id*. at 681. The Princess

alleged that the DEA did not pay her the commission, and further, that their negligence in protecting her resulted in her kidnapping. *Id*. The defendants argued that this was a witness protection contract and was therefore outside of the Tucker Act. *Id*. at 707. The Court of Federal Claims rejected the defendants' argument and determined that there was Tucker jurisdiction, reasoning:

> The Princess' services agreement does not arise out of the criminal justice system in the sense that her agreement implicates "the delicate and sensitive business of conducting criminal trials" or is properly enforced by the court administering a criminal case related to her agreement. *Kania*, 650 F.2d at 269. Indeed, there is no criminal case related to the Princess' agreement or its breach. Unlike *Kania* or *Sanders*, the Government's prosecutorial discretion did not play any role—let alone a paramount role—with respect to Plaintiff's alleged agreement. This is not a contract like a plea or immunity agreement subject to enforcement in a court of general jurisdiction in connection with its criminal jurisdiction. Although Defendant characterizes the Princess' contract as an agreement to protect a witness, it is not such an agreement. The Princess was not in the witness protection program when she was working undercover and abducted, and her confidential informant contract was not incident or adjunct to any particular criminal proceeding.

*Id*. at 708. The Court further noted, "[i]n assuming jurisdiction in this case, this Court is not treading on the District Court's criminal jurisdiction, it is merely entertaining a claim for breach of contract." *Id*. Likewise, the contract between Mr. Ravi and the Government did not relate to any specific criminal case, and "the Government's prosecutorial discretion did not play any role—let alone a paramount role—with respect to" the contract.

The Government also discusses that "courts have recognized that the Government does not waive its sovereign immunity as it relates to such agreements unless the purported agreement 'unmistakably subjects the United States to damages in the event of breach,' *id.* at 127 (citing *Kania*, 650 F.2d at 268; *Silva*, 51 Fed. Cl. at 377, aff'd, 51 F. App'x 12)." The context in the case at Bar is different from these prosecutorial discretion cases that the Government cites; the application of the principle that "the government does not waive its sovereign immunity in agreements unless the agreement unmistakable subjects the United States to damages in the event of breach" applies only in the context of prosecutorial discretion. This Court should apply the reasoning in *SGS-92-X003 v. United States*, 85 Fed. Cl. 678 (2009) to this case. The court in that case determined that the agreement was not a contract like a plea or immunity agreement subject to enforcement in a court of general jurisdiction in connection with its criminal jurisdiction.

Tucker Act jurisdiction has properly been extended in many cases involving contracts under the backdrop of undercover operations. In this case, the trial court erred when it blanketly stated that a contract is sovereign if it is a part of undercover law enforcement operation. Rather, this Court and the Court of Federal Claims have found Tucker jurisdiction in many cases involving undercover operations. See *Sommers Oil Co. v. United States*, 241 F.3d 1375 (Fed. Cir. 2001); *Bailey vs. United States*, 54 Fed. Cl. 459, 483 (2002); *Mendez v. United States*, 121 Fed. Cl. 370, 381

(2015); *GS-92-X003 v. United States*, 85 Fed. Cl. 678 (2009); *Doe v. United States*, No. 19-CV-720 C, 2021 WL 1726814 (Fed. Cl. Apr. 30, 2021).

This case differs from *Aluminum Shapes, LLC v. United States*, 139 Fed.Cl. 709 (2018), because the *Aluminum Shapes* case involved the breach of a civil enforcement settlement agreement—that agreement is the type of agreement that only the Government can make. In contrast, the agreement to provide educational services is a proprietary agreement.

The Court stated in *Stovall* that an agreement falls within the excluded sovereign realm only where it is the sort that can *only* be executed by the sovereign. Correspondingly, the concept of what falls within the "proprietary" realm—and thus within this court's Tucker Act jurisdiction—is relatively broad and includes not only the "principal class of contract" involving the procurement of goods, lands, and services, but any other agreement undertaken by the Federal government that has a private analogue, that is, categorically of the sort that can be executed among private entities and individuals. *See Houston v. United States,* 60 Fed.Cl. 507, 511 (2006) (referring to contracts made in the government's sovereign capacity as a "narrow exception" to the "broad category of proprietary contracts"). *Stovall*, 71 Fed. Cl. at 699.

