**Volume I, Pages 1 to 274**

2022-1559

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

**TEJA RAVI, Individually and on Behalf of All Others Similarly Situated,**

*Plaintiff-Appellant*

**v.**

**UNITED STATES,**

*Defendant-Appellee*

Appeal from the United States Court of Federal Claims
Case Number 20-1237C, Judge Nancy B. Firestone

## CORRECTED JOINT APPENDIX - NONCONFIDENTIAL

**Amy E. Norris**
**Anna L. Nathanson**
Norris Law Group, PLLC
616 E Street, N.W.
Washington, DC 20004-2264
Telephone 202-830-1225

*Attorneys for Plaintiff-Appellant*

**Brian M. Boynton**
Principal Deputy Assistant Attorney General

**Patricia M. McCarthy**
Director

**Eric P. Bruskin**
Assistant Director

**Meen Geu Oh**
Senior Trial Counsel
Commercial Litigation Branch
Civil Division, Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Telephone 202-307-0184

*Attorneys for Defendant-Appellee*

JOINT APPENDIX
TEJA RAVI V. UNITED STATES

## Table of Contents

**Item Description**                                                      **Page Number**

United States Court of Federal Claims Dismissal of
Case No. 20-1237 C dated March 16, 2022…………......……….……………...**1-27**

United States Court of Federal Claims Civil Docket for
Case No. 20-1237 C……………………………………………………….…..**28-32**

Class action complaint in the United States Court of Federal Claims,
Case No. 20-1237 C and attached Exhibits 1-2………......………………..……..**33-53**

      Exhibit 1: I-20, Certificate of Eligibility for Nonimmigrant Student
      Status..………………………………………………………………..**45-48**

      Exhibit 2: Emails and invoices sent by University of Farmington……..**49-53**

Amended class action complaint in the United States Court of Federal Claims,
Case No. 20-1237 C…………..…...……………………………………...…….…..**54-65**

Defendant's Motion to Dismiss Case No. 20-1237 C in the
United States Court of Federal Claims…………………………...……….…..**66-74**

Plaintiff's Opposition to Defendant's Motion to Dismiss Case No. 20-1237 C
in the United States Court of Federal Claims and attached Exhibits A-I…......**75-310**

      Exhibit A: I-20, Certificate of Eligibility for Nonimmigrant Student
      Status..………………………………………………………..………....**81-84**

      *Exhibit B: Government Documents on Operation Paper Chase……..**85-274**

      Exhibit C: Application for University of Farmington…...............……**275-277**

      Exhibit D: Acceptance Documents for University of Farmington..…**278-282**

Exhibit E: Emails from University of Farmington dated
March 21, 2018……………………..…………………………………..**283-284**

Exhibit F: Email from University of Farmington dated
November 9, 2018; Request for Evidence………………..……….**285-295**

Exhibit G: Audio Recording Filed Under Separate Event………………..**296**

Exhibit H: Invoices Paid to University of Farmington………………**297-306**

Exhibit I: Departure Record for Teja Ravi…………………..………**307-309**

**Additional Appendix Documents………………………...…………….**310-440**

Affidavits of University of Farmington Students………….**400-402, 408-421**

Affidavit of Teja Ravi…………………..……………………………**432-434**

Notice of Appeal……………………...………………………..…………...….**441**

Declaration of Stephen Webber…………………………..………….………**442-452**

Affidavit of Angela L. Avery…………………………….....…………………**453-454**

<u>Appellee's Statement</u>
*Appx85-274 contains information that was redacted by the Government before
the trial court on law enforcement sensitivity and privilege grounds as the
information pertains to an ongoing undercover law enforcement investigation and
investigative methods and processes. *See* ECF No. 50 (explaining grounds of
privilege assertion and that assertions were not challenged before the trial court).

**Appx323-336 contains information designated as confidential and subject to
protective order as those pages contains names and other identifying information of
individuals consulted and responsible for approving the undercover operation, as well
as sensitive information pertaining the approval processes for the operation itself.
Appx325-328, Appx331-332, and Appx336 contains information designated (and
redacted) by the Government before the trial court as law enforcement sensitive
and privileged.

<u>Appellant's Statement</u>

*Appellant contends that the privilege assertion was challenged at the trial court level. *See* Opposition to Motion for Protective Order, Appx29 (ECF No. 22). Appellant also contends that the undisclosed redacted material may include a description of the Farmington/ Paper Chase Operation running a proprietary business, because based on a review of ICE policies, a common reason for ICE to label an undercover law enforcement investigation "sensitive" is if it involves running a proprietary business.

** Appellant contends that the privilege assertion was challenged at the trial level and that the undisclosed redacted material may include a description of the Farmington/ Paper Chase Operation running a proprietary business, because based on a review of ICE policies, a common reason for ICE to label an undercover law enforcement investigation "sensitive" is if it involves running a proprietary business.

# In the United States Court of Federal Claims

**No. 20-1237 C**

**Filed: March 16, 2022**

**TEJA RAVI**

**v.**                                                    **JUDGMENT**

**THE UNITED STATES**

      Pursuant to the court's Opinion, filed March 16, 2022, granting defendant's motion to dismiss,

      IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff's complaint is dismissed for lack of subject matter jurisdiction.

Lisa L. Reyes
Clerk of Court

By:    s/ Debra L. Samler

Deputy Clerk

NOTE: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Filing fee is $505.00.

# In the United States Court of Federal Claims

No. 20-1237C
(Filed: March 25, 2022)*
**\*Opinion originally filed under seal on March 16, 2022**

| | | |
|---|---|---|
| TEJA RAVI, | ) | |
| | ) | |
| | ) | Motion to Dismiss; RCFC 12(b)(1); |
| Plaintiff, | ) | Sovereign Capacity Doctrine; RCFC |
| | ) | 56(d); RCFC 15; Futility |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

*Amy E. Norris*, Washington, DC, for plaintiff.

*Meen Geu Oh*, Civil Division, United States Department of Justice, Washington, DC, with whom were *Brian M. Boynton*, Acting Assistant Attorney General, *Martin F. Hockey, Jr.*, Acting Director, and *Eric P. Bruskin*, Assistant Director, for defendant.

## OPINION

**FIRESTONE**, *Senior Judge.*

Between 2018 and 2019, plaintiff Teja Ravi,[1] a citizen of India, enrolled at and made tuition payments to the University of Farmington. At the time of his enrollment, Mr. Ravi did not know that the University of Farmington was a fictitious school staffed and operated by agents from United States Immigration and Customs and Enforcement

---

[1] Mr. Ravi's legal name is Ravi Teja Tiyagurra. Def.'s Supp. Br. at 1 n.1, ECF No. 24. However, the parties continue to refer to the plaintiff as Teja Ravi and, for consistency, so will the court.

(ICE) as part of an undercover law enforcement operation whose purpose was to expose student visa fraud. In 2019, after ICE ceased operating Farmington and began pursuing enforcement actions, Mr. Ravi left the United States and returned to India. In this action, Mr. Ravi seeks the return of his tuition payments, alleging that the government breached a contract with him when it did not provide him legitimate educational services.

Now pending before the court are the government's motion to dismiss Mr. Ravi's amended complaint, or, in the alternative, motion for summary judgment, as well as Mr. Ravi's requests for additional discovery and his motion to further amend his complaint. As discussed in more detail below, the court **GRANTS** the government's motion to dismiss Mr. Ravi's amended complaint for lack of subject matter jurisdiction because the sovereign capacity doctrine bars this court from hearing Mr. Ravi's contract claims. The government's alternative motion for summary judgment is **DISMISSED AS MOOT.** Mr. Ravi's requests for further discovery are **DENIED** as futile, and Mr. Ravi's motion to amend the complaint is also **DENIED** as futile.

## I.    STATUTORY AND REGULATORY BACKGROUND

The laws of the United States generally require foreign citizens to obtain a visa before entering the country. One type of visa the United States offers to foreign citizens is the F-1 nonimmigrant academic visa, sometimes called a student visa. *See* 8 U.S.C. § 1101(a)(15)(F)(i). The F-1 visa allows "nonimmigrant students" to come to the United

States for a specified time period to pursue a "full course of study"[2] at an approved educational institution. *See id.*

Students seeking an F-1 visa are subject to certain requirements. The students must apply and be accepted to a school certified by the Student and Exchange Visitor Program (SEVP), which is overseen by the Department of Homeland Security (DHS). Def.'s Supp. Br. at 3 (citing U.S. Dep't of State, Bureau of Consular Affairs, Student Visa Page, available at https://travel.state.gov/content/travel/en/us-visas/study/student-visa.html (last accessed March 16, 2022)); *see* 8 C.F.R. § 214.3. SEVP schools are authorized to issue students a "Certificate of Eligibility for Nonimmigrant Student Status," otherwise known as a Form I-20, which demonstrates that the holder meets all standards of admission for the school and has been accepted for a full course of study. *See* 8 C.F.R. § 214.2(f)(1)(i)(A). Upon receiving the Form I-20, the student must complete an F-1 visa application, and, if granted an F-1 visa, must pursue a full course of study for the entire time period specified in the visa (subject to certain exceptions not relevant here). *See* 8 C.F.R. § 214.2(f)(5)(i). Visa holders may work for pay in addition to participating in their full course of study by obtaining a Form I-20 authorizing "curricular practical training" or CPT. *See* 8 C.F.R. § 214.2(f)(10)(i). A student is required to return to his or her home country within 60 days of when the approved course

---

[2] A "full course of study" is defined in detail in 8 C.F.R. § 214.2(f)(6), which generally requires a certain number of credit or clock hours depending on the type of educational program attended under a student visa.

of study is complete, or within 15 days of when the individual ceases to maintain a full course of study.  8 C.F.R. § 214.2(f)(5)(iv).

## II.    FACTUAL BACKGROUND

The following undisputed facts relevant to this opinion are taken from Mr. Ravi's amended complaint and certain unchallenged parts of the exhibits to the parties' briefs.

### A.    The University of Farmington

In December 2014, in consultation with the United States Attorney's Office in the Eastern District of Michigan, government officials devised a three-year law enforcement strategy called Operation Paper Chase.  Def.'s Supp. Br., Ex. 2 ¶ 8 ("Webber Decl.").  Operation Paper Chase was a certified undercover law enforcement operation designed to target individuals fraudulently maintaining their student visa status while working in the United States, without having to attend classes or maintain a full course of study, by paying tuition to a collaborating educational institution in exchange for a Form I-20 authorizing CPT.  Def.'s Supp. Br. at 6; Def.'s Appx49, ECF No. 33; Webber Decl. ¶ 8;

*see also* Am. Compl. ¶ 1, ECF No. 8.  This type of student visa fraud is known as a "pay to stay" scheme.  Def.'s Supp. Br. at 5.  Operation Paper Chase was also designed to target recruiters who assisted students in participating in the "pay to stay" scheme.  *Id.* at 7.  The day-to-day aspects of the operation were carried out by agents of Homeland

Security Investigations (HSI) in ICE.  Webber Decl. ¶¶ 8-9; *see also* Am. Compl. ¶ 1.

The setting for the undercover operation was the University of Farmington, which was presented as "a State of Michigan licensed and nationally accredited private

university."  Def.'s Appx111; *see also* Webber Decl. ¶ 9; Am. Compl. ¶ 1.  To set up the

operation, HSI undercover agents secured and staffed a commercial office building in the

Detroit, Michigan area and, for purposes of the operation, obtained state accreditation for

the school. Webber Decl. ¶ 9; Am. Compl. ¶¶ 8-11. Undercover agents were also

assigned to "maintain[] a website and a significant and active social media presence."

Def.'s Appx111; Am. Compl. ¶¶ 13-15. The HSI agents posing as Farmington

administrators accepted applications and corresponded with potential and enrolled

Farmington students. *See* Webber Decl. ¶ 11; Am. Compl. ¶ 22.

　　To ensure that Operation Paper Chase complied with the law governing such

undercover operations, HSI followed the certification procedures in two statutes: 8

U.S.C. § 1363a and 19 U.S.C. § 2081.[3] Webber Decl. ¶ 8 (referencing certification

materials); *see, e.g.,* Def.'s Appx6 (certification memorandum). These statutes authorize

DHS through its ICE agents to lease commercial spaces, "establish or acquire"

commercial entities, and "operate" these "entities on a commercial basis." 8 U.S.C. §

1363a; 19 U.S.C. § 2081. These statutes also explain the procedural steps ICE must

undertake and the approvals ICE must obtain to exercise the undercover authority in the

statutes. *Id.* Once approved, the statutes authorize ICE to use "proceeds" retained in the

operation to recoup costs expended in the undercover efforts. *Id.*

---

[3] The Title 8 statute applied to what was formerly the Immigration and Naturalization Service
(INS), and the Title 19 statute applied to what was formerly the Customs Service. The
investigative and enforcement functions of INS and the Customs Service were later combined
and reorganized under ICE, which is part of DHS. Congress has conveyed to DHS the authority
granted to government officials under the statutes. Def.'s Supp. Br. at 9 n.6 (citing 6 U.S.C. §
557).

### B.    Mr. Ravi's Enrollment at Farmington

Mr. Ravi is a citizen of India who, at the time he applied to the University of Farmington in February 2018, was already enrolled at Northwestern Polytechnic University in California under an F-1 visa.  Am. Compl. ¶ 29; Def.'s Supp. Br. at 11.  In March 2018, Mr. Ravi enrolled at the University of Farmington in its "Information Technology" program and received from Farmington a Form I-20.  Am. Compl. ¶¶ 17, 29; Def. Supp. Br. at 11.  From the time of his enrollment through January 2019, Mr. Ravi paid Farmington $12,500 in tuition.  Am. Compl. ¶ 30; *see* Def.'s Supp. Br. at 11, 13.  During his entire time with Farmington, Mr. Ravi did not attend any classes or complete any assignments.  Am. Compl. ¶¶ 30-31.

In January 2019, HSI ceased operating Farmington and began enforcement actions related to Operation Paper Chase.  Webber Decl. ¶ 27; Def.'s Appx183; Am. Compl. ¶ 27.  After Mr. Ravi learned that Farmington was part of an undercover operation and enforcement actions began, Mr. Ravi returned to India.  Webber Decl. ¶ 28; *see* Pl.'s Supp. Resp., Ex. 7 ¶ 1, ECF No. 40 (Mr. Ravi's declaration, stating that he currently resides in India).

## III.    PROCEDURAL BACKGROUND

On September 21, 2020, Mr. Ravi filed his initial complaint in this court individually and on behalf of a class of similarly situated Farmington students.  Compl. ¶¶ 2-4, ECF No. 1.  According to Mr. Ravi, he understood the University to be a legitimate educational institution and, by paying tuition, he entered into a contractual relationship with the government for educational services.  *Id.* ¶¶ 9-33, 39-43.  Because

the government never provided those services, Mr. Ravi brings claims for breach of contract and breach of the implied covenant of good faith and fair dealing. *Id.* ¶¶ 39-49. Among other things, he seeks that the action be certified as a class action,[4] "compensatory, statutory and/or punitive damages" for breach of contract, "fraud, negligent misrepresentation and false promises," and "equitable monetary relief, including restitution and disgorgement." *Id.* ¶ 50.

On January 8, 2021, the government filed a motion to dismiss the complaint under Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), arguing that Mr. Ravi failed to sufficiently allege two elements required to establish a valid contract with the government: that the government intended to enter into an educational services contract with Mr. Ravi and that the HSI agents running Farmington had actual authority to bind the government in a contract for educational services. Def.'s Mot. to Dismiss at 5-6, ECF No. 7. The government also argues that Mr. Ravi's claims should be dismissed under the sovereign capacity doctrine, which bars contract claims that arise out of the government's sovereign actions. *Id.* at 6-7.

After the government filed its motion to dismiss, on January 28, 2021, Mr. Ravi filed an amended complaint under RCFC 15(a)(1)(B). The amended complaint reiterates the allegations of the original complaint and adds allegations that the HSI personnel behind the University "had actual authority to bind the government in contract . . . ." Am. Compl. ¶ 43; *see also id.* ¶ 8. The amended complaint also alleges that the

---

[4] Mr. Ravi has not filed a motion for class certification and he is the only named plaintiff in this case.

government "ratified" the contracts for educational services with Farmington students when it "accepted the benefit of the contracts by keeping all tuition money paid by Plaintiff and class members under the contracts." *Id.* ¶ 44; *see also id.* ¶ 27.

After the government filed its reply brief in support of its motion to dismiss, the court held a status conference and ordered Mr. Ravi to file a supplemental brief regarding whether Mr. Ravi, as a citizen of India, had standing to sue under the Reciprocity Act, 28 U.S.C. § 2502.  *See* Joint Status Report Order, ECF No. 14.  The Reciprocity Act grants plaintiffs who are citizens of a foreign government the right to sue the United States in its courts only if a reciprocal right is afforded to an American citizen in the plaintiff's country.  28 U.S.C. § 2502.  In his supplemental briefing, Mr. Ravi argues, and the government agrees, that the Reciprocity Act does not bar Mr. Ravi's claims.  Pl.'s Supp. Br. at 1-3, ECF No. 17; Def.'s Supp. Resp. at 1-3, ECF No. 23.

The court also ordered the government to file a supplemental brief in support of its motion to dismiss or, in the alternative, a motion for summary judgment.  *See* Joint Status Report Order, ECF No. 14.  The court directed the government to address in its supplemental briefing a variety of topics, including "the statutory basis for the University of Farmington undercover operation and whether that operation was certified under the relevant statutes," whether the alleged educational services contract with Mr. Ravi was illegal and unenforceable, and whether the HSI agents operating the University of Farmington had the authority to bind the United States to an educational services contract

with Mr. Ravi.[5] *Id.* In its supplemental briefing, the government argues that Mr. Ravi's amended complaint should be dismissed or summary judgment should be granted in the government's favor for three reasons: (1) the sovereign capacity doctrine bars Mr. Ravi's claims because those claims arise out of a certified undercover law enforcement action; (2) Mr. Ravi cannot plead or prove a mutuality of intent to contract or that HSI agents had the necessary authority to bind the United States to a contract for educational services; and (3) Mr. Ravi knew his conduct was illegal, and, therefore the doctrine of *in pari delicto* bars him from obtaining assistance from this court to recover his tuition money. Def.'s Supp. Br. at 2. The government attached to its supplemental brief evidence in support of these arguments, including affidavits from ICE personnel and the required certification documents for the Farmington undercover operation. *See generally* Def.'s Appx6-255.

Supplemental briefing on the government's motion to dismiss, or, in the alternative, for summary judgment was completed on October 8, 2021. Oral argument was held on January 13, 2022, and the government's motion is now pending.

Two other matters are also before the court. First, Mr. Ravi makes a request in his supplemental briefing for further discovery, which the government opposes. Pl.'s Supp. Resp. at 8-9, 14, 16, 21; Def.'s Supp. Reply at 3, 9-10, ECF No. 43. Second, one day before oral argument, Mr. Ravi moved to amend his complaint to add another named plaintiff. Mot. to Amend at 1, ECF No. 47. Pursuant to the court's January 12, 2022

---

[5] The court also entered a protective order governing the disclosure of the evidence the government submitted in support of its supplemental brief. *See* Protective Order, ECF No. 30.

order, ECF No. 49, the government at oral argument opposed the motion to amend, Tr. 20-23, ECF No. 51.

## IV.  DISCUSSION

Although the parties agree on this point, the court first addresses whether the Reciprocity Act bars Mr. Ravi's claims.  The court will then turn to the government's motion to dismiss, or, in the alternative, motion for summary judgment.  Finally, the court will address Mr. Ravi's request for additional discovery and Mr. Ravi's motion to amend his complaint to add another named plaintiff.

### A.    The Reciprocity Act Does Not Bar Mr. Ravi's Contract Claims

Because Mr. Ravi is a citizen of India, he must meet the requirements of the Reciprocity Act, 28 U.S.C. § 2502, in order to pursue his claims before this court.  Under the Reciprocity Act, "[c]itizens or subjects of any foreign government which accords to citizens of the United States the right to prosecute claims against their government in its courts may sue the United States in the United States Court of Federal Claims if the subject matter of the suit is otherwise within such court's jurisdiction." *Id.*  The Act "burdens alien plaintiffs who invoke the process of the Court of Federal Claims with showing that their home courts treat natives and American citizens equally when they adjudicate claims brought against their home countries." *El-Shifa Pharm. Indus. Co. v. United States*, 378 F.3d 1346, 1354 (Fed. Cir. 2004).  The Act should not be interpreted "rigidly" and does not require "the existence of an action in the foreign state of identical nature or scope." *Ferreiro v. United States*, 350 F.3d 1318, 1322 (Fed. Cir. 2003).  Rather, "[e]qual treatment is the paramount requirement of the Reciprocity Act." *Id.*  A

plaintiff may satisfy the requirements of the Reciprocity Act with evidence—such as statutes, case law, treaties, or an affidavit from an experienced attorney or government official from the foreign state, *see Yifrach v. United States*, 145 Fed. Cl. 691, 697 (2019); *Humphries v. United States*, 44 Fed. Cl. 81, 82 (1999)—that demonstrates that "American citizens enjoy an equal standing with foreigners in actions against the foreign state," *Nippon Hodo Co. v. United States*, 285 F.2d 766, 767-68 (Ct. Cl. 1961).

In this case, the court agrees with Mr. Ravi and the government that Mr. Ravi has satisfied the requirements of the Reciprocity Act. *See* Pl.'s Supp. Br. at 1-3; Def.'s Supp. Resp. at 1-3. Mr. Ravi provides an affidavit from an experienced Indian attorney who is an Assistant Professor at a leading law school in India explaining that "an American citizen has a right to sue the Indian government in its courts under the existing constitutional as well as statutory scheme in India." Pl.'s Supp. Br., Ex. A at 2. In support, Mr. Ravi's supplemental brief and attached affidavit cite the Indian Constitution, Indian Civil Procedure Code Sections 9, 79, and 83, and case law. *Id.* at 1-3, Ex. A at 2-9; *see also* Def.'s Supp. Resp. at 1-3 (citing Article 300(1) of India's Constitution and Sections 9, 79, and 83 of India's Code of Civil Procedure). Taken together, these sources of law demonstrate that the Act does not bar Mr. Ravi's claims.

Article 300(1) of the Constitution of India authorizes suits against the Indian government:

> The Government of India may sue or be sued by the name of the Union of India and the Government of a State may sue or be sued by the name of the State and may, subject to any provisions which may be made by an Act of Parliament or of the Legislature of such State enacted by virtue of powers conferred by this Constitution, sue or be sued in relation to their respective affairs in the like cases as the Dominion of India and the corresponding Provinces or the corresponding

Indian States might have sued or been sued if this Constitution had not been enacted.

*See also* Pl.'s Supp. Br., Ex. A at 8 n.28, Ex. B; Def.'s Supp. Resp. at 2. Likewise,

Section 79 of India's Code of Civil Procedure states:

> In a suit by or against the Government, the authority to be named as plaintiff or defendant, as the case may be, shall be – (a) in the case of a suit by or against the Central Government, the Union of India, and (b) in the case of a suit by or against a State Government, the State.

*See also* Pl.'s Supp. Br., Ex. A at 8 & n.27; Def.'s Supp. Resp. at 2. In addition, Section

9 of India's Code of Civil Procedure confers Indian courts with jurisdiction over "all civil

suits." Pl.'s Supp. Br., Ex. A at 8 & n.26 (noting a "civil court in India would have

jurisdiction to entertain" civil suits). These provisions together provide that the

government of India is subject to civil lawsuits, with no limitations on who may bring

those claims. *Id.*, Ex. A at 8 (explaining that Section 79 and Article 300 of the Indian

Constitution "provide[] that the Government of India may sue or be sued").

Section 83 of India's Code of Civil Procedure states that "alien friends[] may sue

in any Court otherwise competent to try the suit, as if they were a citizen of India." *See*

*also* Pl.'s Supp. Br., Ex. A at 8-9 & n.29. Alien friends under Section 83 are foreign

citizens whose government is not "at war with India," such as American citizens. *Id.*

Section 83 demonstrates that American citizens and Indian citizens may sue the Indian

government on equal footing.

Therefore, when read together, the Indian Constitution and Code of Civil

Procedure Sections 9, 79, and 83, and the affidavit submitted by Mr. Ravi, Pl.'s Supp. Br.,

Ex. A, demonstrate that American citizens "enjoy an equal standing" with Indian

citizens in actions against the Indian government. *Nippon Hondo Co.*, 285 F.2d at 767-78. The court thus concludes that the Reciprocity Act does not bar Mr. Ravi's contract claims in this court.

### B.    The Sovereign Capacity Doctrine Bars Mr. Ravi's Contract Claims

While the government has moved to dismiss Mr. Ravi's contract claims, or for summary judgment, on three grounds, this opinion will focus only on the government's argument based on the sovereign capacity doctrine that Mr. Ravi's claims should be dismissed for lack of subject matter jurisdiction under RCFC 12(b)(1). As discussed below, under the sovereign capacity doctrine, the court must dismiss Mr. Ravi's contract claims.

### i.    Legal Standard Under RCFC 12(b)(1)

When deciding a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), the court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the plaintiff's favor. *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). The plaintiff bears the burden of establishing subject matter jurisdiction, and must do so by a preponderance of the evidence. *Id.* If the court determines that it lacks subject matter jurisdiction, it must dismiss the plaintiff's action. RCFC 12(h)(3).

### ii.    The Sovereign Capacity Doctrine

The Court of Federal Claims is a court of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). As relevant here, the Tucker Act grants the court jurisdiction over "any claim against the United States founded . . .

upon any express or implied contract with the United States." 28 U.S.C. § 1491. The Tucker Act, however, merely confers jurisdiction on this court, it does not "create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976).

"The contract liability which is enforceable under the Tucker Act consent to suit does not extend to every agreement, understanding, or compact" with the government that "can semantically be stated in terms of offer and acceptance or meeting of minds." *Kania v. United States*, 650 F.2d 264, 268 (Ct. Cl. 1981). As this court has explained, there are "two main categories of contracts that the government makes," which are "often referred to as proprietary and sovereign." *Awad v. United States*, 61 Fed. Cl. 281, 284 (2004). The United States has "generally waived sovereign immunity with regard to proprietary contracts" where "the sovereign steps off the throne and engages in purchase and sale of goods, lands, and services, transactions such as private parties, individuals or corporations also engage in among themselves." *Id.* (quoting *Kania*, 650 F.2d at 268).

However, the government has not waived sovereign immunity for—and jurisdiction of the Court of Federal Claims does not extend to—contracts entered into by the government "in its sovereign capacity that do not unmistakably subject the United States to damages in the event of breach." *Trudeau v. United States*, 68 Fed. Cl. 121, 127 (2005) (citing *Kania*, 650 F.2d at 268; *Silva v. United States*, 51 Fed. Cl. 374, 377 (2002), *aff'd*, 51 F. App'x 12 (Fed. Cir. 2002)), *aff'd*, 186 F. App'x 998 (Fed. Cir. 2006); *see also Awad*, 61 Fed. Cl. at 284. Under the sovereign capacity doctrine, this court "generally . . . does not possess subject matter jurisdiction over agreements made in the course of

criminal proceedings," *Silva*, 51 Fed. Cl. at 377, or over agreements made by the government in "administering the criminal justice system," *Sadeghi v. United States*, 46 Fed. Cl. 660, 662 (2000). So, for example, this court has declined to exercise jurisdiction over contracts arising out of the government's criminal enforcement actions, such as "plea agreements, immunity agreements, and witness protection agreements," *Trudeau*, 68 Fed. Cl. at 128 (citing cases), unless those agreements "clearly and unmistakably subject[] the government to monetary liability for any breach," *Aluminum Shapes, LLC v. United States*, 139 Fed. Cl. 709, 713 (2018) (quoting *Sanders v. United States*, 252 F.3d 1329, 1335 (Fed. Cir. 2001)). This court has applied the same rationale to contract claims arising out of civil enforcement actions because, like criminal enforcement actions, civil enforcement actions "could only be undertaken by the sovereign." *Aluminum Shapes*, 139 Fed. Cl. at 714 (citing *Trudeau*, 68 Fed. Cl. at 129).

Most relevant to this case, this court in *Silva v. United States* held that a contract action arising out of an undercover law enforcement operation was barred by the sovereign capacity doctrine. 51 Fed. Cl. at 377. *Silva* involved a government operation to expose a scheme to illegally import wildlife. *Id.* at 375-76. During the operation, a third party cooperating with the U.S. Fish and Wildlife Service entered into an agreement to care for and feed an illegal importer's birds. *Id.* at 376. At the close of the operation, the government confiscated more than 100 exotic birds belonging to the illegal importer. *Id.* The illegal importer filed a contract-based lawsuit in this court alleging that the government (assumed to be in privity of contract with the importer) should be held liable for the lost value of the birds. *Id.* The importer argued that the government had entered

into a "commercial agreement" to care for and feed the birds. *Id.* at 377. Despite what the agreement appeared to be "on its face," the court held that it lacked jurisdiction over the contract action under the sovereign capacity doctrine. *Id.* at 377-78. The court explained that the purported "commercial agreement" was meant to further "law enforcement operations," which, "without question, lie at the heart of sovereign action." *Id.* at 377 (quotation omitted).

The court recognizes that not all contract claims that are related to a government's sovereign actions will be barred by the sovereign capacity doctrine. As this court has explained:

> Prisons are related to the sovereign action of incarcerating persons convicted in the criminal justice system. The act of building the prison is however, not a sovereign act but an act in which the sovereign has stepped off the throne and has engaged in the purchase and sale of goods, lands and services.

*Bailey v. United States*, 54 Fed. Cl. 459, 483 (2002). The central question in this case is whether the government was acting in its sovereign or proprietary capacity when it entered into the alleged contract with Mr. Ravi for educational services. *See Trudeau*, 68 Fed. Cl. at 129.

### iii.    Mr. Ravi's Claims Must Be Dismissed Under RCFC 12(b)(1)

Applying the above-discussed standards, the court concludes that Mr. Ravi's claims are barred by the sovereign capacity doctrine and must be dismissed for lack of subject matter jurisdiction. The undisputed facts demonstrate that the government was acting in its sovereign capacity when it allegedly entered into an educational services contract with Mr. Ravi. Specifically, the allegations in Mr. Ravi's amended complaint

and the undisputed evidence[6] submitted by the government during supplemental briefing demonstrate that the alleged educational services contract was made in furtherance of an undercover law enforcement operation, a sovereign action.