Nevertheless, the Government maintains that the contract was a sovereign act, arguing that it was essential to Operation Paper Chase. The Government states that

the "central purpose of the operation was to identify foreign citizens seeking to violate immigration laws, and expose a surrounding network of illicit recruiters," and to "address[] visa fraud, . . . [t]o identify the full scope of the criminal [student visa fraud] enterprise, to include not only student visa violators, but also the recruiters and facilitators of the criminal enterprise." Govt. Br. 9, 25.

The court found that "enrolling students at Farmington was fundamental" to the goals. Assuming arguendo that enrolling students in the University was integral to the operation, the contract between Mr. Ravi and the Government was not. If the purpose was to find those only with an interest in engaging in visa fraud - not to find those with an actual interest in classes - why promise Mr. Ravi educational services at all? Why not simply "enroll" the students by providing them with fabricated documents stating that they attended the University? Even if the underlying purpose of the contract was to further the goals of the operation, the contractual agreement for educational services itself was neither necessary nor integral to the operation.

The Government stepped off its throne when it promised to provide educational services, which are proprietary in nature. This case differs from *Aluminum Shapes* because in that case, the Government was not acting in a proprietary capacity. That case involved a settlement agreement that only the government could make; there was nothing proprietary at all about the agreement. The sale of educational services, in contrast, is in the proprietary realm. There are

two main categories of contract that the government makes: proprietary and sovereign. *See Stovall v. United States*, 71 Fed. Cl. 696, 698 (2006).

The United States generally has waived sovereign immunity with regard to proprietary contracts. These are contracts in which "the sovereign steps off the throne and engages in purchase and sale of goods, lands, and services, transactions such as private parties, individuals or corporations also engage in among themselves." *Kania v. United States,* 650 F.2d 264, 268 (Ct. Cl. 1981); *see also Bloemker v. United States,* 229 Ct. Cl. 690, 692–93 (1981); *Trudeau v. United States,* 68 Fed. Cl. 121, 127 (2005), aff'd¨186 F. App'x 998 (Fed. Cir. 2006). Private parties engage in contracts for educational services among themselves; such contracts are therefore proprietary contracts, for which the Government has waived sovereign immunity.

The Government cites *Silva v. United States*, 51 Fed. Cl. 372 (2002) in support of its arguments, but *Silva* is distinguishable from the instant case. In *Silva*, the government entered an agreement with the claimant for the purpose of investigating and prosecuting the claimant's criminal conduct. *Silva v. United States*, 51 Fed. Cl. 374 (Fed. Cl. 2002). That agreement was for the care of <u>illegal</u> birds. The agreement at hand was an agreement for accredited educational services. Here, the government did not enter an agreement with the purpose of investigating

and prosecuting Mr. Ravi, but rather in pursuit of its goal of enrolling students in a university that "include[d] undergraduate and graduate degrees". *See* Appx50.

The Government also makes the argument that allowing Mr. Ravi to recover here would open the Government to breach of contract claims stemming from undercover work, and "would inflict lasting damage on the ability of law enforcement to investigate criminal activity." Govt. Br. 27. Allowing Mr. Ravi to recover here would not open up such floodgates of potential litigation. Mr. Ravi does not dispute that he would not be able to recover anything if he had paid for a pay-to-stay scheme; providing him with a remedy here would therefore not set the precedent that one who makes an illegal contract with an undercover Government agent is entitled to the benefit of that contract. On the contrary, providing relief for Mr. Ravi would serve important public policy goals, as it would encourage more careful design and supervision of undercover operations so as to not ensnare unwitting parties with no criminal intent such as Mr. Ravi. This was a sloppy investigation, and the Government should not be rewarded with millions of dollars of tuition money that was taken from students who expected educational services in return.

## II.    Mr. Ravi's Claim Is Properly Characterized As A Breach Of Contract Claim

In the alternative, the Government argues that Mr. Ravi's complaint "sounds in tort" and therefore falls outside of this Court's jurisdiction, pointing to Mr. Ravi's

condemnation of the Government's deception.  Govt. Br. 30-32.  However, even if a plaintiff "uses terminology appropriate for a tort claim," if the action "arises primarily from a contractual undertaking," his claim "sound[s] in contract and . . . therefore exclusive jurisdiction lay in the Court of Federal Claims." *Awad v. United States*, 301 F.3d 1367, 1374 (Fed. Cir. 2022) (internal quotation marks omitted). *See also SGS-92-X003*, 85 Fed. Cl. at 706 (noting that the Court of Federal Claims has jurisdiction over breach of contract claims under the Tucker Act, even if the losses arose from tortious conduct (citing *Wood v. United States*, 961 F.2d 195, 198 (Fed.Cir.1992))).