The allegations in Mr. Ravi's amended complaint state that the purpose of the University of Farmington was to effectuate an undercover law enforcement operation to expose student visa fraud by targeting Farmington enrollees and recruiters. *See, e.g.*, Am. Compl. ¶ 1 (stating that the government "created Farmington in an attempt to expose student visa fraud in the United States"); ¶¶ 3, 10, 31 (referring to the University as a "sting operation"). Mr. Ravi's allegations also confirm that the activities of the HSI agents operating Farmington that form the basis of Mr. Ravi's contract claims, such as enrolling students and accepting tuition payments, were made in furtherance of the goals of that undercover law enforcement operation. *See, e.g.*, Am. Compl. ¶ 8 ("The University of Farmington was a fake university setup by ICE's Homeland Security Investigations and overseen by DHS and was setup to expose student visa fraud. Defendant authorized HSI and/or DHS agents to setup and run the University of

---

[6] The court requested in its supplemental briefing order that the government submit evidence on a variety of issues. Joint Status Report Order, ECF No. 14. Normally, unless jurisdictional facts are in dispute, the court will not look beyond the pleadings when considering a motion to dismiss under RCFC 12(b)(1). *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583-84 (Fed. Cir. 1993). However, in the context of an RCFC 12(b)(1) motion arising out of summary judgment proceedings, the Federal Circuit has held that the court can "consider . . . evidentiary matters outside the pleadings." *Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985). Mr. Ravi does not dispute the facts taken from the government's evidence that the court relies on in this opinion.

Farmington scheme, including to enroll students, to accept tuition payments, and to use these contracts with students as a basis to revoke their visa status.").

The undisputed evidence provided by the government likewise shows that the government was acting in its sovereign capacity when undercover agents enrolled Mr. Ravi at Farmington and accepted his tuition payments. These documents describe Operation Paper Chase, the undercover law enforcement operation involving Farmington that was lawfully certified and reauthorized under 8 U.S.C. § 1363a and 19 U.S.C. § 2081. Def.'s Appx6-255 (certification and reauthorization documents describing the actions taken by HSI agents in operating the University for Operation Paper Chase). They explain that HSI agents, in furtherance of Operation Paper Chase and using the lawful authority granted to them under 8 U.S.C. § 1363a and 19 U.S.C. § 2081, established the University of Farmington, enrolled students, and accepted tuition payments. *See, e.g.*, Def.'s Appx176 (reauthorizing the Operation Paper Chase "undercover investigative operation"), Appx182-83 (describing agents' activities). The objective of these undercover actions was not to provide students with an education, but "to address[] visa fraud, . . . [t]o identify the full scope of the criminal [student visa fraud] enterprise, to include not only the student visa violators, but also the recruiters and facilitators of the criminal enterprise." *Id.* Appx15. The last phase of Operation Paper Chase involved "the prosecution of criminal targets and administrative immigration charges against those aliens who engaged in fraud," including both student visa violators and recruiters. *Id.* Appx183.

These undisputed facts demonstrate that any alleged educational services contract formed between HSI agents and Mr. Ravi arose out of Operation Paper Chase, an undercover law enforcement operation. The sovereign capacity doctrine bars contract actions that arise out of such lawful "criminal . . . enforcement actions . . . that could only be undertaken by the sovereign." *Aluminum Shapes*, 139 Fed. Cl. at 714. "[U]ndercover law enforcement operations" like Operation Paper Chase have been held by this court to "without question, lie at the heart of sovereign action." *Silva*, 51 Fed. Cl. at 377 (quotation omitted). Under the sovereign capacity doctrine, therefore, Mr. Ravi cannot assert breach of contract and related claims against the government in connection with his alleged educational services contract with Farmington. Based on the undisputed facts before it, the court must dismiss Mr. Ravi's claims for lack of subject matter jurisdiction.

Mr. Ravi argues that the sovereign capacity bar does not apply to this lawsuit for three reasons. First, Mr. Ravi argues that undercover agents were "stepp[ing] off [the government's] throne to engage in the sale of educational services" during Operation Paper Chase. Pl.'s Supp. Resp. at 16-18. Mr. Ravi points out that the operation's certification and reauthorization documents demonstrate that the government engaged in "commercial" activities, such as "creat[ing] a website and market[ing] educational services," "accept[ing] and enroll[ing] . . . international students into a university," and "leasing a building," *id.* at 16-17, which he contends support his argument that the alleged educational services contract was "private" in nature, *id.*

The court disagrees. As the government argues, Def.'s Supp. Reply at 5-6, the only reason the government engaged in the actions that allegedly form the basis of the

purported educational services contract with Mr. Ravi was to effectuate the goals of
Operation Paper Chase. Undercover agents did not sell educational services to Mr. Ravi;
they were instead authorized to pose as if they did to further a law enforcement operation.
*See, e.g.*, Def.'s Appx111 (describing the purpose of Operation Paper Chase and the
undercover agents' activities). Even if the alleged educational services contract between
Mr. Ravi and the government could "on its face" appear to be a "commercial agreement,"
the true purpose of the government's conduct was to further "law enforcement
operations" targeting student visa violators, not to provide Mr. Ravi with an education.
*Silva*, 51 Fed. Cl. at 377. Law enforcement operations "without question, lie at the heart
of sovereign action," *id.* (quotation omitted), and are not susceptible to contract-based
claims in this court.

Second, Mr. Ravi argues that the alleged contract for educational services under
which he attempts to bring this lawsuit was "only tangentially related to carrying out a
law enforcement purpose." Pl.'s Resp. at 3-4, ECF No. 9. In support, Mr. Ravi invokes
the prison analogy discussed above to argue that, like the "private" act of building a
prison to serve the sovereign action of incarcerating people, the government engaged in
the "private" act of enrolling students to serve the sovereign objective of Operation Paper
Chase. Pl.'s Supp. Resp. at 17. In this case, however, the alleged educational services
contract was not a "private" act "tangentially" connected to the government's undercover
operation. Rather, the undisputed facts show that enrolling students at Farmington was
fundamental to the goals of Operation Paper Chase, a sovereign action.

Finally, Mr. Ravi in his original response to the government's motion to dismiss relies on *Sommers Oil Co. v. United States*, 241 F.3d 1375 (Fed. Cir. 2001), to argue that the sovereign capacity doctrine does not apply here. Pl.'s Resp. at 4. Specifically, Mr. Ravi argues that, under *Sommers Oil*, the sovereign capacity doctrine does not apply where enforcing the alleged contract with the government "would not disrupt an active criminal case" and "would not requir[e] paying monetary damages for seized contraband." *Id.* This is incorrect. Mr. Ravi later acknowledges that the sovereign capacity doctrine has been applied outside of active criminal proceedings or the seizure of contraband, *see, e.g., id.* at 4 (noting that the doctrine has been applied to "civil enforcement agreements" among others), and Mr. Ravi does not rely on *Sommers Oil* in his supplemental briefing.[7]

In sum, the purported educational services contract on which Mr. Ravi bases his contract claims arises out of a government law enforcement operation, a sovereign action. Under the sovereign capacity doctrine, this court lacks jurisdiction over Mr. Ravi's contract claims, which must be dismissed under RCFC 12(b)(1).[8] The court does not

---

[7]
   *Sommers Oil* involved a claim for money damages pursuant to an agreement entered into by an informant with the Internal Revenue Service. 241 F.3d at 1377. This court has held that the government can "step off the throne" to secure informant services. *See Yifrach*, 145 Fed. Cl. at 697-98. This case does not involve an informant services contract.

[8]
   This court has held that even where the government enters into a contract in its sovereign capacity, a plaintiff may assert a contract action if the alleged contract "unmistakably subject[s] the United States to damages in the event of breach" and if a government agent was authorized to enter into the contract. *Trudeau*, 68 Fed. Cl. at 127-128. In this case, Mr. Ravi alleges only that a contract was formed when he obtained an offer of admission to Farmington and paid tuition. Am. Compl. ¶¶ 17, 22, 29-30, 40. Mr. Ravi does not present any evidence to demonstrate or even suggest that his alleged contract with HSI agents afforded him an "unmistakable" right to

address the government's other grounds for dismissal or summary judgment, and the government's alternative motion for summary judgment is dismissed as moot.

### C.     Mr. Ravi's Request for Additional Discovery is Denied as Futile

Although he has not made a formal motion, Mr. Ravi throughout his supplemental response brief requests that the court order additional discovery before ruling on the government's alternative motion for summary judgment so that Mr. Ravi may explore certain material facts that he argues are disputed. Pl.'s Supp. Resp. at 8-9, 14, 16, 21. The government opposes Mr. Ravi's request because additional discovery would be futile. Def.'s Supp. Reply at 10 ("Mr. Ravi provides no reason to suspect pre-answer discovery will lead to a different result."). The court agrees with the government.

RCFC 56(d) permits this court to order additional discovery during summary judgment proceedings when essential facts are not available to the nonmovant. Rule 56(d)(2) provides that "if a nonmovant [for summary judgment] shows by affidavit or declaration that . . . it cannot present facts essential to justify its opposition, the court may . . . allow time . . . to take discovery." RCFC 56(d)(2). Such a motion must articulate "with particularity, what facts the movant hopes to obtain by discovery and how these facts will raise a genuine issue of fact." *Pfizer Inc. v. United States*, 149 Fed. Cl. 711, 715-16 (2020) (citing *Exigent Tech., Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1310 (Fed. Cir. 2006)). While motions under RCFC 56(d) are to be "liberally granted," *Jade Trading, LLC v. United States*, 60 Fed. Cl. 558, 565 (2004), the court may deny a motion

---

damages in the event he did not receive educational services. It is therefore not necessary to reach the question of HSI agents' authority to contract for educational services.

for discovery under RCFC 56(d) if the requested discovery would be futile, *see JEM Transport, Inc. v. United States*, 120 Fed. Cl. 189, 196-97 (2015) (citing, among others, *Simmons Oil Corp. v. Tesoro Petroleum Corp.*, 86 F.3d 1138, 1144 (Fed. Cir. 1996)). This is true even in cases like this one where a formal discovery period has not yet occurred. *Id.*

Mr. Ravi fails to satisfy the requirements of RCFC 56(d). To begin, Mr. Ravi has not complied with the Rule's procedural requirements. He has not provided an affidavit in support of the requests. RCFC 56(d); *Clear Creek Cmty. Servs. Dist. v. United States*, 100 Fed. Cl. 78, 82-83 (2011).

In addition, Mr. Ravi's requests for discovery would be futile in light of the court's holding that the sovereign capacity doctrine presents a jurisdictional bar to Mr. Ravi's contract claims. Mr. Ravi seeks additional discovery for the following reasons: to explore whether Farmington offered "actual classes," Pl.'s Supp. Resp. at 8, to "obtain more names of students, conduct more interviews, and view government records of communications between Farmington officials and students" to determine whether these students were aware of the "pay to stay" scheme, *id.* at 9, to determine whether tuition payments "were used to fulfill Operation Paper Chase objectives," *id.* at 14, to "identify the [ICE] personnel involved" in the operation, *id.*, to "see if the Government also had implied actual authority to enter into" the alleged educational services contract, *id.*, and "to discern which agents made representations to Mr. Ravi," *id* at 16. However, the information requested would not alter the court's decision dismissing Mr. Ravi's contract claims. As discussed above, the undisputed facts demonstrate that the University of

Farmington was a government-created educational institution established as part of a lawful, certified undercover operation to identify and prosecute student visa violators and recruiters engaging in a "pay to stay" visa fraud scheme. Based these undisputed facts, the court lacks jurisdiction over Mr. Ravi's contract claims under the sovereign capacity doctrine. The court therefore denies Mr. Ravi's discovery requests as futile.[9]

### D.    Mr. Ravi's Motion to Amend His Complaint is Denied as Futile

Finally, Mr. Ravi has filed a motion to amend his complaint in order to add an additional lead plaintiff, Swetha Batchu. Mot. to Amend. at 1. Mr. Ravi asserts that "Ms. Bachu is one of the many who never received educational services after she accepted an offer to pay tuition money in exchange for an accredited educational program." *Id.* Mr. Ravi argues that allowing him to add an additional lead plaintiff years into this case "would serve justice and promote judicial efficiency." *Id.*

The government opposes this motion. Tr. 20-23. First, the government argues that "the sovereign capacity bar" is decisive, "and if the case is resolved" on that ground, "adding a party is futile." *Id.* at 21. Second, the government contends that "there is unfair prejudice and undue delay" in Mr. Ravi's request. *Id.* The government points out

---

[9]  The court does not read Mr. Ravi's supplemental briefing as requesting jurisdictional discovery. *See* Pl.'s Supp. Resp. at 21 (stating that "summary judgment" would not be appropriate without additional discovery). The court may permit discovery to resolve a dispute regarding jurisdictional facts. *Clear Creek*, 100 Fed. Cl. at 81. The court, however, "may deny jurisdictional discovery when it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction[.]" *Nuance Commc'ns, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1235-36 (Fed. Cir. 2010) (quotation omitted). To the extent Mr. Ravi requests jurisdictional discovery, that request is also denied as futile, because none of Mr. Ravi's requests would provide a basis for this court's jurisdiction.

that this case was filed in 2020, and the parties have completed two rounds of briefing including "a full merits analysis as to Mr. Ravi's case." *Id.* To add an additional plaintiff now, the government argues, would make much of this effort and work "for naught." *Id.* at 21-22. Finally, the government asserts that the motion to amend "seem[s] to be an attempt to prolong" proceedings at a time when the court "is clearly ready to make a decision," which is improper. *Id.* at 22.

Mr. Ravi did not file a reply.

The court agrees with the government and will deny Mr. Ravi's motion to amend as futile. A party may amend its complaint under RCFC 15(a)(2) with the court's leave, which should be given "freely . . . when justice so requires." Courts construe this language liberally, and generally grant leave to amend. *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1158 (Fed. Cir. 2014) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). The court, however, should deny leave to amend if there is evidence of delay, bad faith, repeated failure to correct a complaint's deficiencies, undue prejudice to the opposing party, or if the amendment would be futile. *Id.*

"A proposed amendment is futile if it would not survive a motion to dismiss." *Marchena v. United States*, 128 Fed. Cl. 326, 330 (2016), *aff'd*, 702 F. App'x 988 (Fed. Cir. 2017). "When a party faces the possibility of being denied leave to amend on the ground of futility, that party . . . must proffer sufficient facts supporting the amended pleading that the claim could survive a dispositive pretrial motion." *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, 464 F.3d 1339, 1354-55 (Fed. Cir. 2006). Mr. Ravi has failed to do so here.

Mr. Ravi seeks to amend his complaint to add an additional plaintiff who will assert contract claims for educational services with the government based on the government's law enforcement activities during Operation Paper Chase. *See* Mot. to Amend. at 1. However, the court has held that it lacks jurisdiction over such claims under the sovereign capacity doctrine. Because the court would lack jurisdiction over any such claims regardless of the named plaintiff, Mr. Ravi's proposed amendment would be futile, and his motion to amend his complaint is therefore denied.

## V.  CONCLUSION

For the reasons discussed above, the government's motion to dismiss, ECF No. 7, for lack of subject matter jurisdiction under RCFC 12(b)(1) is **GRANTED**. The government's alternative motion for summary judgment is **DISMISSED AS MOOT**. Mr. Ravi's requests for further discovery, *see* ECF No. 40, are **DENIED**. Mr. Ravi's motion to amend the complaint, ECF No. 47, is also **DENIED**. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge

APPEAL,CLOSED,ECF,PROTO

# US Court of Federal Claims
## United States Court of Federal Claims (COFC)
### CIVIL DOCKET FOR CASE #: 1:20−cv−01237−NBF

RAVI v. USA
Assigned to: Senior Judge Nancy B. Firestone
Demand: $9,000,000
Case in other court:  22−01559
Cause: 28:1491 Tucker Act

Date Filed: 09/21/2020
Date Terminated: 03/16/2022
Jury Demand: None
Nature of Suit: 134 Contract − Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**TEJA RAVI**
*Individually and on Behalf of All Others
Similarly Situated*

represented by **Amy Norris**
616 E ST NW #1156
Washington, DC 20004
713−303−5535
Email: amy@norrislawgroup.org
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

V.

**Defendant**

**USA**

represented by **Meen Geu Oh**
U.S. Department of Justice − Civil
Division
P. O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 307−0184
Fax: (202) 307−0972
Email: Meen−Geu.Oh@usdoj.gov
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/21/2020 | 1 | COMPLAINT against USA (HLS) (Filing fee $400, Receipt number AUSFCC−6463849) (Copy Served Electronically on Department of Justice), filed by TEJA RAVI.**Answer due by 11/20/2020.** (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Civil Cover Sheet)(ac7) (Entered: 09/22/2020) |
| 09/22/2020 | 2 | NOTICE of Assignment to Judge Nancy B. Firestone. (ac7) (Entered: 09/22/2020) |
| 09/22/2020 | 3 | NOTICE of Designation of Electronic Case. (ac7) (Entered: 09/22/2020) |
| 09/23/2020 | 4 | NOTICE of Appearance by Meen Geu Oh for USA . (Oh, Meen Geu) (Entered: 09/23/2020) |
| 11/15/2020 | 5 | Unopposed MOTION for Extension of Time until 1/8/2021 to File Answer re 1 Complaint, , filed by USA.**Response due by 11/30/2020.**(Oh, Meen Geu) (Entered: 11/15/2020) |
| 11/16/2020 | 6 | ORDER granting 5 Motion for Extension of Time to Answer: **Defendant shall have until 1/8/2021 to answer or otherwise respond to plaintiff's complaint.** Signed by Senior Judge Nancy B. Firestone. (dpk) Service on parties made. (Entered: 11/16/2020) |
| 01/08/2021 | 7 | MOTION to Dismiss pursuant to Rules 12 (b)(1) and (6) , filed by USA.**Response due by 2/5/2021.**(Oh, Meen Geu) (Entered: 01/08/2021) |
| 01/28/2021 | 8 | AMENDED DOCUMENT, filed by TEJA RAVI. *Amended Complaint.* (Attachments: # 1 Exhibit Exhibits)(Norris, Amy) (Entered: 01/28/2021) |

| 02/05/2021 | 9 | RESPONSE to 7 MOTION to Dismiss pursuant to Rules 12 (b)(1) and (6) , filed by TEJA RAVI.**Reply due by 2/19/2021.** (Norris, Amy) (Entered: 02/05/2021) |
|---|---|---|
| 02/17/2021 | 10 | Unopposed MOTION for Extension of Time until February 24, 2021 to File Reply as to 9 Response to Motion [Dispositive] *To Dismiss*, filed by USA.**Response due by 3/3/2021.**(Oh, Meen Geu) (Entered: 02/17/2021) |
| 02/18/2021 | 11 | ORDER granting 10 Motion for Extension of Time to File Reply. **Defendant's Reply to its Motion to Dismiss now due by 2/24/2021.** Signed by Senior Judge Nancy B. Firestone. (lb) Service on parties made. (Entered: 02/18/2021) |
| 02/24/2021 | 12 | REPLY to Response to Motion re 7 MOTION to Dismiss pursuant to Rules 12 (b)(1) and (6) , filed by USA. (Oh, Meen Geu) (Entered: 02/24/2021) |
| 03/09/2021 | 13 | STATUS CONFERENCE ORDER: **Status Conference set for 3/17/2021 11:00 AM in Chambers (Telephonic) before Senior Judge Nancy B. Firestone. The parties should be prepared to discuss the issues set forth in this order.** Signed by Senior Judge Nancy B. Firestone. (lb) Service on parties made. (Entered: 03/09/2021) |
| 03/17/2021 | | Minute Entry – Was the proceeding sealed to the public? N. Proceeding held in Washington, DC 3/17/2021 before Senior Judge Nancy B. Firestone: Status Conference. [Total number of days of proceeding: 1]. Official record of proceeding taken by court reporter. To order a certified transcript or an audio recording of the proceeding, click HERE.(dpk) (Entered: 03/17/2021) |
| 03/18/2021 | 14 | STATUS REPORT ORDER: **Joint Status Report proposing a supplemental briefing schedule due by 3/31/2021.** Signed by Senior Judge Nancy B. Firestone. (dpk) Service on parties made. (Entered: 03/18/2021) |
| 03/31/2021 | 15 | JOINT STATUS REPORT *Proposing Schedule for Further Briefing*, filed by USA. (Oh, Meen Geu) (Entered: 03/31/2021) |
| 04/01/2021 | 16 | SCHEDULING ORDER for Supplemental Briefing: **Plaintiff's supplemental brief due by 5/26/2021. Defendant's supplemental brief and response due by 6/25/2021. Plaintiff's response and reply due by 8/6/2021. Defendant's reply due by 8/20/2021.** Signed by Senior Judge Nancy B. Firestone. (lb) Service made. (Entered: 04/01/2021) |
| 05/26/2021 | 17 | SUPPLEMENTAL BRIEF *Standing*, filed by TEJA RAVI. (Norris, Amy) (Entered: 05/26/2021) |
| 06/22/2021 | 18 | MOTION for Protective Order , filed by USA.**Response due by 6/30/2021.** (Attachments: # 1 Exhibit Proposed Protective Order)(Oh, Meen Geu) (Entered: 06/22/2021) |
| 06/23/2021 | 19 | SCHEDULING ORDER: Expedited Briefing on Defendant's Motion for a Protective Order, ECF No. 18, shall be as follows: **Plaintiff's Response due by 6/30/2021. Defendant's Reply due by 7/7/2021. Further, Defendant's supplemental brief in support of its motion to dismiss, or in the alternative, motion for summary judgment, due by 6/25/2021, shall be filed under seal pending resolution of the motion for entry of a protective order.** Signed by Senior Judge Nancy B. Firestone. (dpk) Service on parties made. (Entered: 06/23/2021) |
| 06/25/2021 | 20 | Consent MOTION for Extension of Time until 07/02/2021 to File Response as to 16 Scheduling Order, *Regarding Supplemental Brief In Support Of Motion To Dismiss, Or In The Alternative, Motion For Summary Judgment*, filed by USA.**Response due by 7/9/2021.**(Oh, Meen Geu) (Entered: 06/25/2021) |
| 06/25/2021 | 21 | ORDER granting 20 Motion for Extension of Time to File Response re 20 Consent MOTION for Extension of Time until 07/02/2021 to File Response as to 16 Scheduling Order *Regarding Supplemental Brief In Support Of Motion To Dismiss, Or In The Alternative, Motion For Summary Judgment:* **Defendant's supplemental brief in support of its motion to dismiss, or in the alternative, motion for summary judgment due by 7/2/2021.** Signed by Senior Judge Nancy B. Firestone. (dpk) Service on parties made. (Entered: 06/25/2021) |
| 06/30/2021 | 22 | RESPONSE to 18 MOTION for Protective Order *Opposition*, filed by All Plaintiffs.**Reply due by 7/7/2021.** (Norris, Amy) (Entered: 06/30/2021) |

| 07/02/2021 | 23 | RESPONSE to 17 Supplemental Brief *of Plaintiff Regarding Reciprocity Act*, filed by USA. (Oh, Meen Geu) (Entered: 07/02/2021) |
|---|---|---|
| 07/02/2021 | 24 | SUPPLEMENTAL BRIEF re: 16 Scheduling Order, *in Support of Motion to Dismiss, or in the Alternative, Motion for Summary Judgment*, filed by USA. (Attachments: # 1 Affidavit Avery Declaration, # 2 Affidavit Webber Declaration)(Oh, Meen Geu) (Entered: 07/02/2021) |
| 07/02/2021 | 25 | **SEALED**SUPPLEMENTAL BRIEF re: 19 Scheduling Order,, 16 Scheduling Order, *Provisionally Under Seal and Redacted Appendix in Support of Supplemental Brief, ECF No. 24*, filed by USA. (Oh, Meen Geu) (Entered: 07/02/2021) |
| 07/02/2021 | 26 | MOTION To File Exhibit In Appendix Via CD re 25 Supplemental Brief, 24 Supplemental Brief, 16 Scheduling Order, , filed by USA.**Response due by 7/16/2021.**(Oh, Meen Geu) (Entered: 07/02/2021) |
| 07/02/2021 | 27 | ORDER granting 26 Motion To File Exhibit In Appendix Via CD **Defendant to file exhibit via−CD by 7/7/2021.** Signed by Senior Judge Nancy B. Firestone. (ag) Service on parties made. (Entered: 07/02/2021) |
| 07/07/2021 | 28 | REPLY to Response to Motion re 18 MOTION for Protective Order , filed by USA. (Oh, Meen Geu) (Entered: 07/07/2021) |
| 07/15/2021 | 29 | ORDER granting 18 Motion for Protective Order. **Defendant shall file by 7/19/2021 a sealed and public version of the appendix 25 in accordance with the terms of the protective order.** Signed by Senior Judge Nancy B. Firestone. (lb) Service on parties made. (Entered: 07/15/2021) |
| 07/15/2021 | 30 | PROTECTIVE ORDER (related to 29 Order on Motion for Protective Order). Signed by Senior Judge Nancy B. Firestone. (lb) Service on parties made. (Entered: 07/15/2021) |
| 07/19/2021 | 31 | **SEALED**AMENDED DOCUMENT, filed by USA. Amendment to 25 Supplemental Brief, 29 Order on Motion for Protective Order, *Confidential Appx to Motion*. (Oh, Meen Geu) (Entered: 07/19/2021) |
| 07/19/2021 | 32 | ~~STRICKEN PURSUANT TO 7/20/2021 ORDER. **SEALED**AMENDED DOCUMENT, filed by USA. Amendment to 25 Supplemental Brief, 29 Order on Motion for Protective Order, *Public Appendix to Motion*. (Oh, Meen Geu)~~ (Entered: 07/19/2021) |
| 07/19/2021 | 33 | AMENDED DOCUMENT, filed by USA. Amendment to 25 Supplemental Brief, 29 Order on Motion for Protective Order, *Public Appendix to Supplemental Brief*. (Oh, Meen Geu) (Entered: 07/19/2021) |
| 07/20/2021 | 34 | Consent MOTION to Strike 32 Amended Document *As Erroneous Duplicate Filing Of Public Appendix In Support Of Supplemental Brief*, filed by USA.**Response due by 8/3/2021.**(Oh, Meen Geu) (Entered: 07/20/2021) |
| 07/20/2021 | 35 | ORDER granting 34 Consent Motion to Strike 32 Amended Document. Signed by Senior Judge Nancy B. Firestone. (lb) Service on parties made. (Entered: 07/20/2021) |
| 07/23/2021 | 36 | Unopposed MOTION for Extension of Time until August 27, 2021 to Our Reply in Support of Our Supplemental Brief and Our Response to Defendants Supplemental Brief to its Motion to Dismiss, or in the Alternative, Motion for Summary Judgment , filed by TEJA RAVI.**Response due by 8/6/2021.**(Norris, Amy) (Entered: 07/23/2021) |
| 07/23/2021 | 37 | ORDER granting 36 Motion for Extension of Time. Briefing Schedule AMENDED as follows: **Plaintiff's reply in support of his supplemental brief and his response to defendant's supplemental brief to its motion to dismiss, or in the alternative, a motion for summary judgment due by 8/27/2021; Defendant's reply in support of its supplemental brief to its motion to dismiss, or in the alternative, a motion for summary judgment due by 9/10/2021.** Signed by Senior Judge Nancy B. Firestone. (dpk) Service on parties made. (Entered: 07/23/2021) |
| 08/26/2021 | 38 | MOTION for Extension of Time to File Response as to 24 Supplemental Brief, , filed by TEJA RAVI.**Response due by 9/9/2021.**(Norris, Amy) (Entered: 08/26/2021) |

| | | |
|---|---|---|
| 08/27/2021 | 39 | ORDER granting 38 Motion for Extension of Time to File Response. **Plaintiff's response and reply due by 9/10/2021. Defendant's reply due by 9/24/2021.** Signed by Senior Judge Nancy B. Firestone. (lb) Service on parties made. (Entered: 08/27/2021) |
| 09/10/2021 | 40 | **SEALED**RESPONSE to 25 Supplemental Brief , filed by TEJA RAVI. (Attachments: # 1 Exhibit Exhibits to Plaintiff's Response to Supplemental Brief, # 2 Text of Proposed Order)(Norris, Amy) (Entered: 09/10/2021) |
| 09/22/2021 | 41 | Unopposed MOTION for Extension of Time until October 8, 2021 to File Reply as to 39 Order on Motion for Extension of Time to File Response, *And Supplemental Brief Supporting Motion To Dismiss, Or In the Alternative, For Summary Judgment*, filed by USA.**Response due by 10/6/2021.**(Oh, Meen Geu) (Entered: 09/22/2021) |
| 09/23/2021 | 42 | ORDER granting 41 Motion for Extension of Time to File Reply re 41 Unopposed MOTION for Extension of Time until October 8, 2021 to File Reply as to 39 Order on Motion for Extension of Time to File Response, *And Supplemental Brief Supporting Motion To Dismiss, Or In the Alternative, For Summary Judgment:* **Defendant's Reply due by 10/8/2021.** Signed by Senior Judge Nancy B. Firestone. (dpk) Service on parties made. (Entered: 09/23/2021) |
| 10/08/2021 | 43 | REPLY to Response to 24 Supplemental Brief, *in Support of Motion to Dismiss, or in the Alternative, For Summary Judgment*, filed by USA. (Oh, Meen Geu) (Entered: 10/08/2021) |
| 11/01/2021 | 44 | ORDER Setting Oral Argument/Hearing on Motion the parties' supplemental briefing following defendant's 7 MOTION to Dismiss pursuant to Rules 12 (b)(1) and (6) : **Oral Argument via AT&T Teleconferencing set for 12/2/2021 11:00 AM in Chambers (Telephonic) before Senior Judge Nancy B. Firestone. In advance of the proceeding, the court will issue an order setting forth questions the parties should be prepared to address at oral argument.** Signed by Senior Judge Nancy B. Firestone. (dpk) Service on parties made. (Entered: 11/01/2021) |
| 11/19/2021 | 45 | ORDER Setting Oral Argument/Hearing on Motion 7 MOTION to Dismiss pursuant to Rules 12 (b)(1) and (6) : **Oral Argument initially scheduled for 12/2/2021 is hereby RESCHEDULED for 1/13/2022 02:00 PM in Chambers (Telephonic) before Senior Judge Nancy B. Firestone.** Signed by Senior Judge Nancy B. Firestone. (dpk) Service on parties made. (Entered: 11/19/2021) |
| 01/06/2022 | 46 | **SEALED** ORDER Setting Forth Issues for Oral Argument: re 45 Order Setting Oral Argument/Hearing on Motion. Signed by Senior Judge Nancy B. Firestone. (dpk) Copy to parties. (Entered: 01/06/2022) |
| 01/12/2022 | 47 | First MOTION to Amend Pleadings – Rule 15 1 Complaint, , filed by All Plaintiffs.**Response due by 1/26/2022.** (Attachments: # 1 Amended Complaint)(Norris, Amy) (Entered: 01/12/2022) |
| 01/12/2022 | 48 | AMENDED DOCUMENT, filed by All Plaintiffs. Amendment to 1 Complaint, . (Norris, Amy) (Entered: 01/12/2022) |
| 01/12/2022 | 49 | ORDER re 47 First MOTION to Amend Pleadings – Rule 15 1 Complaint: filed by TEJA RAVI. **The government, if possible, is DIRECTED to respond to plaintiffs motion at the close of the oral argument scheduled for tomorrow, January 13, 2022.** Signed by Senior Judge Nancy B. Firestone. (dpk) Service on parties made. (Entered: 01/12/2022) |
| 01/13/2022 | | Minute Entry – Was the proceeding sealed to the public? Y. Proceeding held in Washington, DC 1/13/2022 before Senior Judge Nancy B. Firestone: Oral Argument. [Total number of days of proceeding: 1] Approximate duration of proceeding: 1 hour and 30 minutes. Official record of proceeding taken by court reporter. To order a certified transcript or an audio recording of the proceeding, click HERE.(dpk) (Entered: 01/13/2022) |
| 01/21/2022 | 50 | Notice of Filing of Certified Transcript for proceedings held on January 13, 2022 in Washington, D.C. (ew) (Entered: 01/21/2022) |
| 01/21/2022 | 51 | TRANSCRIPT of proceedings held on January 13, 2022 before Judge Nancy B. Firestone. Total No. of Pages: 1–61. Procedures Re: Electronic Transcripts and |