Defendant would have the Court bogged down in the details regarding F-1 visas,  but this is a simple breach of contract matter.[23] Mr. Ravi was offered

---

[2] This cause of action is the breach of a contract for educational services, and it is not an immigration law matter.  Further, the Government is most likely in violation of this Court's rules by including such a large section on F-1 visas. This section on F-1 visas provides a large section of material that is not in dispute. Federal Circuit Rule 28(b), Exclusion of Contents from Appellant's Brief, states that "[a]n appellee's statements of jurisdiction, the issues, the case and facts, and the standard of review must be limited to specific areas of disagreement with those of the appellant. Absent disagreement, an appellee must not include those statements." The section on F-1 visas contains a great deal of law and material that is not in dispute. The Government's legal background section disorients the Court as this is not an immigration law matter, but rather a matter of breach of contract for educational services. It is a Tucker Act jurisdiction case.

[3] Every school that is accredited in the United States and can accept F-1 visa holders, as the University of Farmington claimed to do, is required to have a Designated School Official (DSO). The role of the DSO is to "adequately provide recommendations to F and/or M students enrolled at the school regarding

educational services, Mr. Ravi accepted the offer for educational services, and there was consideration in the form of thousands of dollars in tuition money. The Government had authorization to make the offer of educational services to the students.

The Government mischaracterizes Mr. Ravi's complaint. First, to call Farmington "fake" and a "facade" is not an allegation of fraud – it is undisputed. Moreover, the basis of the lawsuit is not that the Government intentionally misled Mr. Ravi when it induced him to enter into a contractual agreement for educational services, but that it induced him to do so at all, and then accepted his money without providing the contracted-for services. As stated, Mr. Ravi genuinely wanted to enroll in a graduate IT program. Mr. Ravi is not bringing suit because the Government tricked him, but because they breached their contract to provide him with this education. Absent this contract, the Government had no obligation to provide Mr. Ravi with such services; "the sole source of any such duty was contractual." *Awad*, 301 F.3d at 1373. Thus, as in *Awad*, this is properly characterized as a contract action.

---

maintenance of nonimmigrant status". 8 CFR § 214.3(l)(iii). The University of Farmington did not comply with immigration law when operating its school. However, that argument is for an Administrative Procedure Act action. This is a breach of contract action. The tuition paid under the contract for educational services is not recoverable under the APA, as monetary damages are not allowed under the APA. The Court of Federal Claims is the appropriate court for the breach of contract action against the Government.

## III.   Mr. Ravi Has Plead The Necessary Elements For Breach Of Contract

Finally, the Government argues that Mr. Ravi has not plead the necessary elements for a breach of contract claim against the Government, and specifically highlights the first and fourth elements: mutuality of intent to contract, and actual authority by the contracting Government representative to bind the Government. Govt. Br. 33.

The requisite elements of a contract with the government are . . . : mutual intent, including an unambiguous offer and acceptance; consideration; and authority . . . *First Com. Corp. v. United States*, 335 F.3d 1373, 1379–80 (Fed. Cir. 2003). To satisfy its burden to prove mutuality of intent, "a plaintiff must show, by objective evidence, the existence of an offer and a reciprocal acceptance." *Anderson v. United States,* 344 F.3d 1343, 1353 (Fed. Cir. 2003). *See also Suess v. United States*, 535 F.3d 1348, 1360 (Fed. Cir. 2008). Ravi received an unambiguous offer. *See* Appx52-53. He then indicated his acceptance to the University of Farmington and submitted tuition payments. *See* Appx298-309. An unambiguous offer and acceptance occurred in this case.[4] The mutuality of intent element is satisfied.

---

[4] In this case, there was an objective manifestation of voluntary, mutual assent— the manifestation of willingness to enter into a bargain. The February 15, 2018 offer letter manifested the University of Farmington's intent to provide educational services from "professional faculty" and gave specific amounts for tuition. The invoices from the University indicated the expected consideration for the bargain.