| | | |
|---|---|---|
| | | Redactions. To order a copy of the transcript, click HERE. Notice of Intent to Redact due 1/28/2022. Redacted Transcript Deadline set for 2/18/2022. Release of Transcript Restriction set for 4/18/2022. (ew) (Entered: 01/21/2022) |
| 02/03/2022 | 52 | **STRICKEN PURSUANT TO 55 ORDER.** ~~MOTION for Referral to ADR , filed by TEJA RAVI.Response due by 2/17/2022.~~(Norris, Amy) (Entered: 02/03/2022) |
| 02/03/2022 | 53 | SCHEDULING ORDER: **Defendant's Response to Plaintiff's Motion 52 for mediation due by 2/10/2022; Plaintiff's Reply due by 2/14/2022.** Signed by Senior Judge Nancy B. Firestone. (dpk) Service on parties made. (Entered: 02/03/2022) |
| 02/09/2022 | 54 | MOTION to Strike 52 MOTION for Referral to ADR , filed by TEJA RAVI.**Response due by 2/23/2022.**(Norris, Amy) (Entered: 02/09/2022) |
| 02/10/2022 | 55 | ORDER: **Plaintiff's Motion to Withdraw 54 his motion for mediation is GRANTED; the deadlines set by the courts February 3, 2022 Scheduling Order 53 are VACATED; and the Clerk is directed to STRIKE 52 Motion for Referral to ADR from the docket.** Signed by Senior Judge Nancy B. Firestone. (dpk) Service on parties made. (Entered: 02/10/2022) |
| 03/16/2022 | 56 | **\*\*SEALED\*\*** SEALED OPINION and ORDER on the defendant's 7 Motion to Dismiss and the plaintiff's 47 Motion to Amend the Complaint. The defendant's motion to dismiss 7 for lack of subject matter jurisdiction under RCFC 12(b)(1) is granted. The government's alternative motion for summary judgment is dismissed as moot. The plaintiff's requests for discovery are denied. The plaintiff's motion to amend the complaint 47 is denied. Requests for redactions due by 3/23/2022. The Clerk is directed to enter judgment. Signed by Senior Judge Nancy B. Firestone.(lb) Copy to parties. (Entered: 03/16/2022) |
| 03/16/2022 | 57 | JUDGMENT entered, pursuant to Rule 58, dismissing plaintiff's complaint for lack of subject matter jurisdiction. (Service on parties made.) (dls) (Entered: 03/16/2022) |
| 03/18/2022 | 58 | NOTICE OF APPEAL as to 56 Order on Motion to Amend Pleadings – Rule 15,,, Order on Motion to Dismiss – Rule 12(b)(1) and (6),,, Sealed Opinion/Order,, 57 Judgment, filed by TEJA RAVI. Filing fee $ 505, receipt number AUSFCC–7756217. Copy to CAFC. (Norris, Amy) (Entered: 03/18/2022) |
| 03/18/2022 | | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals for the Federal Circuit re 58 Notice of Appeal. (ac7) (Entered: 03/19/2022) |
| 03/22/2022 | | CAFC Case Number 2022–1559 for 58 Notice of Appeal, filed by TEJA RAVI. (ac7) (Entered: 03/22/2022) |
| 03/25/2022 | 59 | REPORTED OPINION. Signed by Senior Judge Nancy B. Firestone.(dpk) Service on parties made. (Entered: 03/25/2022) |

Receipt number AUSFCC-6463849

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **Teja Ravi, Individually and on Behalf of** | : | |
| **All Others Similarly Situated** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **The United States of America** | : | 20-1237 C |
| | : | |
| **Defendant.** | : | |

---

## CLASS ACTION COMPLAINT

---

Plaintiff Teja Ravi ("Plaintiff"), by and through his attorneys, brings this action on behalf of himself and all others similarly situated against the United States. Plaintiff hereby alleges, on information and belief, except as to those allegations which pertain to the named Plaintiff, which allegations are based on personal knowledge, as follows:

## NATURE OF THE ACTION

1.      The University of Farmington marketed itself as a university that "provide[s] students from throughout the world a unique educational experience" and claimed to be credited by the Michigan Department of Licensing and Regulatory Affairs and the Accrediting Commission of Career Schools and Colleges. Farmington also claimed it was authorized by the Student and Exchange Visitor Program that allows the admittance of foreign students. However, Farmington was nothing more than a façade. It is now well known that the U.S. Immigration and Customs Enforcement's Homeland Security Investigations ("HSI") created Farmington in an attempt expose student visa fraud in the United States. Yet there was no way for prospective students to distinguish Farmington from a real university. Farmington created what appeared to be a legitimate web presence through its website and Twitter. The website went so far as to have bad weather alerts for students. Ultimately, there was no reason for a student applying from abroad to know or have a suspicion that Farmington was a fake university.

2.      Plaintiff and class members applied and enrolled at Farmington with the understanding that it was an accredited university offering legitimate degrees in such programs as a Masters in Information Technology and a Masters in Computer Science. Farmington required that Plaintiff and class members pay tuition upon acceptance. All class members were informed that there would be regular classes each month, and all class members enrolled in the online program as most of the students lived outside of the state of Michigan and/or were unable to attend on campus courses due to their employment. None of the students received services in exchange for their tuition.

3.      In January 2019, Defendant revealed that the University was a sham and reneged on their guarantees that Plaintiff and Class members had properly adhered to immigration regulations and were therefore lawfully residing and working in the United States. Defendant instead had the audacity to revoke Plaintiff and Class members visa status, accusing the enrollees of visa fraud, even though Plaintiff and Class members were unwitting victims of Defendant's scheme, and had reasonably believed in Defendant's actions and assurances, that the University was a legitimate and authorized school.

4.      The University turned out to be a fraudulent and deprived class members of millions of dollars, without providing the services that it offered and promised. Plaintiff, therefore, brings this action on behalf of himself and all other similarly situated persons who enrolled at the University of Farmington asserting Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing. Plaintiff seeks damages and equitable relief on behalf of the Class, which relief includes, but is not limited to, the following: refunding Plaintiff and class member full amount paid to the University of Farmington; costs and expenses, including attorneys' fees and expert fees; and any additional relief that this Court determines to be necessary to provide complete relief to Plaintiff and the class.

## JURSIDICTION AND VENUE

5.      The United States Court of Federal Claims has jurisdiction and venue over this action pursuant to 28 U.S.C. § 1491(a)(1).

## PARTIES

6.      Plaintiff Teja Ravi is a citizen of India who resided in Houston, Texas at the time he enrolled at Farmington. During the class period, in March 2018, Plaintiff was accepted and enrolled in the University. Plaintiff was told by University officials that he would have regular classes monthly. Plaintiff paid $12,500 in tuition to the University and believed the University's website and marketing material regarding its accreditation.

7.      Defendant is the United States, as acting through its agencies, including the U.S. Immigration and Customs Enforcement, which is based in Washington, D.C. has field offices throughout the United States and is a branch of DHS.

## NATURE OF THE CASE AND BACKGROUND FOR THE CONTRACT

8.      The University of Farmington was a fake university setup by ICE's Homeland Security Investigations and overseen by DHS and was setup to expose student visa fraud.

9.      Defendant offered classes and degree programs on the University of Farmington website and through letters of admission. Class members accepted defendant's offers of admission to enroll in the degree programs. Class members paid tuition money to the University. However, the Defendant did not provide class or degree programs as offered.

10.     In an effort to maintain a legitimate façade, Defendant used a complex scheme of phony credentials and misleading and false statements to enrolled and prospective students. This schemed included:

- Establishing a physical location:
  - o Defendant leased a physical office in Farmington Hills, Michigan. Nevertheless, all administrative interfacing between the University officials and students/prospective students occurred digitally or telephonically as many of the enrolled students and prospective students relied on the online feature of the University.
- Enlisting recruiters to lure students:
  - o Defendant enlisted the assistance of nearly a dozen recruiters to funnel Plaintiff and Class members to enroll in the University of Farmington, rather than other, legitimate, graduate programs. These recruiters, primarily foreign students, were in similar social circles as Plaintiff and Class members and approached Plaintiff and class members without solicitation. Defendant offered recruiters incentives for leading potential students to the University, in the form of cash or University credits. Recruiters helped funnel nearly six hundred (600) students to enroll at Farmington.
- Fabricating credentials:
  - o Defendant went to great lengths to manipulate foreign prospective students by creating the impression that the University was legitimate. This included:

- Undercover agents of the Department of Homeland Security registering the University of Farmington with the state of Michigan as a legitimate university (through Department of Licensing and Regulatory Affairs).
- A national accreditation agency (Accrediting Commission of Career Schools and Colleges), at the request of DHS, listed the University of Farmington as being accredited in order to help deceive prospective students.
- Defendant placing the University on an ICE website, listing the University as an institution approved for the Student and Exchange Visitor Program ("SEVIS").

13.    The University further enticed student enrollment through what appeared to be a legitimate web presence.

14.    From its web presence, it was virtually impossible for a prospective student to differentiate the University from a legitimate one. Prospective students researching schools were doing so from the internet as the majority neither lived in or near Michigan, where the University was located.

15.    The University had a professional website, a red and blue coat of arms as its emblem, a Latin slogan meaning "knowledge and work" and a physical location at a commercial building in Farmington Hills, Michigan. Further, the website offered specific details related to its courses and provided tuition pricing.



One page on its website read:

Located in the heart of the automotive and advanced manufacturing center of Southeast Michigan, the University of Farmington provides students from throughout the world a unique educational experience. Our dynamic business administration and STEM curriculum allows students to rapidly apply their knowledge; preparing them to succeed in an ever-globalizing economy.

Another page describes an educational and collaborative community enrollees could be a part of at UF:

We are very excited about welcoming you to the UF community and helping you achieve your academic goals. You'll find UF to be a vibrant and growing institution where students, faculty and staff enjoy a challenging and collaborative environment. UF has a rolling admission process and operates on a quarterly academic calendar. Students are encouraged to apply early to ensure a smooth transition to UF.

The website also listed and described the enticing, but illusory programs, offered by Farmington. Regarding its graduate MBA program, the site stated:

The two-year schedule offers a convenient way for you to add a master's degree to your résumé while you work. . . . Students hone their skills in project and program management, quality improvement initiatives, and creativity and problem solving. This interactive and collaborative cohort program helps students build strong ties with their professional faculty and gain perspectives from other disciplines and leaders in industry.

The University's website went even further in an effort to induce students with statements such as the school "was accredited by the Accrediting Commission of Career Schools and Colleges (www.accsc.org) and licensed by the Michigan Department of Licensing and Regulatory Affairs as a private postsecondary college. UF is authorized by the Student and Exchange Visitor Program to admit foreign students."

16.    Ultimately, it was near impossible for a prospective student to discern the legitimacy of the University through its recruitment efforts and web presence.

17.    The University also engaged in individual communication via postal and electronic mail with the prospective students. Upon acceptance of an offer letter from the University, a student was enrolled and was advised that there would be regular classes monthly. The University also mailed students an I-20, Certificate of Eligibility for Nonimmigrant Student Status to students, leaving them no reason to question the University's legitimacy. (*see* **Exhibit 1**)

18.    Emails from University officials continued the impression of legitimacy. In an email to prospective students an official wrote:

Thank you for your recent interest in The University of Farmington, a nationally accredited business and STEM (science, technology, engineering, and mathematics) institution. Here at the University of Farmington we have created an innovative learning environment that combines traditional instruction with

fulltime professional experiences. We offer flexible class schedules and a focus
on students who do not want to interrupt their careers. (*see* **Exhibit 2**)

19.     Other communication from officials reiterated the University's fabricated claims
regarding its programs available to students with statements such as:

In many instances, your prior Masters Degree's (MA) credits, combined with
CPT, can be applied to a second MA in lieu of a traditional course load." And
he continued to highlight the scheme's accreditation: "We are accredited by the
Accrediting Commission of Career Schools and Colleges (www.accsc.org) and
licensed by the Michigan Department of Licensing and Regulatory Affairs as a
private postsecondary college.

20.     To further strengthen its claim of legitimacy, emails from the University
contained a footer with the following statement: "A nationally accredited institution authorized
to enroll international students by the U.S. Department of Homeland Security."

21.     Upon enrollment at the University, students would pay tuition to the University and
were advised that a class schedule would be forthcoming. The class schedule never arrived. When
students questioned the University regarding the lack of a class schedule and assignments, they
were met with either silence or assurances from Farmington officials about the legitimacy of the
school.

For example:

22.     Teja Ravi paid $12,500 in tuition to Farmington after he enrolled in March 2018,
after which he was enrolled and informed that he would have a regular class schedule and have
regular class. But he was never enrolled in classes or given assignments. As soon as the semester
commenced, and he still was not enrolled in classes, he contacted officials at the University to ask
about classes and assignment. A university official advised him not worry about it as that was not
an issue. It wasn't until about a year after enrollment, Teja was advised by a friend that the
University was a fake. Teja contacted the University to clarify this rumor and was told by a
University official that the rumor was not true. Ravi never received any educational services from
the University.

23.     Rajasekhar Reddy enrolled in Farmington in October 2017 after paying tuition in
the amount of $10,000. Rajasekhar applied after researching the school online and reviewing
Farmington's website. In January 2019, Rajasekhar learned the University was a fake. He tried
several times to contact the University and received no response.

24.     Naveen Kumar enrolled at University of Farmington around May 2018. Naveen
visited Farmington, MI during the enrollment process, but the University was closed the day he
visited. After researching the University online, Naveen ultimately submitted an application and
accepted its offer to attend. When Naveen became suspicious of the University he requested a

transfer of his SEVIS to another school. Farmington would only agree to the transfer in exchange for a payment of $1500, which Naveen paid.

25.     Pavan Sama, a Farmington student during the time period of Defendant's unlawful acts had a similar experience to other students. He corresponded with a University official named Carey Ferrante whose email address was carey.ferrante@universityoffarmington.edu. Sama paid $15,000 in tuition to Farmington.

26.     Each of these students had common facts associated with their matters: they each relied on the website; they each relied on individual communications with University staff; they each received an accepted an offer of admission; they each enrolled and paid thousands of dollars of tuition; none of them received class information after enrolling; none of them were enrolled in classes; those who inquired after enrolling received assurances; none of them received any sort of service for the thousands of dollars that they spent in tuition money.

27.     In January 2019, Defendant revealed that the University was a sham and reneged on their guarantees that Plaintiff and Class members had properly adhered to immigration regulations and were therefore lawfully residing and working in the United States. Defendant instead had the audacity to revoke Plaintiff and Class members visa status, accusing the enrollees of visa fraud, even though Plaintiff and Class members were unwitting victims of Defendant's scheme, and had reasonably believed in Defendant's actions and assurances, that the University was a legitimate and authorized school.


**PLAINTIFF'S FACTS**

28.     Plaintiff Teja Ravi learned of the University from a friend who advised him that he could attend all classes online, which would allow him to maintain the Curricular Practical Training that allowed him to attend school and continue with employment in the United States. Plaintiff was also enticed by the University's three-month semester schedule as he traveled frequently for his contracted work, which was on a six-month basis.

29.     At the time Plaintiff applied to the University in early 2018, he was enrolled in engineering curriculum at Northwestern Polytechnic University in California, and had been granted a 5-year student visa through that program from July 2015 to July 2020. Plaintiff was interested in the University of Farmington as it offered graduate programs in IT, which he hoped would make him a more attractive candidate to prospective employers. Plaintiff applied to the University in early 2018 by filling out an admission form and enrolled in the Masters in Information Technology program.

30.     Upon enrollment to the University, Plaintiff paid $12,500 in tuition. He was advised by the University that he would be scheduled for regular classes every month. After commencement of the first semester, Plaintiff did not receive any classes to attend or assignments, as he had been promised by the University. Plaintiff contacted University administration to find out why and was told by University officials that the lack of classes and assignments would not be

an issue. Plaintiff also re-checked the University's accreditation on its website, which indicated that his Curricular Practical Training ("CPT") was valid.

31.   A year after enrolling, Plaintiff learned that the University might be fraudulent. Plaintiff contacted University administration three times. On his third attempt, Plaintiff spoke with University administrator Carrie Fernand, who advised Plaintiff that there were no issues. Shortly thereafter, however, Plaintiff discovered news of the University being a sting operation by the Department of Homeland Security, with many students either arrested or deported.

32.   Plaintiff's experiences with the University are typical of the class and over 500 other University of Farmington students.

33.   Plaintiff suffered injury in fact and loss of money or property. He has been damaged by, inter alia, the amounts he has paid the University of Farmington in tuition.

## CLASS ALLEGATIONS

34.   Plaintiff brings this class action on behalf of himself individually and all others similarly situated, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

35.   The proposed class consists of all persons who enrolled in and attended the University of Farmington from 2015 to 2019. Excluded from the Class are the University of Farmington, its affiliates, employees, officers, and directors, persons or entities that distributed or recruited students for the University of Farmington, the Judge(s) assigned to this case, and the attorneys of record in this case. Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

36.   This action is properly brought as a class action for the following reasons:

a.   The proposed class is numerous and geographically dispersed through the United States and other countries, such that the joinder of all class members is impracticable. While Plaintiff does not know the exact number and identity of all class members, Plaintiff is informed and believes that there are hundreds of class members. The precise number of members can be ascertained through discovery.

b.   The disposition of Plaintiff's and proposed class members' claims in a class action will provide substantial benefits to both the parties and the Court.

c.   The proposed class is ascertainable and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each proposed class member were infringed or violated in the same fashion.

d.   There are questions of law and fact common to the proposed class which predominate over any questions that may affect particular class members. Such common questions of law and fact include, but are not limited to:

i.   Whether the conduct by the University of Farmington was unlawful, unfair, or fraudulent;

    ii.    Whether the University's advertising was likely to deceive the public;

    iii.    Whether the University's conduct was false, misleading, or likely to deceive;

    iv.    Whether the University violated the Michigan Consumer Protection Act;

    v.    Whether the University breached the terms of its of contract with students to provide educational services;

    vi.    Whether the University's actions breached the Implied Covenant of Good Faith and Fair Dealing;

    vii.    Whether the University unjustly received funds from Plaintiff or class members;

    viii.    Whether the University is liable for intentional and/or negligent misrepresentations;

    ix.    Whether the University is liable for making false promises;

    x.    Whether the Plaintiff and proposed class members have been harmed and the proper measure of relief;

    xi.    Whether Plaintiff and the proposed class members are entitled to an award of punitive damages, attorneys' fees and expenses against the Defendant; and

    xii.    Whether, as a result of Defendant's misconduct, Plaintiff is entitled to equitable relief, and if so, the nature of such relief.

e.    Plaintiff's claims are typical of the claims of the members of the proposed class. Plaintiff's claims arise from the same practices and conduct that give rise to the claims of all class members and are based on the same legal theories. He was injured by the same wrongful practices as other class members.

f.    Plaintiff will fairly and adequately protect the interest of the proposed class in that he has no interests antagonistic to those of the other proposed class members, and Plaintiff has retained attorneys experienced in consumer class actions and complex litigation.

g.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

    i.    Given the size of individual proposed class members' claims and the expense of litigating those claims, few, if any, proposed class members could afford to or would seek legal redress individually for the wrongs Defendant committed against them, and absent proposed class members have no substantial interest in individually controlling the prosecution of individual actions;

    ii.    The action will promote an orderly and expeditious administration and adjudication of the proposed class claims; economies of time, effort, and resources will be fostered; and uniformity of decisions will be insured;

    iii.    Without a class action, proposed class members suffered injury will have no redress, and Defendant's violations of law will proceed without remedy while Defendant continue to reap and retain the substantial proceeds of its wrongful conduct; and

     iv.    Plaintiff knows of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

37.    Defendant has, or has access to, address information for the Class members, which may be used for the purpose of providing notice of the pendency of this class action.

38.    Plaintiff seeks damages and equitable relief on behalf of the proposed class on grounds generally applicable to the entire proposed class.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

39.    Contracts existed between Plaintiff, class members and the University of Farmington, which was controlled and operated by Defendant.

40.    Defendant purported to offer admission to the University, including access to classes and advanced degrees. Plaintiff and other students indicated their acceptance of the offer of admission and provided consideration for the contract by paying tuition and other fees in the amounts of $10,000 to more than $15,000. The United States breached the contract when it failed to provide the offered classes and degrees.

41.    All conditions precedent under the contracts have been performed by Plaintiff and the Class, including the payment of tuition, application fees, and other fees.

42.    Defendant, operating and controlling the University, breached the terms of its standardized contracts with Plaintiff and the Class by failing to provide them with the promised products and services as contracted.

43.    As a result of Defendant's breach of its contracts, Plaintiff and the Class have been damaged.

## SECOND CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

44.    Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraph above as if fully set forth herein.

45.    The law implies a covenant of good faith and fair dealing in every contract. Defendant, operating the University of Farmington, violated this covenant of good faith and fair dealing in its contract with Plaintiff and members of the Class by, *inter alia*, misrepresenting to Plaintiff and the Class the true nature of the University graduate program as alleged more fully elsewhere in the Complaint.

46.    Plaintiff and members of the Class performed all, or substantially all, of the significant duties required under their agreements with Defendant.

47.     The conditions required for Defendant' performance under the contract agreements had occurred.

48.     Defendant did not provide and/or unfairly interfered with the right of Plaintiff and Class members to receive the benefit under their agreements with Defendant.

49.     Plaintiff and the Class have been damaged by Defendant's breach of the implied covenant of good faith.

## PRAYER FOR RELIEF

50. WHEREFORE, Plaintiff prays this Court enter a judgment against Defendant that:

A.     This action be certified and maintained as a class action under Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure and certify the proposed class as defined, appointing Plaintiff as representative of the Class, and appointing the attorneys and law firms representing Plaintiff as counsel for the Class;

B.     Awards compensatory, statutory and/or punitive damages for Defendant's breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, negligent misrepresentation and false promises, where such relief is permitted;

C.     Award Plaintiff and proposed class members the costs of this action, including reasonable attorneys' fees and expenses;

D.     Orders Defendant to immediately cease its wrongful conduct as set forth above; enjoins Defendant from continuing to falsely market and advertise, conceal material information, and conduct business via the unlawful and unfair business acts and practices complained of herein; orders Defendant to refrain from discriminating against Plaintiff and Class members in the Plaintiff and Class members' future applications to enter the United States, because of Plaintiff and Class members' ensnarement at the University; and requires Defendant to refund to Plaintiff and all of the Class members the funds paid to Defendant for the subject tuition and fees;

E.     Awards equitable monetary relief, including restitution and disgorgement of all ill-gotten gains, and the imposition of a constructive trust upon, or otherwise restricting the proceeds of Defendant's ill-gotten gains, to ensure that Plaintiff and proposed class members have an effective remedy;

F.     Awards pre-judgment and post-judgment interest at the legal rate; and

G.     Such further legal and equitable relief as this Court may deem just and proper.


Respectfully submitted,

By: /s/*Amy E. Norris, Esq.,* (#1017140)
Amy@mwlc.org
(202) 530-0100
NORRIS LAW, PLLC
616 E Street NW

Suite 1156
Washington, DC 20004

Attorney for Teja Revi

Case 2:20-cv-02373-ODW Document 1 Page 49 Filed 09/29/20 Page 49 of 4

# EXHIBIT 1

| **Department of Homeland Security** | I-20, Certificate of Eligibility for Nonimmigrant Student Status |
|---|---|
| U.S. Immigration and Customs Enforcement | OMB NO. 1653-0038 |

## SEVIS ID: N0012801107

| SURNAME/PRIMARY NAME | GIVEN NAME | **Class of Admission** |
|---|---|---|
| PREFERRED NAME | PASSPORT NAME | |
| COUNTRY OF BIRTH | COUNTRY OF CITIZENSHIP | **F-1** |
| DATE OF BIRTH  1992 | ADMISSION NUMBER | |
| FORM ISSUE REASON  CONTINUED ATTENDANCE | LEGACY NAME | **ACADEMIC AND LANGUAGE** |

### SCHOOL INFORMATION

| SCHOOL NAME | SCHOOL ADDRESS |
|---|---|
| University of Farmington  University of Farmington | 30500 Northwestern Highway, Farmington Hills, MI 48334 |
| SCHOOL OFFICIAL TO CONTACT UPON ARRIVAL  Edward Roberts  Director of Student Affairs | SCHOOL CODE AND APPROVAL DATE  DET214F45311000  12 JULY 2016 |

### PROGRAM OF STUDY

| EDUCATION LEVEL  MASTER'S | MAJOR 1  Computer Science 11.0701 | MAJOR 2  None 00.0000 |
|---|---|---|
| PROGRAM ENGLISH PROFICIENCY  Required | ENGLISH PROFICIENCY NOTES  Student is proficient | EARLIEST ADMISSION DATE |
| START OF CLASSES  01 OCTOBER 2017 | PROGRAM START/END DATE  26 SEPTEMBER 2017 - 31 OCTOBER 2019 | |

### FINANCIALS

| ESTIMATED AVERAGE COSTS FOR: 12 MONTHS | | STUDENT'S FUNDING FOR: 12 MONTHS | |
|---|---|---|---|
| Tuition and Fees | $  10,000 | Personal Funds | $   2,500 |
| Living Expenses | $   8,000 | Funds From This School | $       0 |
| Expenses of Dependents (0) | $       0 | Family support. | $  25,000 |
| Insurance, books, etc. | $   2,000 | On-Campus Employment | $       0 |
| TOTAL | $  20,000 | TOTAL | $  27,500 |

### REMARKS

Transfer from NW Polytechnic University, Fall 2017, Session 2.

### SCHOOL ATTESTATION

I certify under penalty of perjury that all information provided above was entered before I signed this form and is true and correct. I executed this form in the United States after review and evaluation in the United States by me or other officials of the school of the student's application, transcripts, or other records of courses taken and proof of financial responsibility, which were received at the school prior to the execution of this form. The school has determined that the above named student's qualifications meet all standards for admission to the school and the student will be required to pursue a full program of study as defined by 8 CFR 214.2(f)(6). I am a designated school official of the above named school and am authorized to issue this form.

X *Edward Roberts*

| SIGNATURE OF: Edward Roberts, Director of Student Affairs | DATE ISSUED  26 September 2017 | PLACE ISSUED  Farmington Hills,MI |
|---|---|---|

### STUDENT ATTESTATION

I have read and agreed to comply with the terms and conditions of my admission and those of any extension of stay. I certify that all information provided on this form refers specifically to me and is true and correct to the best of my knowledge. I certify that I seek to enter or remain in the United States temporarily, and solely for the purpose of pursuing a full program of study at the school named above. I also authorize the named school to release any information from my records needed by DHS pursuant to 8 CFR 214.3(g) to determine my nonimmigrant status. **Parent or guardian, and student, must sign if student is under 18.**

X

| SIGNATURE OF: | DATE |
|---|---|

X

| NAME OF PARENT OR GUARDIAN | SIGNATURE | ADDRESS (city/state or province/country) | DATE |
|---|---|---|---|

**ICE Form I-20 (3/31/2018)**                                                                 **Page 1 of 3**

**Department of Homeland Security**
U.S. Immigration and Customs Enforcement

I-20, Certificate of Eligibility for Nonimmigrant Student Status
OMB NO. 1653-0038

## SEVIS ID: N0012801107 (F-1)   NAME: ▮▮▮▮▮▮▮▮▮

### EMPLOYMENT AUTHORIZATIONS

### CHANGE OF STATUS/CAP-GAP EXTENSION

| REQUESTED VISA TYPE | REQUEST/PETITION STATUS | RECEIPT NUMBER | BENEFIT START DATE/REQUEST DATE |
|---|---|---|---|
| H1-B | PENDING | WAC1714350527 | |
| **COMMENT** | | | |

### AUTHORIZED REDUCED COURSE LOAD

### CURRENT SESSION DATES

| CURRENT SESSION START DATE | CURRENT SESSION END DATE |
|---|---|
| 01 OCTOBER 2017 | 31 DECEMBER 2017 |

### TRAVEL ENDORSEMENT

This page, when properly endorsed, may be used for re-entry of the student to attend the same school after a temporary absence from the United States. Each endorsement is valid for one year.

| Designated School Official | TITLE | SIGNATURE | DATE ISSUED | PLACE ISSUED |
|---|---|---|---|---|
| | | X | | |
| | | X | | |
| | | X | | |
| | | X | | |

ICE Form I-20 (3/31/2018)

Appx47

Page 2 of 3

**Department of Homeland Security**
U.S. Immigration and Customs Enforcement

I-20, Certificate of Eligibility for Nonimmigrant Student Status
OMB NO. 1653-0038

**INSTRUCTIONS TO STUDENTS**

**STUDENT ATTESTATION.** You should read everything on this page carefully. Be sure that you understand the terms and conditions concerning your admission and stay in the United States as a nonimmigrant student before signing the student attestation on page 1 of the Form I-20 A-B. The law provides severe penalties for knowingly and willfully falsifying or concealing a material fact, or using any false document in the submission of this form.