The government's actions and communication held to an objective standard demonstrate a manifestation of assent to provide education services in exchange for tuition payments from students. In an email communication from The University of Farmington, an agent wrote:

> The University of Farmington operates on a quarterly academic calendar, each term is generally ten weeks, excluding exams, and the admissions process is on a rolling basis. Terms start every three months, beginning in September, December, March, and June. Sessions begin every month. Graduate programs tuition is $2500 per quarter. Depending on fees, average costs is $1000 per month. We are accredited by the Accrediting Commission of Career Schools and Colleges and licensed by the Michigan Department of Licensing and Regulatory Affairs as a private postsecondary college.

> Appx50.

The payment of tuition was the manifestation of assent to the terms of the offer. The consideration was made in the tuition payments. Here, the objective manifestation was an offer for educational services. Whether the government subjectively and secretly did not intend to provide those services is immaterial, and that is not the standard for contract formation. The objective offer indicated that the University of Farmington intended to provide educational services. Objectively, mutuality of intent occurred to provide education services and to receive education services. The offer was bound by consideration made in the form of the payments

---

The February 15, 2018 offer letter is objective evidence of an offer for educational services.

for tuition. The objective manifestation indicated that the University of Farmington intended to provide educational services, and therefore mutuality of intent exists.

The unambiguous, objective offer and acceptance was for educational services, not for an illegal purpose. The Government asserts that Mr. Ravi was informed from the beginning that the University was fake and that he intended to take part in a pay to stay scheme, but this is untrue and there is no evidence to support this contention. The evidence supports that Ravi intended to sign up for the accredited program that the University of Farmington offered, he wished to attend a legitimate school and he thought that the University of Farmington was a legitimate school. See Appx50-53, Appx276-277.

The communications cited by the Government in which Mr. Ravi was informed that the University was fake were sent in November 2018 – nine months after Mr. Ravi was accepted into the alleged program in February 2018 and eight months after he paid for the contracted-for services in March 2018. This email therefore does nothing to undermine Mr. Ravi's assertions, under oath, that he legitimately wanted an education. Appx286. Mr. Ravi never sent the fraudulent information requested in the email, because he only wanted a legal education. Appx433-444. Likewise, the November 2018 audio recordings which the Government references do not establish that Mr. Ravi knew that the University was fake when he signed up. These conversations took place after he was accepted into

the University and made his payments, and he never intended to join an illegal university. After being told the university was illegitimate, Mr. Ravi tried to transfer, but University of Farmington officials thwarted his attempt to do so. Appx433-444.

The government spent some time discussing Mr. Thakkallapally. Mr. Thakkallapally was a recruiter for a few universities that did offer an education, including Harrisburg University and Northwest Polytechnic Institute. We deny that Mr. Thakkallapally "informed his recruits" "[a]t the outset" "there would be no classes and no education." Govt. Br. 13; this is not substantiated by the Court Record, as it was a mere allegation made by the prosecution against Mr. Thakkallapally. Appx373. Mr. Thakkallapally was the target of the University of Farmington's operation. Mr. Thakallapally's criminal behavior should not be imputed to our client, Mr. Ravi, who was just seeking an education.

The government is stating that all relevant communications were recorded. Govt. Br. 14. If that was true, why are there no recordings and records informing Mr. Ravi *before he entered the agreement for educational services* that there were no classes and no education? The record indicates that he was told that the school was accredited and he was offered an education. *See* Appx279*,* Appx432-434*.*

The defendant mischaracterizes our client's intent; Mr. Ravi had the intent to enroll in a legitimate educational program. Once he was trapped in the University of

Farmington, about nine months in, the agents told him it was illegal. He was trapped at that point. The agents did not allow him to transfer once he enrolled.

Even if the Government never intended to provide educational services, the fact of the matter is that the Government intended to enter into the contract with Mr. Ravi. The Government argues that it never intended to be bound and the contract was therefore void and unenforceable. The objective intent of the Government was to enter into a legal contract for educational services. The school was accredited, the offer for educational services was unambiguous. See Appx279, Appx432-434. The offer was not for a pay-to-stay scheme. See Appx279, Appx432-434.   Even if the Government lacked the requisite objective intent and the contract was void - which is not the case - that would not leave Mr. Ravi without a remedy. In accepting Mr. Ravi's tuition payments, the Government opened itself up to liability. As this Court stated in *United States v. Amdahl Corp.*, "[w]here a benefit has been conferred . . on the government in the form of goods or services, which it accepted, a contractor may recover at least on a quantum valebant or quantum meruit." 786 F.2d 387, 393 (Fed. Cir. 1986). "Even though a contract be unenforceable against the Government, because not properly advertised, not authorized, or for some other reason, it is only fair and just that the Government pay for goods delivered or services rendered and accepted under it." *Id*. (quoting *Prestex, Inc. v. United States*, 320 F.2d 367, 373 (Ct.Cl.1963)). *See also Veridyne Corp. v. United States*, 83 Fed. Cl. 575, 586 (2008)