**FORM I-20.** The Form I-20 (this form) is the primary document to show that you have been admitted to school in the United States and that you are authorized to apply for admission to the United States in F-1 class of admission. You must have your Form I-20 with you at all times. If you lose your Form I-20, you must request a new one from your designated school official (DSO) at the school named on your Form I-20.

**VISA APPLICATION.** You must give this Form I-20 to the U.S. consular officer at the time you apply for a visa (unless you are exempt from visa requirements). If you have a Form I-20 from more than one school, be sure to present the Form I-20 for the school you plan to attend. Your visa will include the name of that school, and you must attend that school upon entering the United States. You must also provide evidence of support for tuition and fees and living expenses while you are in the United States.

**ADMISSION.** When you enter the United States, you must present the following documents to the officer at the port of entry: 1) a Form I-20; 2) a valid F-1 visa(unless you are exempt from visa requirements); 3) a valid passport; and 4) evidence of support for tuition and fees and living expenses while you are in the United States. The agent should return all documents to you before you leave the inspection area.

**REPORT TO SCHOOL NAMED ON YOUR FORM I-20 AND VISA.** Upon your first entry to the United States, you must report to the DSO at the school named on your Form I-20 and your F-1 visa (unless you are exempt from visa requirements). If you decide to attend another school before you enter the United States, you must present a Form I-20 from the new school to a U.S. consular officer for a new F-1 visa that names the new school. Failure to enroll in the school, by the program start date on your Form I-20 may result in the loss of your student status and subject you to deportation.

**EMPLOYMENT.** Unlawful employment in the United States is a reason for terminating your F-1 status and deporting you from the United States. You may be employed on campus at your school. You may be employed off-campus in curricular practical training (CPT) if you have written permission from your DSO. You may apply to U.S. Citizenship and Immigration Services (USCIS) for off-campus employment authorization in three circumstances: 1) employment with an international organization; 2) severe and unexpected economic hardship; and 3) optional practical training (OPT) related to your degree. You must have written authorization from USCIS before you begin work. Contact your DSO for details. Your spouse or child (F-2 classification) may not work in the United States

**PERIOD OF STAY.** You may remain in the United States while taking a full course of study or during authorized employment after your program. F-1 status ends and you are required to leave the United States on the earliest of the following dates: 1) the program end date on your Form I-20 plus 60 days; 2) the end date of your OPT plus 60 days; or 3) the termination of your program for any other reason. Contact your DSO for details.

**EXTENSION OF PROGRAM.** If you cannot complete the education program by the program end date on page 1 of your Form I-20, you should contact your DSO at least 15 days before the program end date to request an extension.

**SCHOOL TRANSFER.** To transfer schools, first notify the DSO at the school you are attending of your plan to transfer, then obtain a Form I-20 from the DSO at the school you plan to attend. Return the Form I-20 for the new school to the DSO at that school within 15 days after beginning attendance at the new school. The DSO will then report the transfer to the Department of Homeland Security (DHS). You must enroll in the new school at the next session start date. The DSO at the new school must update your registration in SEVIS.

**NOTICE OF ADDRESS.** When you arrive in the United States, you must report your U.S. address to your DSO. If you move, you must notify your DSO of your new address within 10 days of the change of address. The DSO will update SEVIS with your new address.

**REENTRY.** F-1 students may leave the United States and return within a period of five months.To return, you must have: 1) a valid passport; 2) a valid F-1 student visa (unless you are exempt from visa requirements); and 3) your Form I-20, page 2, properly endorsed for reentry by your DSO. If you have been out of the United States for more than five months, contact your DSO

**AUTHORIZATION TO RELEASE INFORMATION BY SCHOOL.** DHS requires your school to provide DHS with your name, country of birth, current address, immigration status, and certain other information on a regular basis or upon request. Your signature on the Form I-20 authorizes the named school to release such information from your records.

**PENALTY.** To maintain your nonimmigrant student status, you must: 1) remain a full-time student at your authorized school; 2) engage only in authorized employment; and 3) keep your passport valid. Failure to comply with these regulations will result in the loss of your student status and subject you to deportation.

**INSTRUCTIONS TO SCHOOLS**

Failure to comply with 8 CFR 214.3(k) and 8 CFR 214.4 when issuing Forms I-20 will subject you and your school to criminal prosecution. If you issue this form improperly, provide false information, or fail to submit required reports, DHS may withdraw its certification of your school for attendance by nonimmigrant students.

**ISSUANCE OF FORM I-20.** DSOs may issue a Form I-20 for any nonimmigrant your school has accepted for a full course of study if that person: 1) plans to apply to enter the United States in F-1 status; 2) is in the United States as an F-1 nonimmigrant and plans to transfer to your school; or 3) is in the United States and will apply to change nonimmigrant status to F-1. DSOs may also issue the Form I-20 to the spouse or child (under the age of 21) of an F-1 student to use to enter or remain in the United States as an F-2 dependent. DSOs must sign where indicated at the bottom of page 1 of the Form I-20 to attest that the form is completed and issued in accordance with regulations.

**ENDORSEMENT OF PAGE 2 FOR REENTRY.** If there have been no substantive changes in information, DSOs may endorse page 2 of the Form I-20 for the student and/or the F-2 dependents to reenter the United States. If there have been substantive changes, the DSO should issue and sign a new Form I-20 that includes those changes.

**RECORDKEEPING.** DHS may request information concerning the student's immigration status for various reasons. DSOs should retain all evidence of academic ability and financial resources on which admission was based, until SEVIS shows the student's record completed or terminated.

**AUTHORITY FOR COLLECTING INFORMATION.** Authority for collecting the information on this and related student forms is contained in 8 U.S.C. 1101 and 1184. The Department of State and DHS use this information to determine eligibility for the benefits requested.The law provides severe penalties for knowingly and willfully falsifying or concealing a material fact, or using any false document in the submission of this form.

**REPORTING BURDEN.** U.S. Immigration and Customs Enforcement collects this information as part of its agency mission under the Department of Homeland Security. The estimated average time to review the instructions, search existing data sources, gather and maintain the needed data, and complete and review the collection of information is 30 minutes (.50 hours) per response. An agency may not conduct or sponsor, and a person is not required to respond to an information collection unless a form displays a currently valid OMB Control number. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to: Office of the Chief Information Officer/Forms Management Branch, U.S. Immigration and Customs Enforcement. 801 I Street NW Stop 5800, Washington, DC 20536-5800. Do not send the form to this address.

**ICE Form I-20 (3/31/2018)**

Appx48

Case 1:20-cv-02237-UNA Document 1-17 Filed 02/24/2023

# EXHIBIT 2

**From:** ████████████████ ▇
**Subject:** Fwd: Genra
**Date:** May 24, 2020 at 10:46 AM
**To:** ████████████████





---------- Forwarded message ----------
From: < nfo@un vers tyoffarm ngton.edu>
Date: Thu, May 18, 2017 at 2:00 PM
Sub ect: RE: Genra

Yes, we have many nternat ona students and do offer Day 1 CPT. Be ow s add t ona deta s on our schoo and programs:

Thank you for your recent nterest n The Un vers ty of Farm ngton, a nat ona y accred ted bus ness and STEM nst tut on. Here at the Un vers ty of Farm ngton we have created an nnovat ve earn ng env ronment that comb nes trad t ona nstruct on w th fu t me profess ona exper ences. We offer flex b e c ass schedu es and a focus on students who do not want to nterrupt the r careers.

In many nstances, your pr or Masters Degree's (MA) cred ts, comb ned w th CPT, can be app ed to a second MA n eu of a trad t ona course oad.

Our programs nc ude undergraduate and graduate degrees n:

Account ng

F nance

Internat ona Bus ness
Supp y Cha n Management
Pub c Re at ons and Market ng
Bus ness Informat on Systems

Computer Sc ence
Informat on Techno ogy
Industr a and Systems Eng neer ng
Manufactur ng Eng neer ng
Mechatron cs

The Un vers ty of Farm ngton operates on a quarter y academ c ca endar, each term s genera y ten weeks, exc ud ng exams, and the adm ss ons process s on a ro ng bas s. Terms start every three months, beg nn ng n September, December, March, and June. Sess ons beg n every month. Graduate programs tu t on s $2500 per quarter. Depend ng on fees, average cost s $1,000 per month.

We are accred ted by the Accred t ng Comm ss on of Career Schoo s and Co eges (www.accsc.org) and

 censed by the M ch gan Department of L cens ng and Regu atory Affa rs as a pr vate postsecondary co ege.

If you are n eres ed n hav ng your omorrow s ar oday p ease comp e e he a ached app ca on and subm a copy of your passpor

If you are interested in having your tomorrow start today, please complete the attached application and submit a copy of your passport and current visa. We have also attached a student admissions checklist for your reference.

You also can contact the University of Farmington Office of Admissions at (248) 702-6316 or admissions@universityoffarmington.edu.

Good luck in all your endeavors.

Office of Admissions

University of Farmington

30500 Northwestern Highway, Suite 210

Farmington Hills, MI 48334





A nationally accredited institution authorized to enroll international students by the U.S. Department of Homeland Security.

ACCSC



University of Farmington
*Office of Admissions*
30500 Northwestern Highway
Farmington Hills, MI 48334



Dear ███████

It is with great pleasure to inform you of your admission to the University of Farmington for the Fall 2017 Quarter.

You were chosen from the largest and most competitive applicant pool in the institution's history for this opportunity. On behalf of myself and our faculty, students, and alumni - congratulations and welcome to the global community that is the University of Farmington!

Your admission to the University of Farmington is a reflection on your past academic achievements and future goals. We are confident in your ability to prosper and succeed at the University of Farmington.

At the University of Farmington, you will be part of a diverse community, where undergraduate, graduate, and international students work alongside renowned faculty in an environment of ingenuity, creativity, and innovation. The professional faculty at the University of Farmington are drawn directly from business and industry and will provide you experiences needed to succeed in your career by exposing you to a blend of traditional, applied, and practical educational opportunities.

The opportunities a degree from the University of Farmington holds are endless.

If you have any further questions regarding your acceptance and next steps in the admissions process, please contact us at admissions@universityoffarmington.edu.

The University of Farmington community welcomes you, and I personally look forward to greeting you on campus.

Sincerely,

Ali Milani
Director of Admissions

248.702.6316                                    admissions@universityoffarmington.edu

A nationally accredited institution authorized to enroll international students by the U.S. Department of Homeland Security.

Appx52



# Invoice

Office of Student Accounts
University of Farmington
30500 NW Highway, Suite 205
Farmington Hills, Michigan 48334
Office Phone: 2487026719
studentaccounts@universityoffarmington.edu

| | |
|---|---|
| **Invoice Number:** | I180212305 |
| **Invoice Date:** | 02/12/2018 |
| **Payment Terms:** | Payment 30 days after invoice date |
| **Invoice Due Date:** | 03/14/2018 |
| **Invoice Amount:** | 2,500.00 |
| **Created By:** | Office of Student Accounts |

**Bill To**

**Ship To**

| Item Name | Unit Price | Total |
|---|---|---|
| Initial Attendance/I-20 Issuance | 1,000.00 | 1,000.00 |
| Balance of Tuition, Winter Term 2017 | 1,500.00 | 1,500.00 |

**Comments:**

| | |
|---|---|
| Subtotal: | $ 2,500.00 |
| **Invoice Amount** | **$ 2,500.00** |

**Terms & Conditions:**

Initial enrollment deposit or related fee is due upon receipt of I-20.

Balance of tuition is due within 30 days of enrollment or the start of a new term.

Fees for student ID replacement, transcripts, or diplomas are due within 30 days of request.

A $25 late fee will be charged on all invoices.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| Teja Ravi, Individually and on Behalf of | : | |
| All Others Similarly Situated | : | |
| | : | No. 20-1237C |
| **Plaintiff,** | : | (Senior Judge Firestone) |
| | : | |
| v. | : | |
| | : | |
| **The United States of America** | : | |
| | : | |
| **Defendant.** | : | |

---

## AMENDED CLASS ACTION COMPLAINT

---

Plaintiff Teja Ravi ("Plaintiff"), by and through his attorneys, brings this action on behalf of himself and all others similarly situated against the United States. Plaintiff hereby alleges, on information and belief, except as to those allegations which pertain to the named Plaintiff, which allegations are based on personal knowledge, as follows:

## NATURE OF THE ACTION

1.     The University of Farmington marketed itself as a university that "provide[s] students from throughout the world a unique educational experience" and claimed to be credited by the Michigan Department of Licensing and Regulatory Affairs and the Accrediting Commission of Career Schools and Colleges. Farmington also claimed it was authorized by the Student and Exchange Visitor Program that allows the admittance of foreign students. However, Farmington was nothing more than a façade. It is now well known that the U.S. Immigration and Customs Enforcement's Homeland Security Investigations ("HSI") created Farmington in an attempt expose student visa fraud in the United States. Yet there was no way for prospective students to distinguish Farmington from a real university. Farmington created what appeared to be a legitimate web presence through its website and Twitter. The website went so far as to have bad weather alerts for students. Ultimately, there was no reason for a student applying to know or have a suspicion that Farmington was a fake university.

2.     Plaintiff and class members applied and enrolled at Farmington with the understanding that it was an accredited university offering legitimate degrees in such programs as a Masters in Information Technology and a Masters in Computer Science. Farmington required that Plaintiff and class members pay tuition upon acceptance. All class members were informed that there would be regular classes each month, and all class members enrolled in the online program as most of the students lived outside of the state of Michigan and/or were unable to attend on campus courses due to their employment. None of the students received services in exchange for their tuition.

3.     In January 2019, Defendant revealed that the University was a sham and reneged on their guarantees that Plaintiff and Class members had properly adhered to immigration regulations and were therefore lawfully residing and working in the United States. Defendant instead had the audacity to revoke Plaintiff and Class members visa status, accusing the enrollees of visa fraud, even though Plaintiff and Class members were unwitting victims of Defendant's scheme, and had reasonably believed in Defendant's actions and assurances, that the University was a legitimate and authorized school.

4.     The University turned out to be a fraudulent, and deprived class members of millions of dollars, without providing the services that it offered and promised. Plaintiff, therefore, brings this action on behalf of himself and all other similarly situated persons who enrolled at the University of Farmington asserting Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing. Plaintiff seeks damages and equitable relief on behalf of the Class, which relief includes, but is not limited to, the following: refunding Plaintiff and class member full amount paid to the University of Farmington; costs and expenses, including attorneys' fees and expert fees; and any additional relief that this Court determines to be necessary to provide complete relief to Plaintiff and the class.

## JURSIDICTION AND VENUE

5.     The United States Court of Federal Claims has jurisdiction and venue over this action pursuant to 28 U.S.C. § 1491(a)(1).

## PARTIES

6.     Plaintiff Teja Ravi is a citizen of India who resided in Houston, Texas at the time he enrolled at Farmington. During the class period, in March 2018, Plaintiff was accepted and enrolled in the University. Plaintiff was told by University officials that he would have regular classes monthly. Plaintiff paid $12,500 in tuition to the University and believed the University's website and marketing material regarding its accreditation.

7.     Defendant is the United States, as acting through its agencies, including the U.S. Immigration and Customs Enforcement, which is based in Washington, D.C. has field offices throughout the United States and is a branch of DHS.

## NATURE OF THE CASE AND BACKGROUND FOR THE CONTRACT

8.     The University of Farmington was a fake university setup by ICE's Homeland Security Investigations and overseen by DHS and was setup to expose student visa fraud. Defendant authorized HSI and/ or DHS agents to setup and run the University of Farmington scheme, including to enroll students, to accept tuition payments, and to use these contracts with students as a basis to revoke their visa status.

9.     Defendant offered classes and degree programs on the University of Farmington website and through letters of admission. Class members accepted defendant's offers of admission to enroll in the degree programs. Class members paid tuition money to the University. However, the Defendant did not provide class or degree programs as offered.

10.     In an effort to maintain a legitimate façade, Defendant used a complex scheme of phony credentials and misleading and false statements to enrolled and prospective students. This schemed included:

- Establishing a physical location:
  - o   Defendant leased a physical office in Farmington Hills, Michigan.  Nevertheless, all administrative interfacing between the University officials and students/prospective students occurred digitally or telephonically as many of the enrolled students and prospective students relied on the online feature of the University.
- Enlisting recruiters to lure students:
  - o   Defendant enlisted the assistance of nearly a dozen recruiters to funnel Plaintiff and Class members to enroll in the University of Farmington, rather than other, legitimate, graduate programs. These recruiters, primarily foreign students, were in similar social circles as Plaintiff and Class members and approached Plaintiff and class members without solicitation. Defendant offered recruiters incentives for leading potential students to the University, in the form of cash or University credits. Recruiters helped funnel nearly six hundred (600) students to enroll at Farmington.

- Fabricating credentials:
  - Defendant went to great lengths to manipulate foreign prospective students by creating the impression that the University was legitimate. This included:
    - Undercover agents of the Department of Homeland Security registering the University of Farmington with the state of Michigan as a legitimate university (through Department of Licensing and Regulatory Affairs).
    - A national accreditation agency (Accrediting Commission of Career Schools and Colleges), at the request of DHS, listed the University of Farmington as being accredited in order to help deceive prospective students.
    - Defendant placing the University on an ICE website, listing the University as an institution approved for the Student and Exchange Visitor Program ("SEVIS").

13. The University further enticed student enrollment through what appeared to be a legitimate web presence.

14. From its web presence, it was virtually impossible for a prospective student to differentiate the University from a legitimate one. Prospective students researching schools were doing so from the internet as the majority neither lived in or near Michigan, where the University was located.

15. The University had a professional website, a red and blue coat of arms as its emblem, a Latin slogan meaning "knowledge and work" and a physical location at a commercial building in Farmington Hills, Michigan. Further, the website offered specific details related to its courses and provided tuition pricing.



One page on its website read:

Located in the heart of the automotive and advanced manufacturing center of Southeast Michigan, the University of Farmington provides students from throughout the world a unique educational experience. Our dynamic business administration and STEM curriculum allows students to rapidly apply their knowledge; preparing them to succeed in an ever-globalizing economy.

Another page describes an educational and collaborative community enrollees could be a part of at UF:

We are very excited about welcoming you to the UF community and helping you achieve your academic goals. You'll find UF to be a vibrant and growing institution where students, faculty and staff enjoy a challenging and collaborative environment. UF has a rolling admission process and operates on a quarterly academic calendar. Students are encouraged to apply early to ensure a smooth transition to UF.

The website also listed and described the enticing, but illusory programs, offered by Farmington. Regarding its graduate MBA program, the site stated:

The two-year schedule offers a convenient way for you to add a master's degree to your résumé while you work. . . . Students hone their skills in project and program management, quality improvement initiatives, and creativity and problem solving. This interactive and collaborative cohort program helps students build strong ties with their professional faculty and gain perspectives from other disciplines and leaders in industry.

The University's website went even further in an effort to induce students with statements such as the school "was accredited by the Accrediting Commission of Career Schools and Colleges (www.accsc.org) and licensed by the Michigan Department of Licensing and Regulatory Affairs as a private postsecondary college. UF is authorized by the Student and Exchange Visitor Program to admit foreign students."

16.     Ultimately, it was near impossible for a prospective student to discern the legitimacy of the University through its recruitment efforts and web presence.

17.     The University also engaged in individual communication via postal and electronic mail with the prospective students. Upon acceptance of an offer letter from the University, a student was enrolled and was advised that there would be regular classes monthly. The University also mailed students an I-20, Certificate of Eligibility for Nonimmigrant Student Status to students, leaving them no reason to question the University's legitimacy. (*see* **Exhibit 1**)

18.     Emails from University officials continued the impression of legitimacy. In an email to prospective students an official wrote:

Thank you for your recent interest in The University of Farmington, a nationally accredited business and STEM (science, technology, engineering, and mathematics) institution. Here at the University of Farmington we have created an innovative learning environment that combines traditional instruction with

fulltime professional experiences. We offer flexible class schedules and a focus on students who do not want to interrupt their careers. (*see* **Exhibit 2**)

19.     Other communication from officials reiterated the University's fabricated claims regarding its programs available to students with statements such as:

> In many instances, your prior Masters Degree's (MA) credits, combined with CPT, can be applied to a second MA in lieu of a traditional course load." And he continued to highlight the scheme's accreditation: "We are accredited by the Accrediting Commission of Career Schools and Colleges (www.accsc.org) and licensed by the Michigan Department of Licensing and Regulatory Affairs as a private postsecondary college.

20.     To further strengthen its claim of legitimacy, emails from the University contained a footer with the following statement: "A nationally accredited institution authorized to enroll international students by the U.S. Department of Homeland Security."

21.     Upon enrollment at the University, students would pay tuition to the University and were advised that a class schedule would be forthcoming. The class schedule never arrived. When students questioned the University regarding the lack of a class schedule and assignments, they were met with either silence or assurances from Farmington officials about the legitimacy of the school.

For example:

22.     Teja Ravi paid $12,500 in tuition to Farmington after he enrolled in March 2018, after which he was enrolled and informed that he would have a regular class schedule and have regular class. But he was never enrolled in classes or given assignments. As soon as the semester commenced, and he still was not enrolled in classes, he contacted officials at the University to ask about classes and assignment. A university official advised him not worry about it as that was not an issue. It wasn't until about a year after enrollment, Teja was advised by a friend that the University was a fake. Teja contacted the University to clarify this rumor and was told by a University official that the rumor was not true. Ravi never received any educational services from the University.

23.     Rajasekhar Reddy enrolled in Farmington in October 2017 after paying tuition in the amount of $10,000. Rajasekhar applied after researching the school online and reviewing Farmington's website. In January 2019, Rajasekhar learned the University was a fake. He tried several times to contact the University and received no response.

24.     Naveen Kumar enrolled at University of Farmington around May 2018. Naveen visited Farmington, MI during the enrollment process, but the University was closed the day he visited. After researching the University online, Naveen ultimately submitted an application and accepted its offer to attend. When Naveen became suspicious of the University he requested a transfer of his SEVIS to another school. Farmington would only agree to the transfer in exchange for a payment of $1500, which Naveen paid.

25.     Pavan Sama, a Farmington student during the time period of Defendant's unlawful acts had a similar experience to other students. He corresponded with a University official named Carey Ferrante whose email address was carey.ferrante@universityoffarmington.edu. Sama paid $15,000 in tuition to Farmington.

26.     Each of these students had common facts associated with their matters: they each relied on the website; they each relied on individual communications with University staff; they each received an accepted an offer of admission; they each enrolled and paid thousands of dollars of tuition; none of them received class information after enrolling; none of them were enrolled in classes; those who inquired after enrolling received assurances; none of them received any sort of service for the thousands of dollars that they spent in tuition money.

27.     In January 2019, Defendant revealed that the University was a sham and reneged on their guarantees that Plaintiff and Class members had properly adhered to immigration regulations and were therefore lawfully residing and working in the United States. Defendant instead had the audacity to revoke Plaintiff and Class members visa status, accusing the enrollees of visa fraud, even though Plaintiff and Class members were unwitting victims of Defendant's scheme, and had reasonably believed in Defendant's actions and assurances, that the University was a legitimate and authorized school. Defendant had knowledge of the contractual relationship between Defendant and Plaintiff and class members at this time, as the high ranking HSI and/ or DHS officials who authorized the University of Farmington scheme and the revocation of Farmington students' visa status knew that University of Farmington was Defendant's scheme, and knew of Plaintiff and Class members' status as Farmington students, as this was the basis for revoking their visa status and accusing them of visa fraud. Defendant kept all tuition money it collected from Plaintiff and Class members.

## PLAINTIFF'S FACTS

28.     Plaintiff Teja Ravi learned of the University from a friend who advised him that he could attend all classes online, which would allow him to maintain the Curricular Practical Training that allowed him to attend school and continue with employment in the United States. Plaintiff was also enticed by the University's three-month semester schedule as he traveled frequently for his contracted work, which was on a six-month basis.

29.     At the time Plaintiff applied to the University in early 2018, he was enrolled in engineering curriculum at Northwestern Polytechnic University in California, and had been granted a 5-year student visa through that program from July 2015 to July 2020. Plaintiff was interested in the University of Farmington as it offered graduate programs in IT, which he hoped would make him a more attractive candidate to prospective employers. Plaintiff applied to the University in early 2018 by filling out an admission form and enrolled in the Masters in Information Technology program.

30.     Upon enrollment to the University, Plaintiff paid $12,500 in tuition. He was advised by the University that he would be scheduled for regular classes every month. After commencement of the first semester, Plaintiff did not receive any classes to attend or assignments, as he had been promised by the University. Plaintiff contacted University administration to find out why and was told by University officials that the lack of classes and assignments would not be an issue. Plaintiff also re-checked the University's accreditation on its website, which indicated that his Curricular Practical Training ("CPT") was valid.

31.     A year after enrolling, Plaintiff learned that the University might be fraudulent. Plaintiff contacted University administration three times. On his third attempt, Plaintiff spoke with University administrator Carrie Fernand, who advised Plaintiff that there were no issues. Shortly

thereafter, however, Plaintiff discovered news of the University being a sting operation by the Department of Homeland Security, with many students either arrested or deported.

32. Plaintiff's experiences with the University are typical of the class and over 500 other University of Farmington students.

33. Plaintiff suffered injury in fact and loss of money or property. He has been damaged by, inter alia, the amounts he has paid the University of Farmington in tuition.

## CLASS ALLEGATIONS

34. Plaintiff brings this class action on behalf of himself individually and all others similarly situated, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

35. The proposed class consists of all persons who enrolled in and attended the University of Farmington from 2015 to 2019. Excluded from the Class are the University of Farmington, its affiliates, employees, officers, and directors, persons or entities that distributed or recruited students for the University of Farmington, the Judge(s) assigned to this case, and the attorneys of record in this case. Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

36. This action is properly brought as a class action for the following reasons:

    a. The proposed class is numerous and geographically dispersed through the United States and other countries, such that the joinder of all class members is impracticable. While Plaintiff does not know the exact number and identity of all class members, Plaintiff is informed and believes that there are hundreds of class members. The precise number of members can be ascertained through discovery.

    b. The disposition of Plaintiff's and proposed class members' claims in a class action will provide substantial benefits to both the parties and the Court.

    c. The proposed class is ascertainable and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each proposed class member were infringed or violated in the same fashion.

    d. There are questions of law and fact common to the proposed class which predominate over any questions that may affect particular class members. Such common questions of law and fact include, but are not limited to:

        i. Whether the conduct by the University of Farmington was unlawful, unfair, or fraudulent;

        ii. Whether the University's advertising was likely to deceive the public;

        iii. Whether the University's conduct was false, misleading, or likely to deceive;

        iv. Whether the University violated the Michigan Consumer Protection Act;

        v. Whether the University breached the terms of its of contract with students to provide educational services;

vi.  Whether the University's actions breached the Implied Covenant of Good Faith and Fair Dealing;

vii.  Whether the University unjustly received funds from Plaintiff or class members;

viii.  Whether the University is liable for intentional and/or negligent misrepresentations;

ix.  Whether the University is liable for fraud;

x.  Whether the University is liable for making false promises;

xi.  Whether the Plaintiff and proposed class members have been harmed and the proper measure of relief;

xii.  Whether Plaintiff and the proposed class members are entitled to an award of punitive damages, attorneys' fees and expenses against the Defendant; and

xiii.  Whether, as a result of Defendant's misconduct, Plaintiff is entitled to equitable relief, and if so, the nature of such relief.

e.  Plaintiff's claims are typical of the claims of the members of the proposed class. Plaintiff's claims arise from the same practices and conduct that give rise to the claims of all class members and are based on the same legal theories. He was injured by the same wrongful practices as other class members.

f.  Plaintiff will fairly and adequately protect the interest of the proposed class in that he has no interests antagonistic to those of the other proposed class members, and Plaintiff has retained attorneys experienced in consumer class actions and complex litigation.

g.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

i.  Given the size of individual proposed class members' claims and the expense of litigating those claims, few, if any, proposed class members could afford to or would seek legal redress individually for the wrongs Defendant committed against them, and absent proposed class members have no substantial interest in individually controlling the prosecution of individual actions;

ii.  The action will promote an orderly and expeditious administration and adjudication of the proposed class claims; economies of time, effort, and resources will be fostered; and uniformity of decisions will be insured;

iii.  Without a class action, proposed class members suffered injury will have no redress, and Defendant's violations of law will proceed without remedy while Defendant continue to reap and retain the substantial proceeds of its wrongful conduct; and

iv.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

37.     Defendant has, or has access to, address information for the Class members, which may be used for the purpose of providing notice of the pendency of this class action.

38.     Plaintiff seeks damages and equitable relief on behalf of the proposed class on grounds generally applicable to the entire proposed class.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

39.     Contracts existed between Plaintiff, class members and the University of Farmington, which was controlled and operated by Defendant.

40.      Defendant purported to offer admission to the University, including access to classes and advanced degrees. Plaintiff and other students indicated their acceptance of the offer of admission and provided consideration for the contract by paying tuition and other fees in the amounts of $10,000 to more than $15,000. The United States breached the contract when it failed to provide the offered classes and degrees.

41.     All conditions precedent under the contracts have been performed by Plaintiff and the Class, including the payment of tuition, application fees, and other fees.

42.     Defendant, operating and controlling the University, breached the terms of its standardized contracts with Plaintiff and the Class by failing to provide them with the promised products and services as contracted.

43.     The law enforcement personnel from U.S. Immigration and Customs Enforcement, Homeland Security Investigations whose conduct bound the Defendant in contract with the Plaintiff and the Class members had actual authority to bind the government in contract, because forming these contracts was necessary and essential to the successful performance of the agents' assigned tasks and duties regarding carrying out the Farmington scheme. Enrolling students was an integral part of the Farmington scheme authorized by Defendant.