("The case law, properly read, does not support defendant's argument that the appropriate remedy for any contract that is void ab initio is forfeiture of monies already paid or the denial of recovery in quantum meruit or quantum valebat."). Here, Mr. Ravi paid the Government for an education, not for any illegal purpose. The Government accepted this money but did not provide the promised service. Mr. Ravi is therefore entitled to a remedy.

The Government also contests that the agents had authority to contractually bind the Government to provide the services. However, the government had the express actual authority to offer educational services. Specifically, the authorization documents state that "In January 2017, HSI established an undercover **university [to offer] BA and MA degrees** that exists within the Student and Exchange Visitors Information System (SEVIS) as a means to backstop its identity as well as serve as a way for the UCA, posing as an Admissions Officer and DSOs, to accept and transfer aliens . . ." Appx331. Repeatedly, this included authorizing agents to "establish or acquire proprietary corporations or business entities" and "operate them on a commercial basis". Appx86-92, Appx111-117, Appx149-155, Appx183-186, Appx202-204, Appx221-223, Appx238-241, Appx256-259. Agents were authorized to establish and operate commercial entities without limit; this gave them the authority to commercially operate a school, as they did. Contracting for educational

services falls within operating a school on a commercial basis, as agents were explicitly authorized to do.

Even if the agents had not been authorized, which they were, an unauthorized contract is ratified when those with the requisite authority "have actual or constructive knowledge of the unauthorized facts ... [which] can only be based upon a full knowledge of all the facts upon which the unauthorized action was taken." *Doe v. United States*, 58 Fed. Cl. 479, 486 (2003) (internal quotation marks omitted). The Government notes that the "Executive Associate Director for HSI, exercising delegated authority from the Secretary of DHS . . . reviewed and approved (and then, where necessary, reapproved) all procedures and operations." Govt. Br. 11. Further, "[e]ach authorization request explained the operation in detail, included mission objectives, and outlined what progress agents had made," and the AUSA "continued to provide regular oversight of the undercover operation as it unfolded." The agents were "authorized to pose as if they did to further a law enforcement operation." Govt. Br. 26.  The Government also noted that "incoming and outgoing communications were memorialized by law enforcement agents." Govt. Br. 14 n. 7. These admissions indicate that those with the authority to bind the Government had full knowledge of the agents' activities, including the contract and the acceptance of Mr. Ravi's money. The agents had actual authority to operate the school and enroll students, and they

were authorized to make the contract and accept Mr. Ravi's money, and their actions were subsequently ratified by their superiors' knowledge.

## CONCLUSION

In conclusion, given that the contract between the Government and Mr. Ravi was one for educational services, the contract had no apparent connections to the criminal justice system, and it was not integral to Operation Paper Chase, the contract is properly considered a proprietary contract and falls under the Tucker Act.

Mr. Ravi's lawsuit is based on this contract and the Government's breach thereof - not upon any pre-existing duty owed to Mr. Ravi, or any tortious conduct by the Government.

Mr. Ravi has pleaded the elements for this breach of contract claim, as he has asserted that his intent was to enter into a legitimate proprietary contract. It is undisputed the Government offered the proprietary educational services and accepted Mr. Ravi's money for such. Further, not only was the contract specifically authorized, but it was also ratified by the supervision of those with authority to bind the Government.

For these reasons, the Court's dismissal of Mr. Ravi's claim should be reversed.

Respectfully submitted,

/s/ *Amy E. Norris*, *Esq*., (#1017140)
Amy@norrislawgroup.org

/s/ *Anna L. Nathanson*, *Esq*., (#1737999)
Anna@norrislawgroup.org

(202) 830-1225

NORRIS LAW, PLLC
616 E Street N.W, Suite 1156
Washington, DC 20004

Attorneys for Teja Ravi

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, this brief complies with the Court's type-volume limitation rules. According to the word count calculated by the word processing system with which this brief was prepared, the brief contains a total of 4,987 words.

/s/ *Amy E. Norris*
AMY E. NORRIS
Counsel for Plaintiff-Appellant