44.     Defendant ratified the contracts. The law enforcement personnel from U.S. Immigration and Customs Enforcement, Homeland Security Investigations who authorized the University of Farmington scheme and the revocation of Farmington students' visa status had knowledge of the student contracts at the time the officials authorized revoking the students' visa status and accusing them of visa fraud. ICE has written records of each contract, including written communications between the students and the agents, and registration documents, invoices, and receipts sent from agents to students or displayed on the Farmington website portal. Defendant has accepted the benefit of the contracts by keeping all tuition money paid by Plaintiff and class members under the contracts.

45.     As a result of Defendant's breach of its contracts, Plaintiff and the Class have been damaged.

## SECOND CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

46.     Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraph above as if fully set forth herein.

47.     The law implies a covenant of good faith and fair dealing in every contract. Defendant, operating the University of Farmington, violated this covenant of good faith and fair dealing in its contract with Plaintiff and members of the Class by, *inter alia*, misrepresenting to Plaintiff and the Class the true nature of the University graduate program as alleged more fully elsewhere in the Complaint.

48.     Plaintiff and members of the Class performed all, or substantially all, of the significant duties required under their agreements with Defendant.

49.     The conditions required for Defendant' performance under the contract agreements had occurred.

50.     Defendant did not provide and/or unfairly interfered with the right of Plaintiff and Class members to receive the benefit under their agreements with Defendant.

51.     Plaintiff and the Class have been damaged by Defendant's breach of the implied covenant of good faith.


## PRAYER FOR RELIEF

52. WHEREFORE, Plaintiff prays this Court enter a judgment against Defendant that:

A.     This action be certified and maintained as a class action under Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure and certify the proposed class as defined, appointing Plaintiff as representative of the Class, and appointing the attorneys and law firms representing Plaintiff as counsel for the Class;

B.     Awards compensatory, statutory and/or punitive damages for Defendant's breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, negligent misrepresentation and false promises, where such relief is permitted;

C.     Award Plaintiff and proposed class members the costs of this action, including reasonable attorneys' fees and expenses;

D.     Orders Defendant to immediately cease its wrongful conduct as set forth above; enjoins Defendant from continuing to falsely market and advertise, conceal material information, and conduct business via the unlawful and unfair business acts and practices complained of herein; orders Defendant to refrain from discriminating against Plaintiff and Class members in the Plaintiff and Class members' future applications to enter the United States, because of Plaintiff and Class members' ensnarement at the University; and requires Defendant to refund to Plaintiff and all of the Class members the funds paid to Defendant for the subject tuition and fees;

E.     Awards equitable monetary relief, including restitution and disgorgement of all ill-gotten gains, and the imposition of a constructive trust upon, or otherwise restricting the

proceeds of Defendant's ill-gotten gains, to ensure that Plaintiff and proposed class members have an effective remedy;

F.      Awards pre-judgment and post-judgment interest at the legal rate; and

G.      Such further legal and equitable relief as this Court may deem just and proper.


Respectfully submitted,

By: /s/*Amy E. Norris, Esq.,* (#1017140)
Amy@mwlc.org
(202) 530-0100
NORRIS LAW, PLLC
616 E Street NW
Suite 1156
Washington, DC 20004

Attorney for Teja Revi

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TEJA RAVI,                              )
                                        )
                Plaintiff,              )
                                        )       No. 20-1237C
        v.                              )       (Senior Judge Firestone)
                                        )
                                        )
THE UNITED STATES,                      )
                                        )
                Defendant.              )

## DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Pursuant to Rule 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal

Claims (RCFC), the United States respectfully requests that the Court dismiss the complaint filed

by the plaintiff, Teja Ravi. In support of this motion, we rely upon Mr. Ravi's complaint, his

supporting exhibits, and this brief.[1]

## STATEMENT OF THE ISSUES

1.      Whether this Court has jurisdiction over Mr. Ravi's purported breach of contract claim.

2.      Whether Mr. Ravi has sufficiently pleaded his breach of contract action to state a claim

upon which relief may be granted.

## BACKGROUND FACTS

This is a purported breach of contract case against the United States.

The allegations in this case center on a Government-created entity called the University

of Farmington (University). *See generally* Compl. The University was part of a multi-pronged

Government law enforcement operation, designed "to expose student visa fraud." *See*, *e.g.*, *id*. at

---

[1] For the purposes of this motion, we assume that all of the allegations in Mr. Ravi's complaint are true. Should this motion be denied, we reserve the right to contest all of the allegations in Mr. Ravi's complaint.

¶¶ 1, 3, 8, and 27.  The University was staffed with law enforcement personnel from U.S. Immigration and Customs Enforcement, Homeland Security Investigations, who presented themselves as administrators of the University, *id*. at ¶¶ 1, 8-21, but in actuality were engaged in ferreting out illegal conduct.

The plaintiff, Teja Ravi, insists he was an innocent and unwitting participant in these operations.  He claims that in March 2018, he enrolled at the University in the honest pursuit of higher learning.  ECF No. 1 at 2, ¶ 1.  Mr. Ravi alleges that he understood the University to be a legitimate educational institution that offered services, including classes and accredited degree programs, and that he paid the University $12,500 in tuition.  *See id*. at ¶¶ 9-22.  By doing so, Mr. Ravi claims that a contractual relationship was formed whereby he should have received those services.  *Id*. at ¶¶ 9-22.  Because the Government never provided him with those services, *id*. at ¶ 9, Mr. Ravi claims he may sue the Government in this Court and recover monetary damages under a breach of contract theory.  *Id*. at ¶ 39-49.

<div align="center">ARGUMENT</div>

I.    Standards of Review

    A.    Legal Standard Under RCFC 12(b)(1)

The Court of Federal Claims is a court of specific jurisdiction.  *See Rick's Mushroom Serv. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008).  Although this Court possesses authority to grant relief against the United States, that authority is capped by the extent to which the United States has waived its sovereign immunity.  *See United States v. Testan*, 424 U.S. 392, 399 (1967).

In addressing RCFC 12(b)(1) motions, a "[d]etermination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed."  *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997) (citations omitted).  If this Court's subject matter jurisdiction is challenged, the non-moving party must establish that this Court has jurisdiction over the dispute.  *See Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998).  In such circumstances, this Court may consider evidentiary matters outside the pleadings.  *Indium Corp. of America v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985).  Where the moving party "can show that the pleader's allegations are insufficient on their face, as for instance when they fail to properly allege the existence of a contract or privity of contract," a RCFC 12(b)(1) motion "should be granted . . . ."  *Total Medical Management, Inc. v. United States*, 29 Fed. Cl. 296, 299 (1993).

B.    <u>Legal Standard Under RCFC 12(b)(6)</u>

A court should grant a motion to dismiss for failure to state a claim upon which relief may be granted when the claimant's asserted facts do not, under the law, entitle him to a remedy.  *See Perez v. United States*, 156 F.3d 1366, 1370 (Fed. Cir. 1998).  For purposes of the motion, the Court assumes that all well-pled factual allegations are true and makes reasonable inferences in favor of the non-movant.  *See id.*  Although a claimant need not recite detailed factual allegations in his complaint, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions[.]"  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  The complaint must allege "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claims.  *See id.* at 556.

II.    There Was No Tucker Act Contract To Provide Mr. Ravi With Educational Services

Mr. Ravi's complaint fails for the simple reason that there was no contract between the United States and Mr. Ravi for the provision of educational services.  To establish a valid contract with the Government, a plaintiff must allege and prove basic contractual elements such as (1) mutuality of intent to contract, (2) lack of ambiguity in offer and acceptance, and (3) consideration.  *Seuss v. United States*, 535 F.3d 1348, 1359 (Fed. Cir. 2008).  However, "[w]hen the United States is a party, a fourth requirement is added: the government representative whose conduct is relied upon must have actual authority to bind the government in contract." [2]  *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998); *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990) (same); *see also H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed. Cir. 1984) (explaining that plaintiff must show "that the officer whose conduct is relied upon had actual authority to bind the government in contract").

Mr. Ravi makes no attempt to plead this last necessary element.  *See generally* Compl. To establish that the Government agreed to contractually obligate itself under the type of contract he alleges, Mr. Ravi must identify someone (or some entity) capable of binding the United States to a contract to provide him with the services he claims were withheld.  Yet Mr. Ravi does not identify any Government representative who was allegedly authorized to bind the Government to a contract, much less the source of any such authority.  *See, e.g., H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989).  Mr. Ravi's failure to plead this last necessary contractual element is fatal to his case.  Moreover, it does not appear that Mr. Ravi can plausibly allege that any Government representative had authority to enter into the alleged contract given

---

[2] A plaintiff alleging an implied in fact contract must allege the same elements, although a signed writing need not exist.  *See Hanlin v. United States*, 50 Fed. Cl. 697, 699 (2001).

the facts alleged in the complaint. Indeed, one Federal district court has already dismissed a largely identical breach of contract case on these exact grounds. *Zhu v. Dep't of Homeland Sec.*, No. 2:18-489, 2019 WL 4261167, at *4 (W.D. Wash. Sept. 9, 2019) (dismissing plaintiff's breach of contract claim related to another Government-created university because plaintiff did not "allege facts that plausibly show a government's representative had actual authority to bind the government in contract"). For this reason, the complaint should be dismissed.[3]

III.      The Gravamen Of Mr. Ravi's Lawsuits Resounds In Tort, Not Contract

Mr. Ravi's pleaded facts fail in another way. They actually undermine (rather than support) the notion that there was some mutual contract-based agreement between Mr. Ravi and the Government, and that the harm alleged resulted from a breach of such an agreement. *United States v. Neustadt*, 366 U.S. 696, 703 (1961) ("We must look beyond the literal meaning of the language to ascertain the real cause of complaint"). As Mr. Ravi's complaint makes clear, there was *no intent* by any Government official to enter into a contract to provide Mr. Ravi with educational services, nor do any of his allegations contest that point. *See generally* Compl. These facts demonstrate that the purported contract Mr. Ravi identifies lacks the requisite mutuality of intent to contract. Instead, the gravamen of Mr. Ravi's complaint is that the University itself was "fraudulent," and the Government's "misleading and false statements" caused him harm. Compl. ¶¶ 4, 10, 30, 31, 36 45, and 50 (alleging "misleading and false statements," "false promises" that were "misleading" and "likely to deceive," and demanding relief for "fraud, negligent misrepresentation, and false promises"). His complaint is rife with these kinds of allegations that demonstrate that the facts giving rise to his lawsuit do not arise out

---

[3] Dismissal under either RCFC 12(b)(1) or 12(b)(6) is appropriate because Mr. Ravi has not alleged facts sufficient to establish the existence of a valid contract.

of any contract, but rather (when taken at face value) resound in tort, regardless of how Mr. Ravi

styles his claim. *Mt. Homes, Inc. v. United States*, 912 F.2d 352, 356 (9th Cir. 1990) (explaining

that although plaintiff "couched its complaint in terms of the breach of a duty to prepare the

documents adequately, we look beyond its characterization to the conduct on which the claim is

based"). Accordingly, neither Mr. Ravi's pleaded claims nor the relief he seeks fit the

parameters of a breach of contract case, and for that reason, his complaint must be dismissed.

*See Phang v. United States*, 87 Fed. Cl. 321, 325–26 (2009), *aff'd sub nom. Phu Mang Phang v.

United States*, 388 F. App'x 961 (Fed. Cir. 2010) (dismissing complaint because allegations of

"fraud and fraud in the inducement [to enter into agreement] sound in tort").

IV.    The Sovereign Capacity Doctrine Bars Mr. Ravi's Lawsuit

Beyond its pleading deficiencies, Mr. Ravi's lawsuit has a more fundamental problem

centered on the issue of sovereign immunity. As Mr. Ravi's pleading makes clear, the sole

purpose of the Government's activities were grounded in law-enforcement objectives. Compl. at

¶¶ 1, 3, 8, and 27. When a purported contract action arises out of "criminal" or "civil

enforcement actions . . . that could only be undertaken by the sovereign," this Court has

repeatedly barred those cases under the sovereign capacity doctrine. *Aluminum Shapes, LLC v.

United States*, 139 Fed. Cl. 709, 714 (2018); *see Trudeau v. United States*, 68 Fed. Cl. 121, 127

(2005), *aff'd*, 186 F. App'x 998 (Fed. Cir. 2006) (citations omitted). That is because the contract

does not arise under a circumstances where "the sovereign"—here, the United States—"steps off

the throne and engaged in purchase and sale of goods, lands, and services, transactions such as

private parties, individuals or corporations also engage in among themselves." *See Awad v.

United States*, 61 Fed. Cl. 281, 284 (2004) (dismissing Tucker Act contract claim because the

purported contract "was made in the government's sovereign capacity, since both counter-

terrorism efforts and the granting of citizenship and passports are solely government functions"). Rather, the Government is acting in a uniquely sovereign function which lacks "a private analogue," *id.*, meaning the Government has not clearly and unequivocally waived its sovereign immunity. *Ledford v. United States,* 297 F.3d 1378, 1381 (Fed. Cir. 2002) (explaining that a waiver of sovereign immunity under the Tucker Act "cannot be implied but must be unequivocally expressed").

Mr. Ravi has no grounds to contest that the facts giving rise to his case are integrally tied to a sovereign function. The "contract" he purports to identify was made in furtherance of an undercover law enforcement operation that squarely falls within the scope of uniquely Government activity. *Silva v. United States*, 51 Fed. Cl. 374, 377 (2002), *aff'd,* 51 F. App'x 12 (Fed. Cir. 2002) (dismissing Tucker Act contract claim because the alleged "contract would have been entered into by the FWS for the purpose of furthering undercover law enforcement operations for illegal importation of wildlife"). Mr. Ravi's pleading concedes that the University itself was designed for the sole purpose of "expos[ing] student visa fraud." Compl. at ¶¶ 1, 3, 8, and 27. To facilitate that objective, the University was staffed with law enforcement personnel who presented themselves as administrators of the University, *id.* at ¶¶ 1, 8-21, but were actually working undercover to unearth potentially criminal activity. None of these activities, which the Government took in its sovereign capacity, have any parallel in the private sphere, and therefore, they are not susceptible to contract-based lawsuits under the Tucker Act.[4] Accordingly, Mr. Ravi's complaint must be dismissed.

---

[4] We recognize that, apart from his breach of contract claim, Mr. Ravi also pleads an independent count under an implied duty of good faith and fair dealing. But when a plaintiff "fail[s] to establish either an express or implied contract with [the United States], its dependent claim for a breach of implied covenant of good faith and fair dealing also must be dismissed." *See HSH Nordbank AG v. United States*, 121 Fed. Cl. 332, 340 (2015).

CONCLUSION

For these reasons, we respectfully request that the Court dismiss Mr. Ravi's complaint for lack of subject matter jurisdiction or, alternatively, for failure to state a claim upon which relief may be granted.

<div style="margin-left: 50%;">

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

/s/ Eric P. Bruskin
ERIC P. BRUSKIN
Assistant Director

/s/ Meen Geu Oh
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-0184

</div>

January 8, 2021                    Attorneys for Defendant

## **CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 8th day of January 2021, a copy of

the foregoing "DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT" was

filed electronically. I understand that notice of this filing will be sent to all parties by operation

of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Meen Geu Oh_____

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| Teja Ravi, Individually and on Behalf of | : | |
| All Others Similarly Situated | : | |
| | : | **No. 20-1237C** |
| **Plaintiff,** | : | **Judge Firestone** |
| | : | |
| **v.** | : | |
| | : | |
| The United States of America | : | |
| | : | |
| **Defendant.** | : | |

### Plaintiff's Opposition to Defendant's Motion to Dismiss

Plaintiff Teja Ravi ("Plaintiff"), by and through his attorneys, hereby opposes the Motion to Dismiss filed by the United States and states as follows:

### I . **The United States is a correct and necessary party to this suit and this Court has jurisdiction to hear the claims.**

To survive a Rule 12(b)(1) challenge to jurisdiction, the Federal Circuit has held unambiguously that "jurisdiction . . . requires no more than a non-frivolous allegation of a contract with the government." *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1353 (Fed. Cir. 2011) (citing, e.g., Lewis v. United States, 70 F.3d 597, 602, 604 (Fed. Cir. 1995)); see also *Hanlin v. United States*, 214 F.3d 1319, 1321 (Fed. Cir. 2000) (explaining that a non-frivolous allegation of the existence of an implied-in-fact contract is sufficient to confer jurisdiction unless another statute divests the court of jurisdiction). When ruling on a motion to dismiss for lack of jurisdiction, the court must "accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Id*. (citing *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)).

Jurisdiction is established here as Mr. Ravi has alleged a non-frivolous allegation of contract with the government. A contractual relationship was formed between Mr. Ravi and the personnel from ICE, as there was offer, acceptance, and consideration. Additionally, the personnel had the authority to contract with the students as they were given the orders to make offers to students from their agency. (*See* Amended Complaint). These students had no idea that the United States government was involved in creating a fake university, and they were assured that this was a real university as ICE obtained real accreditation. When the offers were made to the students, University of Farmington's advertising portrayed it to be a real University, which would provide educational services and degrees. The United States breached their agreement when they did not provide the services as offered.

**II. In addition, the complaint should survive the motion to dismiss under RCFC 12(b)(6).**

Under RCFC 12(b)(6), a complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The factual matters alleged "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555-56 (citations omitted). When reviewing the complaint, "the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff." *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009) (citing *Papasan v. Allain*, 478 U.S. 265, 283 (1986)) (additional citation omitted). Conclusory statements of law and fact, however, "are not entitled to the assumption of truth" and "must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. "'[N]aked assertion[s]' devoid of 'further factual enhancement'" are insufficient to state a claim. Id. at 678 (quoting *Twombly*, 550 U.S. at 557); accord *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed. Cir. 1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim.").

The government cites caselaw from 1984 and 1990 to make its determination of what the government calls "the fourth element" for a breach of contract claim. Under *Cincinnati v. United States*, there is a fourth requirement, "the government representative whose conduct is relied upon must have actual authority to bind the government in contract."

According to more recent caselaw, a viable breach of contract claim requires "four elements: 1) a valid contract between the parties; 2) an obligation or duty arising from that contract; 3) a breach of that duty; and 4) damages caused by that breach." *Claude Mayo Constr. Co., v. United States*, 132 Fed. Cl. 634, 637 (2017) (citing *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989)). Mr. Ravi has plead all of those elements. *See* complaint.

While not an element of contract, Mr. Ravi concedes that there is an authority requirement for which the government references. Mr. Ravi has amended his complaint to include allegations that the government officials who were operating the University of Farmington had the actual authority to operate the University of Farmington; including that the government had the actual authority to contract with the students. Mr. Ravi specifically alleges, "The law enforcement personnel from U.S. Immigration and Customs Enforcement, Homeland Security Investigations whose conduct bound the Defendant in contract with the Plaintiff and the Class members had actual authority to bind the government in contract, because forming these contracts was necessary and essential to the successful performance of the agents' assigned tasks and duties regarding carrying out the Farmington scheme." *See* Amended Complaint, page 10.

Discovery will allow the plaintiffs to further identify the United States personnel involved. A government's representative must have had actual authority to bind the students in contract, as the personnel were given the authority to proceed with the sting operation and take the student money. By accepting the benefits of the tuition money, ICE was bound by the promise to provide

education services to plaintiff. Mr. Ravi should be made whole, as he did not receive the services promised by the contract, and instead he was swindled out of $12,000. The government specifically demonstrated its intent to provide a service in consideration for the $12,000.

*Zhu* differs from this case as the plaintiff in that case did not allege offer and acceptance and he did not allege that a government's representative had actual authority to bind the government in contract. This case alleges offer, acceptance, and actual authority by the government officials. *See* Amended Complaint.

We know that the agents were given the authority to carry out this plot, when the government revealed its involvement. As in this case, when a Defendant has not provided sufficient facts to render Plaintiff's theory of authority implausible, the Court has ordered discovery. *See Mendez v. United States*, 121 Fed. Cl. 370, 386 (2015).

### III. This involves a Contract Dispute and the Gravamen is Actually in Contract, Not in Tort

The court has found that a plaintiff's claim "is not barred simply because it can be stated as a tort." *Dakota Tribal Indus. v. U.S.*, 34 Fed. Cl. 295 (1995). It is s a contract as long as a "contractual obligation" is breached, even if it's also a tort. *See also Morris v. U.S.*, 33 Fed. Cl. 733. The plausible existence of a tort does not, as the defendant claims, wipe out all contract law and the potential for a cause of action under contract law.

The agents made clear their intent to provide educational services. The written and verbal statements manifested an intent to form a binding agreement. The allegations regarding authority have crossed the line from convincible to plausible. *See* Exhibit 1 and 2, Invoices and Website. There was a clear intent to contract; this is seen in the Farmington's offer, the student's acceptance, and acceptance of the consideration of the tuition money.

A breach of contract claim is not barred by torts that the government committed, regarding which the victims have no real means of redress. Misrepresentation is not recoverable under the Federal Torts Claim Act. The government's negligence, in creating the contracts with the students and taking their money, may or may not be recoverable under negligence theory under the Federal Torts Claims Act. The breach of contract claims are the most viable claims, and this court is the appropriate place to litigate those claims. Thus, Mr. Ravi's prayer for relief from the government's actions should be heard, and this honorable court should deny the government's motion to dismiss.

### IV. The Sovereign Capacity Doctrine does not Bar Mr. Ravi's Lawsuit because the government stepped off of its throne to engage in the sale of educational services.

The government stepped off its throne to engage in the sale of educational services. Even if they did not provide the services promised, the government should not be rewarded for the misrepresentations that it made in the act of offering and selling the educational services.

When the government created a website and marketed educational services, it was undeniably acting in the private sphere. There was undeniably an express contract, or in the alternative – implied contract, for educational services. This contract was ratified by the tuition money that the government took from the students.

The government admits that ICE law enforcement officers engaged in these activities. The government does not contend that it was contractors, but the University of Farmington was "staffed" with "law enforcement personnel from U.S. Immigration and Customs Enforcement, Homeland Security Investigations". See *Motion to Dismiss*, 2. Defendant concedes that there were DHS HSI agents operating the University of Farmington.

There is no requirement for Plaintiff to identify any specific person with authority at this juncture. The specific people will be better identified during a period of discovery, as it appears that the ICE personnel used codenames to interact with the students. None of the cases that Defendant cites suggests that it is necessary to identify the specific agents pre-discovery, as their true identities will most likely only be revealed through discovery.

The motion to dismiss should be denied and discovery should be ordered, as the student contracts at issue were only tangentially related to carrying out a law enforcement purpose. HSI agents have previously said the law enforcement purpose was to "identify recruiters and entities engaged in immigration fraud". The student contracts were made to further that law enforcement purpose. The students, who bring the current action, were not suspected of criminal activity. The student contracts were made for a proprietary and not a sovereign purpose, just like how a contract for ICE to buy guns would be a proprietary contract even though it's connected to a law enforcement purpose. This Court should deny the government's motion to dismiss because the government stepped off its throne to engage in the sale of educational services. The government was not acting in a sovereign capacity when forming these contracts as the student contracts were only tangentially related to carrying out a law enforcement purpose.

This case is analogous to *Sommers Oil Co. v. United States*, 241 F.3d 1375 (Fed. Cir. 2001). *Sommers Oil Co.* concerned a government contract made as part of an undercover criminal investigation into tax fraud. The Court found that, despite the contract being part of a criminal investigation, the Court had jurisdiction under the Tucker Act to enforce the contract as long as doing so 1) would not disrupt an active criminal case and 2) would not requiring paying monetary damages for seized contraband. *Id.* at 1378–79 ("If, as Sommers alleges, it has a legal right to the funds as the product of a contractual undertaking by the government to turn those funds over to Sommers, the fact that the government had a temporary need to use the funds as evidence in a criminal case does not defeat Sommers' right to obtain the funds" unless it is contraband). Here, enforcing the contract would also not disrupt the outcome of a criminal case or concern contraband. The students contracted to pay for legitimate educational services. This is what differentiates both *Sommers Oil Co.* and the present matter from *Silva*, where the government contracted to trade the Plaintiff for *contraband.* (In *Silva*, the contraband was illegally imported parrots).

The sovereign capacity doctrine is meant to protect the "delicate and sensitive business of conducting criminal trials" and their civil enforcement analogues, and covers plea agreements, witness protection agreements, immunity agreements, civil enforcement agreements, and undercover law enforcement actions to recover contraband. *Aluminum Shapes, LLC v. United States*, 139 Fed. Cl. 709, 714 (2018). It is not meant to give law enforcement free reigning power to avoid enforcement of every contract they make. As *Sommers Oil Co.* shows, contracts that tangentially serve an undercover law enforcement purpose, but whose enforcement does not

directly disrupt a civil or criminal enforcement action, are made in the government's proprietary capacity.

An agreement entered into by the government falls within the sovereign realm, excluding Tucker Act jurisdiction, only where it is the sort that can only be executed by the sovereign such as plea, witness protection, informant and other forms of criminal agreements. 28 U.S.C.A. § 1491(a). *See Stovall v. United States*, 71 Fed. Cl. 696 (2006). Agreements entered into by the government which fall within the proprietary realm, and thus within Tucker Act jurisdiction, include not only the principal class of contract involving the procurement of goods, lands, and services, but any other agreement undertaken by the federal government that has a private analogue, that is, categorically of the sort that can be executed among private entities and individuals. 28 U.S.C.A. § 1491(a). *Id.* Educational services are categorically of the sort that can be executed among private entities and individuals. Thus, agreements for educational services fall within the proprietary realm. As agreements for educational services are in the proprietary realm versus the sovereign realm, these agreements in these cases fall within Tucker Act jurisdiction.

This case is analogous to the Trump University case in the sense that the students were promised educational services that were not received and swindled out of their money. *See Makaeff v. Trump University,* Case No. 10 CV 9040 IEG WVG, filed in Southern District of California. The personnel operating the University of Farmington stepped off their throne to engage in the sale of services similar to the Trump defendants, in the sense that they offered services and the students paid for services that were not received. Thus, as these contracts were only tangentially related to carrying out law enforcement purposes, the Motion to Dismiss should be denied.

## VI.     The government's acceptance of the benefit of the tuition money ratified Mr. Ravi's contract.

A government contract not initially made with actual authority to bind the government can later be ratified. Where there is not initially authority to "bind the United States in contract, the government can still be bound by contract if the contract was ratified by an official with the necessary authority." *Estes Express Lines v. United States*, No. 11-597C, 2017 U.S. Claims LEXIS 930, at \*15-16 (Fed. Cl. Aug. 8, 2017) (*Janowsky v. United States*, 133 F.3d 888, 891-92 (Fed. Cir. 1998). "Institutional ratification occurs when the government "seeks and receives the benefits from an otherwise unauthorized contract." *Estes Express Lines v. United States*, No. 11-597C, 2017 U.S. Claims LEXIS 930, at \*16 n.3 (Fed. Cl. Aug. 8, 2017) (internal citation omitted). Following *Janowsky*, the Federal Court of Claims has recognized that institutional ratification requires both the "government's acceptance of benefits" and that "an official with the power to ratify must also know of the unlawful promise". *Liberty Ammunition, Inc. v. United States*, 119 Fed. Cl. 368, 406 (2014). Ratifying officials can have "actual or constructive knowledge of the unauthorized acts." *Doe v. United States*, 58 Fed. Cl. 479, 486 (2003). The existence of written communications underlying the contract is considered to be good evidence of "knowledge", even if those written communications were not made with necessary authority. See *Id.* at 487. ("In many cases, one indicator of knowledge is the presence of some written communication between the parties.). In one case, a Court interpreted *Janowsky* to recognize

institutional ratification only where the factors also included "that the agents lacking contracting authority had some similar type of authority, that at least some agents were aware of a proposed agreement detailing the plaintiff's contractual remuneration, and that the Government received a direct benefit from the unauthorized contract." *Id*. at 486.

Here, the accepted benefit was the tuition money that the government kept, and has never returned. The department later carried out raids based on people's status as a student of Farmington (the false I-9s that ICE issued were apparently not valid, even though the students did not know this at the time), a status which was totally dependent on the student having previously made a contract with the ICE agents running Farmington. Thus, at that time, the government must have had actual or constructive knowledge of the contracts. Furthermore, underlying this contract was written communications between the students and the ICE agents, including registration documents, invoices, and receipts sent to the students or visible to them through the Farmington website. There was institutional ratification of the contracts.

For contracts, courts do not look to the internal desires of the parties; rather the courts look to express intent of the parties.

WHEREFORE, Plaintiff respectfully requests that this Court deny the government's motion to dismiss.

Respectfully submitted,

By: /s/*Amy E. Norris, Esq.*, (#1017140)
Amy@mwlc.org
(202) 530-0100
NORRIS LAW, PLLC
616 E Street N.W.
Suite 1156
Washington, DC 20004

Attorney for Teja Ravi

# EXHIBIT A

**Department of Homeland Security**
U.S. Immigration and Customs Enforcement

I-20, Certificate of Eligibility for Nonimmigrant Student Status
OMB NO. 1653-0038

## SEVIS ID:  N0013638381

| | | |
|---|---|---|
| **SURNAME/PRIMARY NAME**<br>Tiyyagura | **GIVEN NAME**<br>Ravi Teja | **Class of Admission** |
| **PREFERRED NAME**<br>Ravi Teja Tiyyagura | **PASSPORT NAME** | |
| **COUNTRY OF BIRTH**<br>INDIA | **COUNTRY OF CITIZENSHIP**<br>INDIA | # F-1 |
| **DATE OF BIRTH**<br>27 OCTOBER 1992 | **ADMISSION NUMBER** | |
| **FORM ISSUE REASON**<br>CONTINUED ATTENDANCE | **LEGACY NAME**<br>Ravi Teja Tiyyagura | **ACADEMIC AND LANGUAGE** |

### SCHOOL INFORMATION

| | |
|---|---|
| **SCHOOL NAME**<br>University of Farmington<br>University of Farmington | **SCHOOL ADDRESS**<br>30500 Northwestern Highway, Farmington Hills, MI 48334 |
| **SCHOOL OFFICIAL TO CONTACT UPON ARRIVAL**<br>Edward Roberts<br>Director of Student Affairs | **SCHOOL CODE AND APPROVAL DATE**<br>DET214F45311000<br>12 JULY 2016 |

### PROGRAM OF STUDY

| | | |
|---|---|---|
| **EDUCATION LEVEL**<br>MASTER'S | **MAJOR 1**<br>Information Technology 11.0103 | **MAJOR 2**<br>None 00.0000 |
| **PROGRAM ENGLISH PROFICIENCY**<br>Required | **ENGLISH PROFICIENCY NOTES**<br>Student is proficient | **EARLIEST ADMISSION DATE** |
| **START OF CLASSES**<br>05 MARCH 2018 | **PROGRAM START/END DATE**<br>21 FEBRUARY 2018 - 31 MARCH 2020 | |

### FINANCIALS

| ESTIMATED AVERAGE COSTS FOR: 12 MONTHS | | STUDENT'S FUNDING FOR: 12 MONTHS | |
|---|---|---|---|
| Tuition and Fees | $   10,000 | Personal Funds | $    2,500 |
| Living Expenses | $    8,500 | Funds From This School | $        0 |
| Expenses of Dependents (0) | $        0 | Family support. | $   25,000 |
| Insurance, books, etc. | $    2,000 | On-Campus Employment | $        0 |
| TOTAL | $   20,500 | TOTAL | $   27,500 |

### REMARKS

Registration, Spring 2018, Session 1.

### SCHOOL ATTESTATION

I certify under penalty of perjury that all information provided above was entered before I signed this form and is true and correct. I executed this form in the United States after review and evaluation in the United States by me or other officials of the school of the student's application, transcripts, or other records of courses taken and proof of financial responsibility, which were received at the school prior to the execution of this form. The school has determined that the above named student's qualifications meet all standards for admission to the school and the student will be required to pursue a full program of study as defined by 8 CFR 214.2(f)(6). I am a designated school official of the above named school and am authorized to issue this form.

X *Edward Roberts*

| **SIGNATURE OF:** Edward Roberts, Director of Student Affairs | **DATE ISSUED**<br>21 February 2018 | **PLACE ISSUED**<br>Farmington Hills,MI |
|---|---|---|

### STUDENT ATTESTATION

I have read and agreed to comply with the terms and conditions of my admission and those of any extension of stay. I certify that all information provided on this form refers specifically to me and is true and correct to the best of my knowledge. I certify that I seek to enter or remain in the United States temporarily, and solely for the purpose of pursuing a full program of study at the school named above. I also authorize the named school to release any information from my records needed by DHS pursuant to 8 CFR 214.3(g) to determine my nonimmigrant status. **Parent or guardian, and student, must sign if student is under 18.**

X

| **SIGNATURE OF:** Ravi Teja Tiyyagura | | **DATE** | |
|---|---|---|---|
| | X | | |
| **NAME OF PARENT OR GUARDIAN** | **SIGNATURE** | **ADDRESS** (city/state or province/country) | **DATE** |

**ICE Form I-20 (3/31/2018)**

Appx82

Page 1 of 3

**Department of Homeland Security**
U.S. Immigration and Customs Enforcement

I-20, Certificate of Eligibility for Nonimmigrant Student Status
OMB NO. 1653-0038

**SEVIS ID: N0013638381 (F-1)**          **NAME: Ravi Teja Tiyyagura**

**EMPLOYMENT AUTHORIZATIONS**

**CHANGE OF STATUS/CAP-GAP EXTENSION**

**AUTHORIZED REDUCED COURSE LOAD**

**CURRENT SESSION DATES**

| CURRENT SESSION START DATE | CURRENT SESSION END DATE |
|---|---|
| 05 MARCH 2018 | 31 MAY 2018 |

**TRAVEL ENDORSEMENT**

This page, when properly endorsed, may be used for re-entry of the student to attend the same school after a temporary absence from the United States. Each endorsement is valid for one year.

| Designated School Official | TITLE | SIGNATURE | DATE ISSUED | PLACE ISSUED |
|---|---|---|---|---|
| | | X | | |
| | | X | | |
| | | X | | |
| | | X | | |

**Department of Homeland Security**
U.S. Immigration and Customs Enforcement

I-20, Certificate of Eligibility for Nonimmigrant Student Status
OMB NO. 1653-0038

**INSTRUCTIONS TO STUDENTS**

**STUDENT ATTESTATION.** You should read everything on this page carefully. Be sure that you understand the terms and conditions concerning your admission and stay in the United States as a nonimmigrant student before signing the student attestation on page 1 of the Form I-20 A-B. The law provides severe penalties for knowingly and willfully falsifying or concealing a material fact, or using any false document in the submission of this form.

**FORM I-20.** The Form I-20 (this form) is the primary document to show that you have been admitted to school in the United States and that you are authorized to apply for admission to the United States in F-1 class of admission. You must have your Form I-20 with you at all times. If you lose your Form I-20, you must request a new one from your designated school official (DSO) at the school named on your Form I-20.

**VISA APPLICATION.** You must give this Form I-20 to the U.S. consular officer at the time you apply for a visa (unless you are exempt from visa requirements). If you have a Form I-20 from more than one school, be sure to present the Form I-20 for the school you plan to attend. Your visa will include the name of that school, and you must attend that school upon entering the United States. You must also provide evidence of support for tuition and fees and living expenses while you are in the United States.

**ADMISSION.** When you enter the United States, you must present the following documents to the officer at the port of entry: 1) a Form I-20; 2) a valid F-1 visa(unless you are exempt from visa requirements); 3) a valid passport; and 4) evidence of support for tuition and fees and living expenses while you are in the United States. The agent should return all documents to you before you leave the inspection area.

**REPORT TO SCHOOL NAMED ON YOUR FORM I-20 AND VISA.** Upon your first entry to the United States, you must report to the DSO at the school named on your Form I-20 and your F-1 visa (unless you are exempt from visa requirements). If you decide to attend another school before you enter the United States, you must present a Form I-20 from the new school to a U.S. consular officer for a new F-1 visa that names the new school. Failure to enroll in the school, by the program start date on your Form I-20 may result in the loss of your student status and subject you to deportation.

**EMPLOYMENT.** Unlawful employment in the United States is a reason for terminating your F-1 status and deporting you from the United States. You may be employed on campus at your school. You may be employed off-campus in curricular practical training (CPT) if you have written permission from your DSO. You may apply to U.S. Citizenship and Immigration Services (USCIS) for off-campus employment authorization in three circumstances: 1) employment with an international organization; 2) severe and unexpected economic hardship; and 3) optional practical training (OPT) related to your degree. You must have written authorization from USCIS before you begin work. Contact your DSO for details. Your spouse or child (F-2 classification) may not work in the United States

**PERIOD OF STAY.** You may remain in the United States while taking a full course of study or during authorized employment after your program. F-1 status ends and you are required to leave the United States on the earliest of the following dates: 1) the program end date on your Form I-20 plus 60 days; 2) the end date of your OPT plus 60 days; or 3) the termination of your program for any other reason. Contact your DSO for details.

**EXTENSION OF PROGRAM.** If you cannot complete the education program by the program end date on page 1 of your Form I-20, you should contact your DSO at least 15 days before the program end date to request an extension.

**SCHOOL TRANSFER.** To transfer schools, first notify the DSO at the school you are attending of your plan to transfer, then obtain a Form I-20 from the DSO at the school you plan to attend. Return the Form I-20 for the new school to the DSO at that school within 15 days after beginning attendance at the new school. The DSO will then report the transfer to the Department of Homeland Security (DHS). You must enroll in the new school at the next session start date. The DSO at the new school must update your registration in SEVIS.

**NOTICE OF ADDRESS.** When you arrive in the United States, you must report your U.S. address to your DSO. If you move, you must notify your DSO of your new address within 10 days of the change of address. The DSO will update SEVIS with your new address.

**REENTRY.** F-1 students may leave the United States and return within a period of five months.To return, you must have: 1) a valid passport; 2) a valid F-1 student visa (unless you are exempt from visa requirements); and 3) your Form I-20, page 2, properly endorsed for reentry by your DSO. If you have been out of the United States for more than five months, contact your DSO

**AUTHORIZATION TO RELEASE INFORMATION BY SCHOOL.** DHS requires your school to provide DHS with your name, country of birth, current address, immigration status, and certain other information on a regular basis or upon request. Your signature on the Form I-20 authorizes the named school to release such information from your records.

**PENALTY.** To maintain your nonimmigrant student status, you must: 1) remain a full-time student at your authorized school; 2) engage only in authorized employment; and 3) keep your passport valid. Failure to comply with these regulations will result in the loss of your student status and subject you to deportation.

**INSTRUCTIONS TO SCHOOLS**

Failure to comply with 8 CFR 214.3(k) and 8 CFR 214.4 when issuing Forms I-20 will subject you and your school to criminal prosecution. If you issue this form improperly, provide false information, or fail to submit required reports, DHS may withdraw its certification of your school for attendance by nonimmigrant students.

**ISSUANCE OF FORM I-20.** DSOs may issue a Form I-20 for any nonimmigrant your school has accepted for a full course of study if that person: 1) plans to apply to enter the United States in F-1 status; 2) is in the United States as an F-1 nonimmigrant and plans to transfer to your school; or 3) is in the United States and will apply to change nonimmigrant status to F-1. DSOs may also issue the Form I-20 to the spouse or child (under the age of 21) of an F-1 student to use to enter or remain in the United States as an F-2 dependent. DSOs must sign where indicated at the bottom of page 1 of the Form I-20 to attest that the form is completed and issued in accordance with regulations.

**ENDORSEMENT OF PAGE 2 FOR REENTRY.** If there have been no substantive changes in information, DSOs may endorse page 2 of the Form I-20 for the student and/or the F-2 dependents to reenter the United States. If there have been substantive changes, the DSO should issue and sign a new Form I-20 that includes those changes.

**RECORDKEEPING.** DHS may request information concerning the student's immigration status for various reasons. DSOs should retain all evidence of academic ability and financial resources on which admission was based, until SEVIS shows the student's record completed or terminated.

**AUTHORITY FOR COLLECTING INFORMATION.** Authority for collecting the information on this and related student forms is contained in 8 U.S.C. 1101 and 1184. The Department of State and DHS use this information to determine eligibility for the benefits requested.The law provides severe penalties for knowingly and willfully falsifying or concealing a material fact, or using any false document in the submission of this form.

**REPORTING BURDEN.** U.S. Immigration and Customs Enforcement collects this information as part of its agency mission under the Department of Homeland Security. The estimated average time to review the instructions, search existing data sources, gather and maintain the needed data, and complete and review the collection of information is 30 minutes (.50 hours) per response. An agency may not conduct or sponsor, and a person is not required to respond to an information collection unless a form displays a currently valid OMB Control number. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to: Office of the Chief Information Officer/Forms Management Branch, U.S. Immigration and Customs Enforcement. 801 I Street NW Stop 5800, Washington, DC 20536-5800. Do not send the form to this address.

**ICE Form I-20 (3/31/2018)**

Page 3 of 3

# EXHIBIT B

*Homeland Security Investigations*
*Office of the Executive Associate Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



**U.S. Immigration
and Customs
Enforcement**

SEP 1 5 2015

MEMORANDUM FOR:     Marlon V. Miller
                    Special Agent in Charge, Detroit
                    Homeland Security Investigations

FROM:               Peter T. Edge *Peter T. Edge*
                    Executive Associate Director
                    Homeland Security Investigations

SUBJECT:            ████████████████ – Approval and Certification

I have evaluated the request for reauthorization of ████████████ I have also considered
the recommendations of the Undercover Review Committee regarding this operation. The
proposal includes a request to exempt the project from certain laws and regulations pertaining to
government conduct (under the authority of 8 U.S.C. § 1363a and 19 U.S.C. § 2081, as
applicable) in the areas listed below. I find the actions authorized by statute are necessary for the
conduct of this undercover investigative operation in the Homeland Security Investigations
programmatic areas of ████████████████████████████████████
Counter Terrorism and Criminal Exploitation and Identity and Benefit Fraud. I hereby approve
and certify ████████████ I authorize ████████████████ while exempt
from certain United States laws and regulations, as allowed by the following statutory authority:

1.   8 U.S.C. § 1363a (a)(1) and 19 U.S.C. § 2081 (a)(1)(A)
     (Related to leasing space)

2.   8 U.S.C. § 1363a (a)(2) and 19 U.S.C. § 2081 (a)(1)(B)
     (Related to acquiring and operating proprietary businesses)

3.   8 U.S.C. § 1363a (a)(3) and 19 U.S.C. § 2081 (a)(2)
     (Related to depositing funds into banks)

4.   8 U.S.C. § 1363a (a)(4) and 19 U.S.C. § 2081 (a)(3)
     (Related to using proceeds to offset expenses)

This authorization to operate ████████████ expires on February 28, 2016.

www.ice.gov

**Date Submitted**          : July 10, 2015

**Date of URC**             : August 19, 2015

**Date of Inception**       : February 11, 2002

**Name of Operation**       : ███████████

**Program Code**            : ███

**Current Programmatic Area(s)** : ███████████
███████████  ███

**Expansion Programmatic
Area(s)**                   : ████████████████
Counter Terrorism/Criminal Exploitation
███████████

**Location**                : SAC Detroit, ████████████████
███████████

**Ops Admin
Supervisor**                : ████████████████

**Group Supervisor(s)**     : ████████████████████████
████████████████████
████████████
████████████████████
████████
████████████████
████████████████
████████████
████████████████
████████████
████████████████

████████████

**Expansion Group Supervisor(s)** : ████████████████

████████████████

**Operation Program Manager** : ████████████████████

**ULC** : ████████████████████

**Expansion Case Agent(s)** : SA Stephen Webber, ████████████████

**Expansion Undercover Operative(s)** : ████████████████████████

**CUFFS Administrator** : ████████████████

**U.S. Attorney's Office(s)** : Eastern District of Michigan
████████████

**Expansion U.S. Attorney's Office(s)** : Eastern District of Michigan

**CUC OPLA Counsel** : ████████████████

**Offsite Location** : Yes, office

**Internet Web Site** : Yes, ████████████

**Special Interest Aliens** : █

**Expansion DEA Designated ASAC** : ████████

**Open Cases** : ████████████

████████████





**Pending Cases**



**Expansion Related Cases** ████████████████ astern District of Michigan, Southern Division (██████████████



**SOU Coordination**    : ██████████

**Statutory Exemptions Requested: (List those exemptions the operation currently utilizes) and place "(EXPANSION RELATED)" in front of those that apply.**

1. (Expansion Related) Use appropriated funds to purchase/lease property, buildings, and other facilities in the U.S., D.C. and U.S. territories and possessions.
2. (Expansion Related) Use appropriated funds to establish or to acquire proprietary corporations or business entities as part of the undercover operation, and to operate them on a commercial basis.
3. (Expansion Related) Deposit appropriated funds and/or proceeds in financial institutions.
4. (Expansion Related) Expend proceeds from the undercover operation to offset necessary and reasonable expenses incurred in the operation.

<u>**SENSITIVE CIRCUMSTANCES**</u>

**DHS**

█ ████████████████████████████████████████
████████████████████████████████████

█ ████████████████████████████████████████
████████████████████████████████████
██████████████████

██████████████



**ICE**

- The operation has continued for ███████████████ first undercover activity ████████████████████

- The operation will require the use of proceeds generated by the undercover operation to offset necessary and reasonable expenses incurred in the operation of the proprietary business ██████████████████

- (Expansion Related) The undercover operation will require the use of the statutory exemptions under 19 U.S.C. § 2081 and/or 8 U.S.C. § 1363a ████ ██████████████

**EXPANSION REQUEST:**

HSI Detroit is submitting this expansion request to add ████████ ██████████████████████ **and Counter Terrorism/Criminal Exploitation** (as it relates to Student and Exchange Visitor Fraud) to its programmatic areas.

## PURPOSE



**Counter Terrorism/Criminal Exploitation**

The enhancement of ███████████████ within the programmatic area of Counter Terrorism/Criminal Exploitation will enable HSI Detroit Special Agents to establish a undercover (UC) school.  This UC school will be used to identify F-1 non-immigrant student visa violators, as well as to attract transfer students who are seeking to fraudulently maintain their student visa status without having to attend class or maintain a full course of study.  By creating a UC school, HSI Detroit will be able to identify student visa violators, recruiters, and school administrators who unlawfully exploit the SEVIS system.



## OBJECTIVE OF EXPANSION



**Counter Terrorism/Criminal Exploitation**

HSI Detroit has taken a proactive approach to addressing visa fraud. The goal is to identify the full scope of the criminal enterprise, to include not only the student visa violators, but also the recruiters and facilitators of the criminal enterprise.  Through the use of the UC school and the information, intelligence, and evidence gathered by UC operatives, HSI Detroit will be able to identify the methods and means through which criminal academic institutions communicate with recruiters worldwide.



**<u>METHOD TO ACHIEVE OBJECTIVE</u>**



**Counter Terrorism/Criminal Exploitation**

Based upon the successful UC model of HSI Newark ███████████ ████ seeks authorization to use two forms of UC activity to meet its objectives set forth above.  First, the CUC will create a "virtual" school within SEVIS.  In addition, the CUC will create a UC website advertising the school.  This UC school will exist within SEVIS and have an internet presence as a means to backstop its identity as well as serve as a way for a UCA, posing as a "Designated School Official" (DSO) to accept and transfer UCAs and CIs purporting to be students to and from academic institutions suspected to be involved in fraudulently sponsoring F-1 non-immigrant students.

Secondly, the CUC seeks authorization to rent an UC school storefront.  This UC facility will consist of an office / reception area in addition to a small classroom if needed.  This UC school will serve as a facility in which recorded UC meetings can occur between the UC DSO and students who are in violation of the conditions of their student visa and who are seeking a corrupt school which does not require them to attend classes while allowing them to keep their status.  The UC school will assist HSI Detroit and other domestic and international HSI offices to potentially locate individuals involved in the recruitment of foreign nationals in an attempt to exploit the non-immigrant visa system.

The UC DSO will attempt to, through a variety of means, contact these students and arrange a face-to-face meeting at the UC facility.  The UC DSO will engage in dialogue with the subject seeking to become a student and explain that this school is not a legitimate school and only for those seeking a student visa without requiring them to attend any classes.  Those interested in legitimately attending classes as prescribed by their visa classification, would be referred to a local school which has been vetted by HSI and SEVP.

This UC school will also seek to be introduced into the underground network of suspected nefarious schools and international recruiters engaging in visa fraud as well as other criminal activities. The UC school will be available for other HSI offices investigating visa fraud related to education. Once the UC school is inserted into the circuit of nefarious schools, the UC school would act as a haven for those students not encountered during an enforcement action at another school. The transfer would lead the individual to believe that he/she would be continuing his/her fraudulent non-immigrant status. This will allow HSI yet another method to identify, locate, arrest and prosecute those students and facilitators involved in this fraud.



**UNDERCOVER ACTIVITY SUMMARY:**

**CURRENT:**



**EXPANSION:**

**Counter-Proliferation Investigations**



**Counter Terrorism/Criminal Exploitation**

Operation Sand Dollar will utilize UCA's and a backstopped UC school that will be represented with a brick and mortar storefront (rented office space) and the establishment of a website. UCAs will employ a variety of methods to conduct business with targets of investigation, to include but not limited to, telephonic communication, email communication, and face to face meetings.  The UC activity will focus on identifying and furthering investigations involving student visa violators, recruiters and facilitators. The information, intelligence, and evidence gathered by UC activity will assist in identifying the methods and means through which criminal academic institutions communicate with recruiters worldwide.



**EXPANSION POTENTIAL:**



**Counter Terrorism/Criminal Exploitation**

This enhancement has the potential to identify global conspirators from a multitude of source countries as well as those employees, managers and executives of the academic institution engaged in criminal activity. The student populations at these types of institutions are from numerous countries/continents of origin. This expansion will facilitate the identification and vetting of such students in similar corrupt institutions. Moreover, this expansion will facilitate the identification of similar institutions that provide comparable services through exploitation and circumvention of the SEVIS

*EXPANSION CASE BRIEFS*





**COUNTER TERRORISM/CRIMINAL EXPLOITATION**

**Operation Paper Chase**
**Eastern District of Michigan,**

████████████████ seeks to establish a undercover (UC) school in order to identify F-1 non-immigrant student visa violators and attract transfer students who are seeking to fraudulently maintain their student visa status without having to attend class or maintain a full course of study. This UC school will exist within SEVIS and the internet as a means to backstop its identity as well as serve as a way for a UCA, posing as a "Designated School Official" (DSO) to accept and transfer UCAs and Cis purporting to be students to and from academic institutions suspected to be involved in fraudulently sponsoring F-1 non-immigrant students and committing other criminal violations.  This UC school will serve as a facility in which recorded UC meetings can occur. The UC DSO will attempt to, through a variety of means, contact these students and arrange face-to-face meetings at the UC facility.  The UC DSO will engage in dialogue with the subject seeking to become a student and explain that this school is not a legitimate school and only for those seeking a student visa without requiring them to attend any classes.  Those interested in legitimately attending classes as prescribed by their visa classification, would be referred to a local school which has been vetted by HSI and SEVP.  Through utilization of the school, HSI Detroit will identify student visa violators, recruiters, and criminal school administrators who exploit the SEVIS system.

Between the months of September and November of 2015, ████████████████ will create a "virtual" school within SEVIS.  In addition, ████████████████ will create a UC website advertising the school. In August 2015, ████████████████ will seek to rent a UC school storefront.  This UC facility will consist of an office / reception area in addition to a small classroom, if needed.  The UC school will assist HSI Detroit and other domestic and international HSI offices to potentially locate individuals involved in the recruitment of foreign nationals in an attempt to exploit the non-immigrant visa system. This UC platform will allow HSI Detroit to proactively identify, locate, arrest and prosecute students involved in fraud as well as the facilitators of the same. HSI Detroit anticipates prosecuting violations of 18 U.S.C. § 1546, Fraud and misuse of visas, permits, and other documents.

**Statutory Exemption(s):**
  **2. Use appropriated funds to establish or to acquire proprietary corporations or business entities as part of the undercover operation, and to operate them on a commercial basis.**
  **3. Deposit appropriated funds and proceeds in financial institutions.**
  **4. Expend proceeds from the operation to offset necessary and reasonable expenses incurred in the operation.**

**DHS Sensitive Circumstance(s):**

████████████████████████████████████
████████████████████████████████████

**ICE Sensitive Circumstance(s): -**
  • ████████████████████████████████████
████████████████████████████████████

████████████

- **The operation will require the use of proceeds generated by the undercover operation to offset necessary and reasonable expenses incurred in the operation of the proprietary business.**
- ███████████████████████████████████████ ████████████
- **The undercover operation will require the use of the statutory exemptions under 19 U.S.C. § 2081 and/or 8 U.S.C. § 1363a.**





## INVESTIGATIONS REQUIRING MAIN DOJ CONCURRENCE

*CASE BRIEFS*





**COUNTER TERRORISM/CRIMINAL EXPLOITATION**

**Operation Paper Chase**
**Eastern District of Michigan,**

Potential _x__        Ongoing___

seeks to establish a undercover (UC) school in order to identify F-1 non-immigrant student visa violators and attract transfer students who are seeking to maintain their student visa status without having to attend class or maintain a full course of study. This UC school will exist within SEVIS and the internet as a means to backstop its identity as well as serve as a way for a UCA, posing as a "Designated School Official" (DSO) to accept and transfer UCA and confidential informants purporting to be students to and from academic institutions suspected to be involved in fraudulently sponsoring F-1 non-immigrant students and other criminal violations.   This UC school will serve as a facility in which recorded UC meetings can occur. The UC DSO will attempt to, through a variety of means, contact these students and arrange a face to face meeting at the UC facility.  The UC DSO will engage in dialogue with the subject seeking to become a student and explain that this school is not a legitimate school and only for those seeking a student visa without requiring them to attend any classes.  Those interested in legitimately attending classes as prescribed by their visa

classification, would be referred to a local school which has been vetted by HSI and SEVP. Through utilization of the virtual school, ███████████████ will identify student visa violators, recruiters, and criminal school administrators who exploit the SEVIS system.

Between the months of March and April 2015, Operation ████████ will create a "virtual" school within SEVIS. In addition, Operation ████████ will create a UC website advertising the school. In May, Operation ████████ will seek to rent a UC school storefront. This UC facility will consist of an office / reception area in addition to a small classroom if needed. The UC school will assist HSI Detroit and other domestic and international HSI offices to potentially locate individuals involved in the recruitment of foreign nationals in an attempt to exploit the non-immigrant visa system. This UC platform will allow HSI Detroit to proactively identify, locate, arrest and prosecute students involved in fraud. HSI Detroit anticipates prosecuting violations of 18 U.S.C. § 1546, Fraud and misuse of visas, permits, and other documents.

**Statutory Exemption(s):**
2. **Use appropriated funds to establish or to acquire proprietary corporations or business entities as part of the undercover operation, and to operate them on a commercial basis.**
3. **Deposit appropriated funds and proceeds in financial institutions.**
4. **Expend proceeds from the operation to offset necessary and reasonable expenses incurred in the operation.**

**DHS Sensitive Circumstance(s):**
███████████████████████████████████
███████████████████████████████████

**ICE Sensitive Circumstance(s):** -
███████████████████████████████████
- **The operation will require the use of proceeds generated by the undercover operation to offset necessary and reasonable expenses incurred in the operation of the proprietary business.**
- ███████████████████████████████████
- **The undercover operation will require the use of the statutory exemptions under 19 U.S.C. § 2081 and/or 8 U.S.C. § 1363a.**

## SECURITY OF OPERATION:





4. All appropriate SOPs and HSI Directives will be followed.











**Expansion Budget Increase Request:**

███████████████ is asking for a budget increase in the expansion request due to the addition of three programmatic areas as well as the rental of an off-site location for the UC Sevis school.  The majority of the funding increase will be for the following OCC Codes;



*Homeland Security Investigations*
*Office of the Executive Associate Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

FEB 2 9 2016



**U.S. Immigration
and Customs
Enforcement**

MEMORANDUM FOR:    Marlon V. Miller
Special Agent in Charge, Detroit
Homeland Security Investigations

FROM:    Peter T. Edge
Executive Associate Director
Homeland Security Investigations

SUBJECT:    ██████████████ – Approval and Certification

I have evaluated the request for reauthorization of ███████████ I have also considered the recommendations of the Undercover Review Committee regarding this operation. The proposal includes a request to exempt the project from certain laws and regulations pertaining to government conduct (under the authority of 8 U.S.C. § 1363a and 19 U.S.C. § 2081, as applicable) in the areas listed below. I find the actions authorized by statute are necessary for the conduct of this undercover investigative operation in the Homeland Security Investigations programmatic areas of ████████████████████████████████████████ Counter Terrorism and Criminal Exploitation and Identity and Benefit Fraud. I hereby approve and certify ██████████████. I authorize ██████████████ to operate, while exempt from certain United States laws and regulations, as allowed by the following statutory authority:

1.    8 U.S.C. § 1363a (a)(1) and 19 U.S.C. § 2081 (a)(1)(A)
(Related to leasing space)

2.    8 U.S.C. § 1363a (a)(2) and 19 U.S.C. § 2081 (a)(1)(B)
(Related to acquiring and operating proprietary businesses)

3.    8 U.S.C. § 1363a (a)(3) and 19 U.S.C. § 2081 (a)(2)
(Related to depositing funds into banks)

4.    8 U.S.C. § 1363a (a)(4) and 19 U.S.C. § 2081 (a)(3)
(Related to using proceeds to offset expenses)

This authorization to operate ██████████████ expires on August 31, 2016.

www.ice.gov

**Date Submitted**        : January 16, 2016

**Date of URC**        : February 17, 2016

**Date of Inception**        : February 11, 2002

**Name of Operation**        : ███████

**Program Code**        : ██

**Programmatic Area(s)**        : ████████

██████Counter Terrorism/Criminal Exploitation

████████████

**Location**        : SAC Detroit, ████████████

████████

**Ops Admin**        : █████████████
**Supervisor**        ████████

**Group Supervisor(s)**        :        ████████████

██████████

███████████

██████████

█████████

████████

█████████

██████████

██████████

████████████

████████████

█████████

████████

████████

**Operation Program Manager**       : ███████████████████████

**ULC**                             : ████████████████████████

**Case Agents**                     : ████████████   ██████████████
                                      ██████████████  ████████████
                                      ████████████    ████████████
                                      ████████        ████████████
                                      ██████████      ████████████

**Undercover Operative(s)**          : ████████████████████████████
                                      ████████████████████████████
                                      ████████████████████████████

**CUFFS Administrator**              : ███████████████████

**U.S. Attorney's Office(s)**        : Eastern District of Michigan
                                      ███████████████

**CUC OPLA Counsel**                 : ██████████████████

**Offsite Location**                 : █

**Internet Web Site**                : █████████████████

**Special Interest Aliens**          : ████████████

**DEA Designated ASAC**              : ██████████████████████████

**Open Cases**                       : ███████
                                      ████████████████    ██████████
                                      ████████████
                                      ██████████████████████████

██████████





**: Counter Terrorism/Criminal Exploitation**

astern District of Michigan Southern Division

**Pending Cases**





**Statutory Exemptions Requested: (List those exemptions the operation currently utilizes).**

1. Use appropriated funds to purchase/lease property, buildings, and other facilities in the U.S., D.C. and U.S. territories and possessions.
2. Use appropriated funds to establish or to acquire proprietary corporations or business entities as part of the undercover operation, and to operate them on a commercial basis.
3.  Deposit appropriated funds and/or proceeds in financial institutions.
4.  Expend proceeds from the undercover operation to offset necessary and reasonable expenses incurred in the operation.

<u>**SENSITIVE CIRCUMSTANCES**</u>

**DHS**

1.



**ICE**

1.    The operation has continued for ████████████████████ first
      undercover   activity ████████████████

2.    ████████████████████████████████████████████
      ██████████████

3.    The operation will require the use of proceeds generated by the undercover
      operation to offset necessary and reasonable expenses incurred in the operation
      of the proprietary business (████████████████████

4.    The undercover operation will require the use of the statutory exemptions under
      19 U.S.C. § 2081 and/or 8 U.S.C. § 1363a ████████████████

5.    ████████████████████████████████████████████
      ████████████████

6.    ████████████████████████████████████████████
      ████████████████████

**UNDERCOVER ACTIVITY SUMMARY:**

████████████████████████████████████████████
████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

████████████

The recent expansion of Operation ███████ to include Counter Terrorism/Criminal Exploitation and Identity and Benefit Fraud will allow HSI Detroit to more efficiently identify student visa violators, recruiters and school administrators who unlawfully exploit the SEVIS system as well as identify similar institutions that provide comparable service through the exploitation and circumvention of SEVIS.  The expansion will also allow HSI Detroit to more efficiently identify, infiltrate, dismantle and prosecute criminal organizations involved in the illegal procurement of counterfeit identity documents that can facilitate such crimes as money laundering and terrorism.













***POTENTIAL INVESTIGATIONS AND UNDERCOVER ACTIVITY***











## Counter Terrorism/Criminal Exploitation



**Operation Paper Chase**
**Eastern District of Michigan,**

Operation Paper Chase is a HSI Detroit investigation targeting Student and Exchange Visitor Program (SEVP) schools, Designated School Officials (DSO), private immigration services businesses and other entities who fraudulently utilize the SEVP to endanger national security, commit visa fraud, smuggle and harbor illegal aliens for profit, launder money, and commit other violations of federal law.  The investigation is also intended to identify aliens who are exploiting the student visa process and to obtain clarity as to the level and method of student and employment based benefit fraud within the HSI Detroit AOR. UCAs are in the process of establishing a UC school in order to attract and identify F-1 non-immigrant student visa violators who are seeking to maintain their current visa status without having to attend class or maintain a full course of study. The school will exist within SEVIS as a means to backstop its identity as well as serve as a way for a UCA, posing as a "Designated School Official" (DSO), to accept and transfer UCAs and Cis purporting to be students to and from academic institutions suspected to be involved in fraudulently sponsoring F-1 non-immigrant students and other criminal violations.   This UC school will serve as a facility in which recorded UC meetings can occur. The UCA DSO will attempt to, through a variety of means, identify aliens seeking F-1 status solely for the purpose of obtaining legal immigration status and work authorization through fraudulent means.   The UCA DSO will engage in

dialogue with the subject seeking to become a student and explain that this school is not a legitimate school and only for those seeking a student visa without requiring them to attend any classes. Those interested in legitimately attending classes as prescribed by their visa classification will be referred to a local school which has been vetted by HSI and SEVP.

During the next reporting period, UCAs will secure a location for a UC school storefront. This UC facility will consist of an office / reception area in addition to a small classroom, if needed. The UC school will assist HSI Detroit and other domestic and international HSI offices to potentially locate individuals involved in the recruitment of foreign nationals in an attempt to exploit the non-immigrant visa system. This UC platform will allow HSI Detroit to proactively identify, locate, arrest and prosecute students involved in fraud. UCAs anticipate the school will be open and be able to accept students by March 2016. UCAs will also complete a build of the school's website to be used in attracting students. In addition, UCAs will attempt to obtain accreditation from several national and regional accrediting bodies. HSI Detroit anticipates prosecuting violations of 18 U.S.C. § 1546, Fraud and misuse of visas, permits, and other documents and 18 U.S.C. § 1956 Money Laundering.

**Statutory Exemption(s):**
  2. **Use appropriated funds to establish or to acquire proprietary corporations or business entities as part of the undercover operation, and to operate them on a commercial basis.**
  3. **Deposit appropriated funds and proceeds in financial institutions.**
  4. **Expend proceeds from the operation to offset necessary and reasonable expenses incurred in the operation.**

**DHS Sensitive Circumstance(s):**



**ICE Sensitive Circumstance(s): -**

- **The operation will require the use of proceeds generated by the undercover operation to offset necessary and reasonable expenses incurred in the operation of the proprietary business.**

- **The undercover operation will require the use of the statutory exemptions under 19 U.S.C. § 2081 and/or 8 U.S.C. § 1363a.**







**INVESTIGATIONS REQUIRING MAIN DOJ CONCURRENCE**





**COUNTER TERRORISM/CRIMINAL EXPLOITATION**

██████████           **Operation Paper Chase**
██████████, **Eastern District of Michigan,** ██████████
Potential_x__        Ongoing___

Operation Paper Chase is a HSI Detroit, National Security Group (NSG) led investigation targeting Student and Exchange Visitor Program (SEVP) schools, Designated School Officials (DSO), private immigration services businesses, and other entities who fraudulently utilize the SEVP to endanger national security, commit visa fraud, smuggle and harbor illegal aliens for profit, launder money, and commit other violations of federal law.  The investigation is also intended to identify aliens who are exploiting the student visa process and to obtain clarity as to the level and method of student and employment based benefit fraud within the HSI Detroit area of responsibility. UCAs are in the process of establishing a UC school in order to attract and identify F-1 non-immigrant student visa violators who are seeking to maintain their current visa status without having to attend class or maintain a full course of study. The school will exist within SEVIS as a means to backstop its identity as well as serve as a way for a UCA, posing as a "Designated School Official" (DSO), to accept and transfer UCA and confidential informants purporting to be students to and from academic institutions suspected to be involved in fraudulently sponsoring F-1 non-immigrant students and other criminal violations.   This UC school will serve as a facility in which recorded UC meetings can occur. The UC DSO will attempt to, through a variety of means, contact these students and arrange a face to face meeting at the UC facility. The UC DSO will engage in dialogue with the subject seeking to become a student and explain that this school is not a legitimate school and only for those seeking a student visa without requiring them to attend any classes.  Those interested in legitimately attending classes as prescribed by their visa classification, would be referred to a local school which has been vetted by HSI and SEVP.

During the next reporting period, UCAs will secure a location for a UC school storefront. This UC facility will consist of an office / reception area in addition to a small classroom if needed.  The UC school will assist HSI Detroit and other domestic and international HSI offices to potentially locate individuals involved in the recruitment of foreign nationals in an attempt to exploit the non-immigrant visa system. This UC platform will allow HSI Detroit to proactively identify, locate, arrest and prosecute students involved in fraud. UCAs anticipate the school will be open and able to accept students by March 2016. UCAs will also complete a build of the school's website to be used in attracting students. In addition, UCAs will attempt to obtain accreditation from several national and regional accrediting bodies. HSI Detroit anticipates pursing violations of 18 U.S.C. § 1546, Fraud and misuse of visas, permits, and other documents and 18 U.S.C. § 1956 Money Laundering.

**Statutory Exemption(s):**
   **2.  Use appropriated funds to establish or to acquire proprietary corporations or business entities as part of the undercover operation, and to operate them on a commercial basis.**
   **3.  Deposit appropriated funds and proceeds in financial institutions.**

**4. Expend proceeds from the operation to offset necessary and reasonable expenses incurred in the operation.**

**DHS Sensitive Circumstance(s):**

- ████████████████████████████████████████████████

▌ ████████████████████████████████████████

**ICE Sensitive Circumstance(s):** -

- ████████████████████████████████████████████████

▌

- **The operation will require the use of proceeds generated by the undercover operation to offset necessary and reasonable expenses incurred in the operation of the proprietary business.**

- ████████████████████████████████████████

- **The undercover operation will require the use of the statutory exemptions under 19 U.S.C. § 2081 and/or 8 U.S.C. § 1363a.**







## SECURITY OF OPERATION:



4. All appropriate SOPs and HSI Directives will be followed.



















*This page left blank intentionally*



*Homeland Security Investigations*
*Investigative Programs*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

**U.S. Immigration
and Customs
Enforcement**

AUG 3 0 2016

| | |
|---|---|
| MEMORANDUM FOR: | Marlon V. Miller<br>Special Agent in Charge, Detroit<br>Homeland Security Investigations |
| FROM: | Peter T. Edge  *Peter T. Edge*<br>Executive Associate Director<br>Homeland Security Investigations |
| SUBJECT: | ███████████ – Approval and Certification |

I have evaluated the request for reauthorization of ███████████ I have also considered the recommendations of the Undercover Review Committee regarding this operation. The proposal includes a request to exempt the project from certain laws and regulations pertaining to government conduct (under the authority of 8 U.S.C. § 1363a and 19 U.S.C. § 2081, as applicable) in the areas listed below. I find the actions authorized by statute are necessary for the conduct of this undercover investigative operation in the Homeland Security Investigations programmatic areas of ███████████, Counter Terrorism/Criminal Exploitation, Identity and Benefit Fraud, and ███████████ I hereby approve and certify ███████████ I authorize ███████████ to operate, while exempt from certain United States laws and regulations, as allowed by the following statutory authority:

1.  8 U.S.C. § 1363a (a)(1) and 19 U.S.C. § 2081 (a)(1)(A)
    (Related to leasing space)

2.  8 U.S.C. § 1363a (a)(2) and 19 U.S.C. § 2081 (a)(1)(B)
    (Related to acquiring and operating proprietary businesses)

3.  8 U.S.C. § 1363a (a)(3) and 19 U.S.C. § 2081 (a)(2)
    (Related to depositing funds into banks)

4.  8 U.S.C. § 1363a (a)(4) and 19 U.S.C. § 2081 (a)(3)
    (Related to using proceeds to offset expenses)

This authorization to operate ███████████ expires on February 28, 2017.

www.ice.gov

**Date Submitted**          : July 15, 2016

**Date of URC**             : August 17, 2016

**Date of Inception**       : February 11, 2002

**Name of Operation**       : ██████████

**Program Code**            : ██

**Programmatic Area(s)**    : ████████████

                                    Counter Terrorism/Criminal Exploitation

                                ████████████████████

**Location**                : SAC Detroit, ████████████████████

                                ████████

**Ops Admin Supervisor**    : ████████████████

                                ████████

**Group Supervisor(s)**     :



**Operation Program Manager** : ██████████████████████

**ULC** : ████████████████████████

**Case Agents** : 

**Undercover Operative(s)** : 

**CUFFS Administrator** : 

**Last UOU Field Review** : 05/15

**U.S. Attorney's Office(s)** : Eastern District of Michigan
████████████████████

**CUC OPLA Counsel** : ██████████████████████

**Offsite Location** : Yes, Farmington University, located in a multi-use building.

**Internet Web Site** : ██████████████████

**Special Interest Aliens** : ████████████

**DEA Designated ASAC** : ████████████████████████

████████████

**Open Cases**







: **Counter Terrorism/Criminal Exploitation**

, Eastern District of Michigan
Southern Division

**Pending Cases** :





**Statutory Exemptions Requested:**

1. Use appropriated funds to purchase/lease property, buildings, and other facilities in the U.S., D.C. and U.S. territories and possessions.

2. Use appropriated funds to establish or to acquire proprietary corporations or business entities as part of the undercover operation, and to operate them on a commercial basis.

3. Deposit appropriated funds and/or proceeds in financial institutions.

4. Expend proceeds from the undercover operation to offset necessary and reasonable expenses incurred in the operation.

## **SENSITIVE CIRCUMSTANCES**

**DHS**



**ICE**

1. Investigations and/or operations that continue ███████████████ the first undercover activity ████████████

4. The undercover operation will require the use of proceeds generated by the undercover operation to offset necessary and reasonable expenses incurred in the operation of the proprietary business ███████████████

5.     The undercover operation will require the use of the statutory exemptions under 19 U.S.C. § 2081 and/or 8 U.S.C. § 1363a ███████████████████████

█   █████████████████████████████████████████████████████████
███████████████████████████████████████████

**<u>UNDERCOVER ACTIVITY SUMMARY:</u>**

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

The recent expansion of Operation ████████████ to include Counter Terrorism/Criminal Exploitation, ████████████████████████████████████████████ will allow HSI Detroit to more efficiently identify student visa violators, recruiters and school administrators who unlawfully exploit the SEVIS system as well as identify similar institutions that provide a comparable service through the exploitation and circumvention of SEVIS. ███████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████████

████████











Appx162



***POTENTIAL INVESTIGATIONS AND UNDERCOVER ACTIVITY***







**Counter Terrorism/Criminal Exploitation**

██████████ **Operation Paper Chase**
██████████ **Eastern District of Michigan,** ██████████

Operation Paper Chase is an HSI Detroit investigation targeting Student and Exchange Visitor Program (SEVP) schools, Designated School Officials (DSO), private immigration services businesses and other entities who fraudulently utilize the SEVP to endanger national security, commit visa fraud, smuggle and harbor illegal aliens for profit, launder money, and commit other violations of federal law.  The investigation is also intended to identify aliens who are exploiting the student visa process as well as to obtain clarity as to the level and method of student and employment based benefit fraud within the HSI Detroit AOR.  UCAs are in the process of establishing a UC school in order to attract and identify F-1 non-immigrant student visa violators who are seeking to maintain their current visa status without having to attend class or maintain a full course of study. The school will exist within SEVIS as a means to backstop its identity as well as serve as a way for a UCA, posing as a "Designated School Official" (DSO), to accept and transfer UCAs and CIs purporting to be students to and from academic institutions suspected to be involved in fraudulently sponsoring F-1 non-immigrant students and other criminal violations.  This UC School will serve as a facility in which recorded UC meetings will occur. The UCA DSO will attempt to, through a variety of means, identify aliens seeking F-1 status solely for the purpose of obtaining legal immigration status and work authorization through fraudulent means.  The UCA DSO will engage in dialogue with the subject seeking to become a student and explain that this school is not a legitimate school and only for those seeking a student visa without requiring them to attend any classes.  Those interested in legitimately attending classes as prescribed by their visa classification will be referred to a local school which has been vetted by HSI and SEVP.  On May 1, 2016, the lease of the commercial space housing the UC storefront began.  The property is in the process of being fully equipped and furnished.

Upon completion, it will house numerous offices and a large multi-purpose instructional environment.

On May 13, 2016, The Accrediting Commission of Career Schools and Colleges, a U.S. Department of Education chartered national accreditor, agreed to nationally accredit the HSI Detroit UC School.  This will allow the UC School to have a website operating with an .edu domain. During the next reporting period, it is anticipated that the UC storefront will be completed and the school's website brought online.  This will allow the first phase of UC operations, the identifying and recruitment of foreign student targets, to commence.  Efforts to facilitate this will include a targeted marketing and advertising campaign and the use of sources of information and confidential informants to introduce UCAs acting as school officials.  The initial criminal violations include 18 U.S.C. § 1546, visa/immigration fraud, and 18 U.S.C. § 1343 - Wire Fraud, 18 U.S.C. § 1546 - Fraud and misuse of visas, permits, and other documents and 18 U.S.C. § 1956 - Money Laundering.

**Statutory Exemption(s):**
1. Use of appropriated funds to [purchase or] lease property, buildings, and other facilities in the United States, the District of Columbia, and U.S. territories and possessions.
2. Use appropriated funds to establish or to acquire proprietary corporations or business entities as part of the undercover operation, and to operate them on a commercial basis.
3. Deposit appropriated funds and proceeds in financial institutions.
4. Expend proceeds from the operation to offset necessary and reasonable expenses incurred in the operation.

**DHS Sensitive Circumstance(s):**
- ███████████████████████████████████████████

**ICE Sensitive Circumstance(s): -**
- ███████████████████████████████████████████
- The operation will require the use of proceeds generated by the undercover operation to offset necessary and reasonable expenses incurred in the operation of the proprietary business.
- ███████████████████████████████████████████
- The undercover operation will require the use of the statutory exemptions under 19 U.S.C. § 2081 and/or 8 U.S.C. § 1363a.
- ███████████████████████████████████████████









**INVESTIGATIONS TRIGGERING  MAIN DOJ SENSITIVE CIRCUMSTANCES**

**COUNTER TERRORISM/CRIMINAL EXPLOITATION**

**Operation Paper Chase**
**, Eastern District of Michigan,**
Potential _x___        Ongoing____



Operation Paper Chase is a HSI Detroit investigation targeting Student and Exchange Visitor Program (SEVP) schools, Designated School Officials (DSO), private immigration services businesses and other entities who fraudulently utilize the SEVP to endanger national security, commit visa fraud, smuggle and harbor illegal aliens for profit, launder money, and commit other violations of federal law.  The investigation is also intended to identify aliens who are exploiting the student visa process as well as to obtain clarity as to the level and method of student and employment based benefit fraud within the HSI Detroit AOR. UCAs are in the process of establishing a UC school in order to attract and identify F-1 non-immigrant student visa violators who are seeking to maintain their current visa status without having to attend class or maintain a full course of study. The school will exist within SEVIS as a means to backstop its identity as well as serve as a way for a UCA, posing as a "Designated School Official" (DSO), to accept and transfer UCAs and CIs purporting to be students to and from academic institutions suspected to be involved in fraudulently sponsoring F-1 non-immigrant students and other criminal violations.   This UC school will serve as a facility in which recorded UC meetings will occur. The UCA DSO will attempt to, through a variety of means, identify aliens seeking F-1 status solely for the purpose of obtaining legal immigration status and work authorization through fraudulent means.   The UCA DSO will engage in dialogue with the subject seeking to become a student and explain that this school is not a legitimate school and only for those seeking a student visa without requiring them to attend any classes.  Those interested in legitimately attending classes as prescribed by their visa classification will be referred to a local school which has been vetted by HSI and SEVP.  On May 1, 2016, the lease of the commercial space housing the UC storefront began.  The property is in the process of being fully equipped and furnished. Upon completion, it will house numerous offices and a large multi-purpose instructional environment.

On May 13, 2016, The Accrediting Commission of Career Schools and Colleges, a U.S. Department of Education chartered national accreditor, agreed to nationally accredit the HSI Detroit UC School.  This will allow the UC School to have a website operating with an .edu domain. During the next reporting period, it is anticipated that the UC storefront will be completed and the school's website brought online.  This will allow the first phase of UC operations, the identifying and recruitment of foreign student targets, to commence.  Efforts to facilitate this will include a targeted marketing and advertising campaign and the use of sources of information and confidential informants to introduce UCAs acting as school officials.  The initial criminal violations include 18 U.S.C. § 1546 - Visa/immigration fraud, 18 U.S.C. § 1343 - Wire fraud, 18 U.S.C. § 1546 - Fraud and misuse of visas, permits, and other documents and 18 U.S.C. § 1956 - money laundering.

**Statutory Exemption(s):**
1.  **Use of appropriated funds to [purchase or] lease property, buildings, and other facilities in the United States, the District of Columbia, and U.S. territories and possessions**
2.  **Use appropriated funds to establish or to acquire proprietary corporations or business entities as part of the undercover operation, and to operate them on a commercial basis.**
3   **Deposit appropriated funds and proceeds in financial institutions.**

**4**    **Expend proceeds from the operation to offset necessary and reasonable expenses incurred in the operation.**

**DHS Sensitive Circumstance(s):**



**ICE Sensitive Circumstance(s): -**

- 
- **The operation will require the use of proceeds generated by the undercover operation to offset necessary and reasonable expenses incurred in the operation of the proprietary business.**
- 
- **The undercover operation will require the use of the statutory exemptions under 19 U.S.C. § 2081 and/or 8 U.S.C. § 1363a.**
-



**SECURITY OF OPERATION:**

1.

4.  All appropriate SOPs and HSI Directives will be followed.

















*Homeland Security Investigations*
*Office of the Executive Associate Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



**U.S. Immigration
and Customs
Enforcement**

FEB 2 3 2017

MEMORANDUM FOR:    Steve K. Francis
                   Acting Special Agent in Charge, Detroit
                   Homeland Security Investigations

FROM:              Peter T. Edge
                   Executive Associate Director
                   Homeland Security Investigations

SUBJECT:           ███████████████ – Approval and Certification

I have evaluated the request for reauthorization of ███████████ I have also considered
the recommendations of the Undercover Review Committee regarding this operation. The
proposal includes a request to exempt the project from certain laws and regulations pertaining to
government conduct (under the authority of 8 U.S.C. § 1363a and 19 U.S.C. § 2081, as
applicable) in the areas listed below. I find the actions authorized by statute are necessary for the
conduct of this undercover investigative operation in the Homeland Security Investigations
programmatic areas of ███████████ Counter Terrorism/Criminal Exploitation, ███████
Identity & Benefit Fraud, and ███████████████ I hereby approve and certify
███████████████ I authorize ███████████████ to operate, while exempt from certain
United States laws and regulations, as allowed by the following statutory authority:

1.   8 U.S.C. § 1363a (a)(1) and 19 U.S.C. § 2081 (a)(1)(A)
     (Related to leasing space)

2.   8 U.S.C. § 1363a (a)(2) and 19 U.S.C. § 2081 (a)(1)(B)
     (Related to acquiring and operating proprietary businesses)

3.   8 U.S.C. § 1363a (a)(3) and 19 U.S.C. § 2081 (a)(2)
     (Related to depositing funds into banks)

4.   8 U.S.C. § 1363a (a)(4) and 19 U.S.C. § 2081 (a)(3)
     (Related to using proceeds to offset expenses)

This authorization to operate ███████████ expires on August 31, 2017.

www.ice.gov

**Date Submitted** : February 3, 2017

**Date of URC** : February 15, 2017

**Date of Inception** : ███████████

**Name of Operation** : ██████

**Program Code** : ██

**Programmatic Area(s)** : ███████

Counter Terrorism/Criminal Exploitation

████████████

**Location** : SAC Detroit, ████████████

████████

**Ops Admin Supervisor** : █████████████

████████

**Operation Group Supervisor** : █████████████

**Operation Program Manager** : █████████████

**ULC** : █████████████

**Undercover Operative(s)** : ████████████████

███████████████████

**CUFFS Administrator** : █████████████

**Last UOU Field Review** : ██████

**U.S. Attorney's Office(s)** : Eastern District of Michigan

███████████████

**CUC OPLA Counsel** : ███████████████████████████

**Offsite Location** : Yes, Storefront

**Internet Web Site** : █████████████

**Special Interest Aliens** : ██████████

**DEA Designated ASAC** : █████████████████████████████

**Open Cases** : ████████



: **Counter Terrorism/Criminal Exploitation**

Eastern District of Michigan Southern Division

**SOU Coordination** :

**Statutory Exemptions Requested:**

1. Use appropriated funds to purchase/lease property, buildings, and other facilities in the U.S., D.C. and U.S. territories and possessions.

2. Establish or acquire proprietary corporations or business entities as part of the undercover operation, and to operate them on a commercial basis.

3. Deposit appropriated funds and/or proceeds in financial institutions.

4. Use proceeds from the undercover operation to offset necessary and reasonable expenses incurred in the operation.

## <u>SENSITIVE CIRCUMSTANCES</u>

**DHS**



**ICE**

■ Investigations and/or operations that continue for ████████████████ the first undercover activity.

■ ████████████████████████████████████
████████████

■ ████████████████████████████████████████
████████████████████████████
██

■ ████████████████████████████████████████
████████

■ The undercover operation will require the use of proceeds generated by the undercover operation to offset necessary and reasonable expenses incurred in the operation of the proprietary business.

■ The undercover operation will require the use of the statutory exemptions under 19 U.S.C. § 2081 and/or 8 U.S.C. § 1363a.

■ ████████████████████████████████████████
██████████

**<u>UNDERCOVER ACTIVITY SUMMARY:</u>**

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████
████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██

████████

The recent expansion of Operation ▮▮▮▮▮▮ to include the Counter Terrorism/ Criminal Exploitation programmatic area will allow HSI Detroit to more efficiently identify student visa violators, recruiters and school administrators who unlawfully exploit the Student Exchange Visitor Information System (SEVIS) system as well as identify similar institutions that provide a comparable service through the exploitation and circumvention of SEVIS.  The expansion will also allow HSI Detroit to more efficiently identify, infiltrate, dismantle and prosecute criminal organizations involved in the illegal procurement of counterfeit identity documents, counterfeit goods, narcotics and illicit proceeds that can facilitate such crimes as money laundering and terrorism as well as identify transnational criminal organizations (TCOs). The expansion provides HSI with a unique opportunity to initiate undercover operations to penetrate and ultimately dismantle these organizations.



**POTENTIAL INVESTIGATIONS AND UNDERCOVER ACTIVITY**



**COUNTER TERRORISM/CRIMINAL EXPLOITATION**

███████████ **Operation Paper Chase**
███████████**, Eastern District of Michigan,** ███████████

Operation Paper Chase is an investigation targeting Student and Exchange Visitor Program (SEVP) schools, Designated School Officials (DSO), and both legitimate and fraudulent institutions, immigration services businesses, employment agencies/consultancies, and other entities who fraudulently utilize the SEVP to endanger national security, commit visa fraud, smuggle and harbor illegal aliens for profit, launder money, and commit other violations of federal law. The primary UC investigative vehicle supporting the operation is an undercover (UC) storefront operating as a State of Michigan licensed and nationally accredited private university. The storefront is located in a commercial office building in the greater metropolitan Detroit area and is staffed fulltime by HSI Detroit UCAs. The school also maintains a website and a significant and active social media presence. The UC methods target students who are already present in the U.S. and predisposed to the criminal activity so that the operation will not directly facilitate the entry of aliens. The covert efforts have resulted in numerous inquiries from students seeking to attend the undercover school without actually attending classes while receiving immediate work authorization in violation of numerous regulations governing the student visa programs and federal laws. All students who are enrolled at the school will be fully vetted, including criminal history checks and for JTTF interest, before any benefit is provided. If a student does appear to have immediate or national security concern that nonimmigrant will be compartmentalized away from the investigation using administrative or criminal apprehension. A series of operational phases were developed during the anticipated three years of operations. The undercover school became operational in fall 2016 and is currently considered to be in Phase 1 of the operation, the enrollment of students to create a critical mass. Phase 2 is the targeting of criminal violators and using the operation to support other UC activities. Phase 3 includes the prosecution of criminal targets and administrative immigration charges against those aliens who engaged in fraud. ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████ Despite being located outside of Michigan, all of these schools have significant numbers of enrolled students authorized for CPT living and working within the Detroit AOR. In addition, HSI Detroit has identified and engaged in undercover email exchanges with a number of individuals who are student recruiters for a number of the above schools. Also, the Accrediting Counsel for Independent Colleges and Schools (ACICS) recent loss of U.S. Department of Education recognition has led to a large number of foreign students from ACICS schools to be no longer eligible for an 18 month post-graduation work authorization. As such, these students are frantically seeking out accredited schools that offer immediate work authorization, including the HSI Detroit undercover school. In the past month, UCAs have conducted nearly 20 monitored phone conversations and a number UC meets at the storefront,

███████████

including "walk-ins", with students with the desire to engage in fraud so they can "pay to stay and work" without going to school or obtaining an education.

In the next six months, UCAs will continue to pose as DSOs and conduct monitored phone calls and email communications with aliens seeking fraudulent immigration benefits. Numerous additional UC methods will be employed at the storefront, including audio/visual surveillance of meets. HSI Detroit intends to covertly engage suspects in incriminating conversations and acts with the goal of using that information to obtain arrest and search warrants, indictments, convictions, and removal of criminal aliens and those deemed threats to national security. The initial criminal violations include 18 U.S.C. § 1546 - Visa/Immigration Fraud, and 18 U.S.C. § 1343 - Wire Fraud, 18 U.S.C. § 1546 - Fraud and Misuse of visas, permits, and other documents and 18 U.S.C. § 1956 - Money Laundering.

Statutory Exemptions: 1, 2, 3, 4









**<u>SECURITY OF OPERATION:</u>**



All appropriate SOPs and HSI Directives are followed.













*Homeland Security Investigations*
*Office of the Executive Associate Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



U.S. Immigration
and Customs
Enforcement

SEP 0 1 2017

MEMORANDUM FOR:      Steve K. Francis
                     Special Agent in Charge, Detroit
                     Homeland Security Investigations

FROM:                Derek N. Benner
                     (A) Executive Associate Director
                     Homeland Security Investigations

SUBJECT:             ███████████████ – Approval and Certification

I have evaluated the request for reauthorization of ███████████. I have also considered
the recommendations of the Undercover Review Committee regarding this operation. The
proposal includes a request to exempt the project from certain laws and regulations pertaining to
government conduct (under the authority of 8 U.S.C. § 1363a and 19 U.S.C. § 2081, as
applicable) in the areas listed below. I find the actions authorized by statute are necessary for the
conduct of this undercover investigative operation in the Homeland Security Investigations
programmatic areas of ████████ Counter Terrorism/Criminal Exploitation, ████████
Identity & Benefit Fraud, and ████████████████ I hereby approve and certify
████████████ I authorize ████████████ to operate, while exempt from certain
United States laws and regulations, as allowed by the following statutory authority:

1.  8 U.S.C. § 1363a (a)(1) and 19 U.S.C. § 2081 (a)(1)(A)
    (Related to leasing space)

2.  8 U.S.C. § 1363a (a)(2) and 19 U.S.C. § 2081 (a)(1)(B)
    (Related to acquiring and operating proprietary businesses)

3.  8 U.S.C. § 1363a (a)(3) and 19 U.S.C. § 2081 (a)(2)
    (Related to depositing funds into banks)

4.  8 U.S.C. § 1363a (a)(4) and 19 U.S.C. § 2081 (a)(3)
    (Related to using proceeds to offset expenses)

This authorization to operate ████████████ expires on February 28, 2018.

www.ice.gov

**Date Submitted** : July 20, 2017

**Date of URC** : August 16, 2017

**Date of Inception** : February 11, 2002

**Name of Operation** : ███████

**Program Code** : ██

**Programmatic Area(s)** : ███████
Counter Terrorism/Criminal Exploitation
████████

**Location** : HSI Detroit
████████

**Ops Admin Supervisor** : ████████

**Operation Group Supervisor** : ████████

**Operation Program Manager** : ████████

**ULC** : ████████

**Undercover Operative(s)** : ████████

**CUFFS Administrator** : ████████

**Last UOU Field Review** : 07/17

**U.S. Attorney's Office(s)** : Eastern District of Michigan
████



**CUC OPLA Counsel**

**Offsite Location**

**Internet Web Site**

**Special Interest Aliens**

**DEA Designated ASAC**

**Open Cases**

**: Counter Terrorism/Criminal Exploitation** Eastern District of Michigan,

**SOU Coordination**

**Statutory Exemptions Requested:**

1. Use of appropriated funds to purchase/lease property, buildings, and other facilities in the United States, the District of Columbia and U.S. territories and possessions.
2. Establish or acquire proprietary corporations or business entities as part of the undercover operation, and to operate them on a commercial basis.

3. Deposit appropriated funds and/or proceeds in banks or other financial institutions.
4. Use proceeds from the undercover operation to offset necessary and reasonable expenses incurred in the operation.

## SENSITIVE CIRCUMSTANCES

**DHS**



**ICE**

█. Investigations and/or operations that continue ██████████ the first undercover activity.

█. ██████████████████████████████

█. ██████████████████████████████

█ ██████████████████████████████

█ The undercover operation will require the use of proceeds generated by the undercover operation to offset necessary and reasonable expenses incurred in the operation of the proprietary business.

█. The undercover operation will require the use of the statutory exemptions under 19 U.S.C. § 2081 and/or 8 U.S.C. § 1363a.

█. ██████████████████████████████

## UNDERCOVER ACTIVITY SUMMARY:



The expansion of Operation ███████ to include the Counter Terrorism/Criminal Exploitation programmatic area earlier in 2017 allows HSI Detroit to more efficiently identify student visa violators, recruiters and school administrators who unlawfully exploit the Student Exchange Visitor Information System (SEVIS) system as well as identify similar institutions that provide a comparable service through the exploitation and circumvention of SEVIS.

**OPERATIONAL RESULTS:**







## COUNTER TERRORISM/CRIMINAL EXPLOITATION

**Operation Paper Chase**
Eastern District of Michigan,

Operation Paper Chase is an investigation targeting Student and Exchange Visitor Program (SEVP) schools, Designated School Officials (DSO), and both legitimate and fraudulent institutions, immigration services businesses, employment agencies/consultancies, and other entities who fraudulently utilize the SEVP to endanger national security, commit visa fraud, smuggle and harbor illegal aliens for profit, launder money, and commit other violations of federal law. The primary UC investigative vehicle supporting the operation is a UC storefront operating as a State of Michigan licensed and nationally accredited private university. The storefront is located in a commercial office building in the greater metropolitan Detroit area and is staffed fulltime by HSI Detroit UCAs. The school also maintains a website and a significant and active social media presence. The UC methods target students who are already present in the U.S. and predisposed to the criminal activity so that the operation will not directly facilitate the entry of aliens. The covert efforts have resulted in numerous inquiries from students seeking to attend the undercover school without actually attending classes while receiving immediate work authorization in violation of numerous regulations governing the student visa programs and federal laws. All students who are enrolled at the school will be fully vetted, including criminal history checks and for JTTF interest, before any benefit is provided. If a student does appear to have immediate or national security concern that nonimmigrant will be compartmentalized away from the investigation using administrative or criminal apprehension. A series of operational phases were developed during the anticipated three years of operations. The undercover school became operational in fall 2016 and is currently considered to be in

Phase 1 of the operation, the enrollment of students to create a critical mass. Phase 2 is the targeting of criminal violators and using the operation to support other UC activities. Phase 3 includes the prosecution of criminal targets and administrative immigration charges against those aliens who engaged in fraud. ███████████████████████████████████████████████████████████████████████████████████████████████████

Despite being located outside of Michigan, all of these schools have significant numbers of enrolled students authorized for Curricular Practical Training (CPT) living and working within the Detroit AOR. In addition, HSI Detroit has identified and engaged in undercover email exchanges with a number of individuals who are student recruiters for a number of the above schools. Also, the Accrediting Counsel for Independent Colleges and Schools (ACICS) recent loss of U.S. Department of Education recognition has led to a large number of foreign students from ACICS schools to be no longer eligible for an 18 month post-graduation work authorization. As such, these students are frantically seeking out accredited schools that offer immediate work authorization, including the HSI Detroit undercover school. UCAs posing as DSOs have made hundreds of monitored phone calls with aliens seeking fraudulent immigration benefits. In addition, at least 50-videotaped meets have been conducted at the storefront. The CUC is in receipt of proceeds through this UC activity.

Over the next several months, Phase 1 efforts will continue as we transition to Phase 2, the targeting of primarily criminal violators. UC operations have already identified student recruiters who each have committed numerous violations of 18 U.S.C § 1546, Visa/Immigration Fraud, 8 U.S.C § 1424, Harboring, and 18 U.S.C § 1343, Wire Fraud. UCAs will continue to pose as DSOs and conduct monitored phone calls and email communications with aliens seeking fraudulent immigration benefits. Numerous additional UC methods will be employed at the storefront including audio/visual surveillance of meets. HSI Detroit intends to covertly engage suspects in incriminating conversations and acts with the goal of using that information to obtain arrest and search warrants, indictments, convictions, and removal of criminal aliens and those deemed threats to national security. The initial criminal violations include 18 U.S.C § 1546, Visa/Immigration Fraud, 18 U.S.C. § 1343, Wire Fraud, 18 U.S.C. § 1546, Fraud and Misuse of visas, permits, and other documents and 18 U.S.C. § 1956, Money Laundering.









**SECURITY OF OPERATION:**

All appropriate SOPs and HSI Directives are followed.

**SAFETY OF PERSONS:**















*Homeland Security Investigations*
*Office of the Executive Associate Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

MAR 0 6 2018



**U.S. Immigration and Customs Enforcement**

MEMORANDUM FOR:     Steve K. Francis
                    Special Agent in Charge, Detroit
                    Homeland Security Investigations

FROM:               Derek N. Benner
                    Deputy Executive Associate Director and
                    Senior Official Performing the Duties of the
                    HSI Executive Associate Director

SUBJECT:            ███████████████ – Approval and Certification

I have evaluated the request for reauthorization of ███████████  I have also considered the recommendations of the Undercover Review Committee regarding this operation. The proposal includes a request to exempt the project from certain laws and regulations pertaining to government conduct (under the authority of 8 U.S.C. § 1363a and 19 U.S.C. § 2081, as applicable) in the areas listed below. I find the actions authorized by statute are necessary for the conduct of this undercover investigative operation in the Homeland Security Investigations programmatic areas of ███████████ Counter Terrorism/Criminal Exploitation, ███████ Identity & Benefit Fraud, and ███████████████████████ I hereby approve and certify ███████████████ I authorize ███████████████ to operate, while exempt from certain United States laws and regulations, as allowed by the following statutory authority:

1. 8 U.S.C. § 1363a (a)(1) and 19 U.S.C. § 2081 (a)(1)(A)
   (Related to leasing space)

2. 8 U.S.C. § 1363a (a)(2) and 19 U.S.C. § 2081 (a)(1)(B)
   (Related to acquiring and operating proprietary businesses)

3. 8 U.S.C. § 1363a (a)(3) and 19 U.S.C. § 2081 (a)(2)
   (Related to depositing funds into banks)

4. 8 U.S.C. § 1363a (a)(4) and 19 U.S.C. § 2081 (a)(3)
   (Related to using proceeds to offset expenses)

This authorization to operate ███████████████ expires on August 31, 2018.

www.ice.gov

**Date Submitted**            : January 10, 2018

**Date of URC**               : February 21, 2018

**Date of Inception**         : February 11, 2002

**Name of Operation**         : ███████

**Program Code**              : █

**Programmatic Area(s)**      : ███████
Counter Terrorism/Criminal Exploitation
███████████████

**Office Location**           ███████████

**Operation Admin Overseer**  : ████████████████

**Operation Group Supervisor**  ████████████████

**Operation Program Manager**  ████████████████

**ULC**                       ████████████████

**Undercover Operative(s)**   ████████████████

**CUFFS Administrator**       ████████████████

**Last UOU Field Review**     : 07/17
                                          ███████



**U.S. Attorney's Office(s)** : Eastern District of Michigan

**CUC OPLA Counsel** :

**Offsite Location**

**Internet Web Site**

**Special Interest Aliens**

**DEA Designated ASAC** :

**Open Cases**

: **Counter Terrorism/Criminal Exploitation**
 EDMI, Southern Michigan,

**SOU Coordination** :

**Statutory Exemptions Requested:**

1. Use appropriated funds to purchase/lease property, buildings, and other facilities in the United States, the District of Columbia and U.S. territories and possessions
2. Establish or acquire proprietary corporations or business entities as part of the undercover operation, and to operate them on a commercial basis.

3. Deposit appropriated funds and/or proceeds in banks and other financial institutions.
4. Use proceeds from the operation to offset necessary and reasonable expenses incurred in the operation.

## SENSITIVE CIRCUMSTANCES

**DHS**



**ICE**

Investigations and/or operations that continue for ████████████ the first undercover activity.

The undercover operation will require the use of proceeds generated by the undercover operation to offset necessary and reasonable expenses incurred in the operation of the proprietary business.

The undercover operation will require the use of the statutory exemptions under 19 U.S.C. § 2081 and/or 8 U.S.C. § 1363a.

## UNDERCOVER ACTIVITY SUMMARY:



The Counter Terrorism/Criminal Exploitation programmatic area allows HSI Detroit to more efficiently identify student visa violators, recruiters and school administrators who unlawfully exploit the Student Exchange Visitor Information System (SEVIS) system, as well as identify similar institutions that provide a comparable service through the exploitation and circumvention of SEVIS.





**POTENTIAL INVESTIGATIONS AND UNDERCOVER ACTIVITY**





**COUNTER TERRORISM/CRIMINAL EXPLOITATION**

**Operation Paper Chase**
**, Eastern District of Michigan,**

Operation Paper Chase is an investigation targeting Student and Exchange Visitor Program (SEVP) schools, Designated School Officials (DSO), and both legitimate and fraudulent institutions, immigration services businesses, employment agencies/consultancies, and other entities who fraudulently utilize the SEVP to endanger national security, commit visa fraud, smuggle and harbor illegal aliens for profit, launder money, and commit other violations of federal law. The primary UC investigative vehicle supporting the operation is a UC storefront operating as a State of Michigan licensed and nationally accredited private university. The storefront is located in a commercial office building in the greater metropolitan Detroit area and is staffed fulltime by HSI Detroit UCAs. The school also maintains a website and a significant and active social media presence. The UC methods target students who are already present in the United States and predisposed to the criminal activity so that the operation will not directly facilitate the entry of aliens. The covert efforts have resulted in numerous inquiries from students seeking to attend the undercover school without actually attending classes while receiving immediate work authorization in violation of numerous regulations governing the student visa programs and federal laws. All students who are enrolled at the school will be fully vetted, including criminal history checks and for JTTF interest, before any benefit is provided. If a student does appear to have immediate or national security concern, that nonimmigrant will be compartmentalized away from the investigation using administrative or criminal apprehension. A series of operational phases were developed during the anticipated three years of operations. The undercover school became operational in fall 2016 and is currently considered to be in Phase 1 of the operation, the enrollment of students to create a critical mass. Phase 2 is the targeting of criminal violators and using the operation to support other UC activities. Phase 3 includes the prosecution of criminal

targets and administrative immigration charges against those aliens who engaged in fraud.  Since April 2014, HSI Detroit has identified and engaged in undercover email exchanges with individuals who are student recruiters for a number of the above schools.  UCAs posing as DSOs have made hundreds of monitored phone calls with aliens seeking fraudulent immigration benefits.  In addition, at least 50-videotaped meets have been conducted at the storefront.  The CUC is in receipt of proceeds through this UC activity.

Over the next several months, UC operations will continue Phase 2, targeting significant student recruiters.  UC operations have already identified student recruiters who each have committed numerous violations of 18 U.S.C § 1546, Fraud and misuse of visas, permits and other documents; 8 U.S.C § 1324, Bringing in and harboring certain aliens, and 18 U.S.C § 1343, Fraud by wire, radio, or television.  UCAs will continue to pose as DSOs and conduct monitored phone calls and email communications with aliens fraudulently seeking immigration benefits.  Numerous additional UC methods will be employed at the storefront including audio/visual surveillance of meets.  HSI Detroit intends to covertly engage suspects in incriminating conversations and acts with the goal of using that information to obtain arrest and search warrants, indictments, convictions, and removal of criminal aliens and those deemed threats to national security.  The initial criminal violations include 18 U.S.C. § 1343, Fraud by wire, radio, or television; 18 U.S.C. § 1546, Fraud and misuse of visas, permits, and other documents; and 18 U.S.C. § 1956, Laundering of monetary instruments.

No foreign undercover activity is anticipated at this time.









ll appropriate SOPs and HSI Directives are followed.











*Homeland Security Investigations*
*Office of the Executive Associate Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

SEP 1 0 2018



**U.S. Immigration
and Customs
Enforcement**

MEMORANDUM FOR:     Steve K. Francis
                    Special Agent in Charge, Detroit
                    Homeland Security Investigations

FROM:               Derek N. Benner
                    Deputy Executive Associate Director and
                    Senior Official Performing the Duties of the
                    HSI Executive Associate Director

SUBJECT:            ██████████████ – Approval and Certification

I have evaluated the request for reauthorization of ██████████. I have also considered the recommendations of the Undercover Review Committee regarding this operation. The proposal includes a request to exempt the project from certain laws and regulations pertaining to government conduct (under the authority of 8 U.S.C. § 1363a and 19 U.S.C. § 2081, as applicable) in the areas listed below. I find the actions authorized by statute are necessary for the conduct of this undercover investigative operation in the Homeland Security Investigations programmatic areas of ██████████, Counter Terrorism/Criminal Exploitation, ██████, Identity & Benefit Fraud, and ██████████████. I hereby approve and certify ██████████ I authorize ██████████ to operate, while exempt from certain United States laws and regulations, as allowed by the following statutory authority:

1.  8 U.S.C. § 1363a (a)(1) and 19 U.S.C. § 2081 (a)(1)(A)
    (Related to leasing space)

2.  8 U.S.C. § 1363a (a)(2) and 19 U.S.C. § 2081 (a)(1)(B)
    (Related to acquiring and operating proprietary businesses)

3.  8 U.S.C. § 1363a (a)(3) and 19 U.S.C. § 2081 (a)(2)
    (Related to depositing funds into banks)

4.  8 U.S.C. § 1363a (a)(4) and 19 U.S.C. § 2081 (a)(3)
    (Related to using proceeds to offset expenses)

This authorization to operate ██████████ expires on February 28, 2019.

www.ice.gov



# UNDERCOVER OPERATION
# REAUTHORIZATION REQUEST

**Date Submitted**            : July 25, 2018

**Date of URC**              : August 15, 2018

**Date of Inception**         : February 11, 2002

**Name of Operation**         : ███████████

**Program Code**             : ██

**Programmatic Area(s)**      : ████████████
Counter Terrorism/Criminal Exploitation
████████████████████████

**Office Location**           : HSI Detroit
██████████

**Operation Admin Overseer**    : ███████████████████

**Operation Group Supervisor**   : ████████████████████████

**Operation Program Manager**   : ████████████████████

**ULC**                     : ███████████████████

**Undercover Operative(s)**     : █████████████████████
████████████████████████
████████████████████████

**CUFFS Administrator**        : ████████████████

**Last UOU Field Review**       : 02/18

*Op*████████ *FOUO - Law Enforcement Sensitive*
*Page 1 of 16*

**U.S. Attorney's Office(s)** : Eastern District of Michigan

**CUC OPLA Counsel** :

**Offsite Location** :

**Internet Web Site**

**Special Interest Aliens** :

**DEA Designated ASAC** :

**Open Cases** :

: **Counter Terrorism/Criminal Exploitation**
 - OPERATION PAPER
CHASE,                        , EDMI,
Southern Michigan,

**SOU Coordination**

**Statutory Exemptions Requested:**

1. Use appropriated funds to purchase/lease property, buildings, and other facilities in the United States, the District of Columbia and U.S. territories and possessions
2. Establish or acquire proprietary corporations or business entities as part of the undercover operation, and to operate them on a commercial basis.
3. Deposit appropriated funds and/or proceeds in banks and other financial institutions.
4. Use proceeds from the operation to offset necessary and reasonable expenses incurred in the operation.

## SENSITIVE CIRCUMSTANCES

**DHS**



**ICE**

- Investigations and/or operations that continue ████████████ the first undercover activity.

- The undercover operation will require the use of proceeds generated by the undercover operation to offset necessary and reasonable expenses incurred in the operation of the proprietary business.
- The undercover operation will require the use of the statutory exemptions under 19 U.S.C. § 2081 and/or 8 U.S.C. § 1363a.

## UNDERCOVER ACTIVITY SUMMARY:



The Counter Terrorism/Criminal Exploitation programmatic area allows HSI Detroit to more efficiently identify student visa violators, recruiters and school administrators who unlawfully exploit the Student Exchange Visitor Information System (SEVIS) system, as well as identify similar institutions that provide a comparable service through the exploitation and circumvention of SEVIS.





**COUNTER TERRORISM/CRIMINAL EXPLOITATION**

█████████████, OPERATION PAPER CHASE
█████████████████, Eastern District of Michigan, █████████████████

Operation Paper Chase is an HSI Detroit  National Security Group (NSG) led investigation targeting Student and Exchange Visitor Program (SEVP) schools, Designated School Officials (DSO) and both legitimate and fraudulent institutions, immigration services businesses, employment agencies/consultancies, and other entities who fraudulently utilize the SEVP to endanger national security, commit visa fraud, smuggle and harbor illegal aliens for profit, launder money, and commit other violations of federal law.  The primary UC investigative vehicle supporting the operation is an undercover (UC) storefront operating as a State of Michigan licensed and nationally accredited private university.  The storefront is in a commercial office building in the greater metropolitan Detroit area and is staffed fulltime by HSI Detroit UCAs.  The school also maintains a website and a significant and active social media presence.  The identification of students seeking to solely maintain their immigration status and obtain work authorization is being conducted using a variety of methods: the analysis of SEVP student data is used to identify patterns of enrollment consistent with past fraud, UCAs visiting online forums frequented by foreign students, and targeted marketing on known social media platforms that engage in criminal activity. These initial methods also ensure that the students are already present in the United States and predisposed to the criminal activity so that the operation will not directly facilitate the entry of aliens.  However, there remains the likelihood that operations will have a foreign nexus, including phone calls, emails, financial transactions, and travel.  This undercover activity will be closely coordinated with the appropriate U.S. law enforcement representatives in the countries or regions where they occur. The covert efforts have resulted in numerous inquiries from students seeking to attend the undercover school without actually attending classes, while receiving immediate work authorization in violation of

numerous regulations governing the student visa programs and federal laws. All students who are enrolled at the school will be fully vetted, including criminal history checks and for JTTF interest, before any benefit is provided. If a student does appear to have immediate or national security concern, that nonimmigrant will be compartmentalized away from the investigation using administrative or criminal apprehension. Additionally, HSI Detroit expects to further identify and seize criminal assets and eliminate national security threats by dismantling criminal organizations that allow non-immigrants to obtain immigration status fraudulently and operate within the U.S. with impunity. At the start of the operation and in conjunction with the U.S. Attorney's Office for the Eastern District of Michigan, a series of operational phases were developed during the anticipated three years of operations including: Phase 1, enrollment of students to create a critical mass, Phase 2, targeting of criminal violators and using the operation to support other UC activities, and Phase 3 which includes the prosecution of criminal targets and administrative immigration charges against those aliens who engaged in fraud. In January 2018, Phase 1 was deemed complete. Current enrollment exceeds 600 students. Efforts continue to restrict further growth. Phase 2 is now focusing on the identification of criminal actors, both individuals and entities. We currently have 7 recruiters deemed criminal targets. They are collectively responsible for approximately 400 enrolled students and have been paid over $80,000 in POE. We also have a student who is an alien member of the U.S. Army under the MAVSI (Military Accessions Vital to National Interests) program, which allows for accelerated naturalization. Prosecution for attempted naturalization fraud has been accepted.

In addition, HSI Detroit has identified and engaged in undercover email exchanges with a number of individuals who were student recruiters for a number of the above schools. They have provided detailed accounts what is actually required of students in these programs: Curriculum Practical Training (CPT) authorization on Day 1, lack of attendance does not affect SEVIS status, etc. In addition, the continuing issues surrounding the Accrediting Counsel for Independent Colleges and Schools (ACICS) has led to a large number of foreign students from ACICS schools to be no longer eligible for an 18-month post-graduation science, technology, engineering and math (STEM) work authorization. As such these, students are frantically seeking out accredited schools that offer immediate work authorization, including the HSI Detroit undercover school. In the past month, UCAs have conducted hundreds of monitored phone conversations and a number UC meets at the storefront, including "walk-ins", with students seeking Day 1 CPT with the desire to engage in fraud so they can "pay to stay and work" without going to school or obtaining an education. The UC University had a large volume of requests from students for fraudulent academic transcripts and attendance records to reply to the increased issuance by U.S. Citizenship and Immigration Services (USCIS) of Notice of Intent to Deny their H1B visa adjustment applications.

HSI Detroit anticipates continuance of Phase 2 through the next six months, during which, UCAs will continue to pose as DSOs and conduct monitored phone calls and email communications with aliens seeking fraudulent immigration benefits. Numerous additional UC methods will be employed at the storefront, including audio/visual surveillance of meets. HSI Detroit intends to covertly engage suspects in incriminating conversations and acts with the goal of using that information to obtain arrest and search warrants, indictments, convictions,

and removal of criminal aliens and those deemed threats to national security.  The initial criminal violations include 18 U.S.C. § 371, Conspiracy, 18 U.S.C. § 1546, Fraud and misuse of visas, permits, and other documents, 18 U.S.C. § 1343, Fraud by wire, radio, or television, and 18 U.S.C. § 1956, Laundering of monetary instruments.

No foreign undercover activity is anticipated at this time.











██████████████████ ██████████████All appropriate
SOPs and HSI Directives are followed.











Homeland Security Investigations
Office of the Executive Associate Director

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

MAR 1 5 2019



**U.S. Immigration and Customs Enforcement**

MEMORANDUM FOR:    Steve K. Francis
Special Agent in Charge, Detroit
Homeland Security Investigations

FROM:    Derek N. Benner
Executive Associate Director
Homeland Security Investigations

SUBJECT:    ███████████ – Approval and Certification

I have evaluated the request for reauthorization of ███████████ I have also considered the recommendations of the Undercover Review Committee regarding this operation. The proposal includes a request to exempt the project from certain laws and regulations pertaining to government conduct (under the authority of 8 U.S.C. § 1363a and 19 U.S.C. § 2081, as applicable) in the areas listed below. I find the actions authorized by statute are necessary for the conduct of this undercover investigative operation in the Homeland Security Investigations programmatic areas of ███████████ Counter Terrorism/Criminal Exploitation, ██████ Identity & Benefit Fraud, and ███████████ I hereby approve and certify ███████████. I authorize ███████████ to operate, while exempt from certain United States laws and regulations, as allowed by the following statutory authority:

1.    8 U.S.C. § 1363a (a)(1) and 19 U.S.C. § 2081 (a)(1)(A)
(Related to leasing space)

2.    8 U.S.C. § 1363a (a)(2) and 19 U.S.C. § 2081 (a)(1)(B)
(Related to acquiring and operating proprietary businesses)

3.    8 U.S.C. § 1363a (a)(3) and 19 U.S.C. § 2081 (a)(2)
(Related to depositing funds into banks)

4.    8 U.S.C. § 1363a (a)(4) and 19 U.S.C. § 2081 (a)(3)
(Related to using proceeds to offset expenses)

This authorization to operate ███████████ expires on August 31, 2019.

www.ice.gov



# UNDERCOVER OPERATION
# REAUTHORIZATION REQUEST

**Date Submitted** : January 9, 2019

**Date of URC** : February 20, 2019

**Date of Inception** : February 11, 2002

**Name of Operation** : █████████

**Program Code** : ███

**Programmatic Area(s)** : ██████████
Counter Terrorism/Criminal Exploitation
████████
██████████
█████████████

**Office Location** : HSI Detroit
████████
███████
█████████

**Operation Admin Overseer** : ███████████████████████

**Operation Group Supervisor** : ████████████████████████

**Operation Program Manager** : ██████████████████████

**ULC** : ███████████████████
███████████████████

**Undercover Operative(s)** : █████████████████████
███████████████████████
██████████████████████
██████████████████████
████████████████████████
████████████████████████

**CUFFS Administrator** : ████████████████████
███████████

**Last UOU Field Review** : 08/18

**U.S. Attorney's Office(s)** : Eastern District of Michigan

**CUC OPLA Counsel**

**Offsite Location**

**Internet Web Site** : Yes. www.universityoffarmington.edu CTCEU,

**Special Interest Aliens**

**DEA Designated ASAC**

**Open Cases**

: **Counter Terrorism/Criminal Exploitation**
 ▮▮▮▮ - OPERATION PAPER
CHASE,▮▮▮▮▮▮▮, EDMI,
Southern Michigan, ▮▮▮▮▮



████████████████████████████

**SOU Coordination** ▉ ████████████████

**Statutory Exemptions Requested:**

1. Use appropriated funds to purchase/lease property, buildings, and other facilities in the United States, the District of Columbia and U.S. territories and possessions
2. Establish or acquire proprietary corporations or business entities as part of the undercover operation, and to operate them on a commercial basis.
3. Deposit appropriated funds and/or proceeds in banks and other financial institutions.
4. Use proceeds from the operation to offset necessary and reasonable expenses incurred in the operation.

## <u>SENSITIVE CIRCUMSTANCES</u>

**DHS**

- ███████████████████████████████
- ██████████████████████████████
- ██████████████████████████████
- ████████████████████████
- ██████████
- ███████████████████████████████
- █████████████

**ICE**

- Investigations and/or operations that continue ██████████████████ the first undercover activity.
- ███████████████████████████████
  ██████████████████
- ████████████████████████████████
  ████████████████████████████████
  ███████████████████████████
  █████████████████████
- ████████████████████████████████
  ███████████████
- The undercover operation will require the use of proceeds generated by the undercover operation to offset necessary and reasonable expenses incurred in the operation of the proprietary business.
- The undercover operation will require the use of the statutory exemptions under 19 U.S.C. § 2081 and/or 8 U.S.C. § 1363a.

*Op*████████*FOUO - Law Enforcement Sensitive Page 3 of 19*

**UNDERCOVER ACTIVITY SUMMARY:**

The Counter Terrorism/Criminal Exploitation programmatic area allows HSI Detroit to more efficiently identify student visa violators, recruiters and school administrators who unlawfully exploit the Student Exchange Visitor Information System (SEVIS) system, as well as identify similar institutions that provide a comparable service through the exploitation and circumvention of SEVIS.



*Op* ▆▆▆▆▆ *FOUO - Law Enforcement Sensitive Page 5 of 19*



**COUNTER TERRORISM/CRIMINAL EXPLOITATION**

██████████████ **OPERATION PAPER CHASE**
██████████████████, **Eastern District of Michigan,** ██████████████

Operation Paper Chase is an HSI Detroit National Security Group (NSG) led investigation

*Op*████████████ *FOUO - Law Enforcement Sensitive Page 6 of 19*

targeting Student and Exchange Visitor Program (SEVP) schools, Designated School Officials (DSO) and both legitimate and fraudulent institutions, immigration services businesses, employment agencies/consultancies, and other entities who fraudulently utilize the SEVP to endanger national security, commit visa fraud, smuggle and harbor illegal aliens for profit, launder money, and commit other violations of federal law. The primary UC investigative vehicle supporting the operation is an undercover (UC) storefront operating as a State of Michigan licensed and nationally accredited private university. The storefront is in a commercial office building in the greater metropolitan Detroit area and is staffed fulltime by HSI Detroit UCAs. The school also maintains a website and a significant and active social media presence. The identification of students seeking to solely maintain their immigration status and obtain work authorization is being conducted using a variety of methods: the analysis of SEVP student data is used to identify patterns of enrollment consistent with past fraud, UCAs visiting online forums frequented by foreign students, and targeted marketing on known social media platforms that engage in criminal activity. These initial methods also ensure that the students are already present in the United States and predisposed to the criminal activity so that the operation will not directly facilitate the entry of aliens. However, there remains the likelihood that operations will have a foreign nexus, including phone calls, emails, financial transactions, and travel. This undercover activity will be closely coordinated with the appropriate U.S. law enforcement representatives in the countries or regions where they occur. The covert efforts have resulted in numerous inquiries from students seeking to attend the undercover school without attending classes, while receiving immediate work authorization in violation of numerous regulations governing the student visa programs and federal laws. All students who are enrolled at the school will be fully vetted, including criminal history checks and for JTTF interest before any benefit is provided. If a student does appear to have immediate or national security concern, that nonimmigrant will be compartmentalized away from the investigation using administrative or criminal apprehension. Additionally, HSI Detroit expects to further identify and seize criminal assets and eliminate national security threats by dismantling criminal organizations that allow non-immigrants to obtain immigration status fraudulently and operate within the U.S. with impunity. At the start of the operation and in conjunction with the U.S. Attorney's Office for the Eastern District of Michigan, a series of operational phases were developed during the anticipated three years of operations including: Phase 1, enrollment of students to create a critical mass, Phase 2, targeting of criminal violators and using the operation to support other UC activities, and Phase 3 which includes the prosecution of criminal targets and administrative immigration charges against those aliens who engaged in fraud. In January 2018, Phase 1 was deemed complete. Current enrollment exceeds 600 students. Enrollment has closed, and the school has stopped accepting students. Phase 2 is complete and HSI Detroit has identified eight brokers who recruited students to the university. The brokers have received fees both from the students and the university and one broker has recruited nearly 400 students. To date, UCAs have paid the brokers approximately $120,000 in Payment of Evidence (POE) as part of the conspiracy. In addition, one broker has received nearly $180,000 in Money Laundering (MLD) points after taking a portion of the student's tuition fees as payment. Currently, HSI Detroit is planning for the implementation of Phase 3 which will include a nationwide enforcement action scheduled for January 30, 2019. The operation will involve the federal criminal arrest of 8 to 10 targets and the administrative arrest of approximately 750 aliens located in 38 states. This number includes both current students and those who have been terminated. Aliens who have transferred to another school or who have a received H1B status will be evaluated on a case by case basis by each local office in

consultation with OPLA to determine if they are amenable to removal proceedings.

In March 2019, agents will work in an undercover capacity with students who continue to provide information on other student recruiter targets and other suspect universities involved in alleged criminal activities. Agents have also identified an alleged marriage fraud ring and will continue to communicate with identified targets in an undercover capacity using undercover assets.  The initial criminal violations include 18 U.S.C. § 371, Conspiracy, 18 U.S.C. § 1546, Fraud and misuse of visas, permits, and other documents, 18 U.S.C. § 1343, Fraud by wire, radio, or television, and 18 U.S.C. § 1956, Laundering of monetary instruments.

No foreign undercover activity is anticipated at this time.



*Op* ████████ *FOUO - Law Enforcement Sensitive Page 9 of 19*



[redacted]

*Op Sand Dollar FOUO - Law Enforcement Sensitive Page 11 of 19*



*Op* **FOUO - Law Enforcement Sensitive Page 12 of 19**



All appropriate SOPs and HSI Directives are followed.





*Op██████████ FOUO - Law Enforcement Sensitive* Page 15 of 19



***Op*** **▬▬▬▬▬** ***FOUO - Law Enforcement Sens***



***Op*** *FOUO - Law Enforcement Sensitive Page 17 of 19*

